1  **BERNSTEIN LITOWITZ BERGER**
2    **& GROSSMANN LLP**
   JONATHAN D. USLANER (Bar No. 256898)
3  (jonathanu@blbglaw.com)
   2121 Avenue of the Stars, Suite 2575
   Los Angeles, CA 90067
4  Tel: (310) 819-3481

5  *Counsel for Plaintiff Iron Tribe Fitness*

6  [Additional counsel on signature page.]

7

8

9

10  **UNITED STATES DISTRICT COURT**

11  **NORTHERN DISTRICT OF CALIFORNIA**

12  IRON TRIBE FITNESS, on behalf of itself     Case No.  3:25-cv-3281
   and all others similarly situated,
13                                **CLASS ACTION COMPLAINT**
14            Plaintiff,
                              DEMAND FOR JURY TRIAL
15        v.
                              **ECF CASE**
16  META PLATFORMS, INC.,

17            Defendant.

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................... 1

II.     JURISDICTION AND VENUE ............................................................... 3

III.    PARTIES ................................................................................................... 3

    A.    Plaintiff ................................................................................... 3

    B.    Defendant ............................................................................... 3

IV.     FACTUAL ALLEGATIONS ...................................................................... 4

    A.    Facebook's Advertisement Auctions ................................... 4

    B.    Facebook Unfairly Overcharged Advertisers ..................... 9

    C.    Facebook's Contract With Plaintiff and the Class ............. 12

V.      CLASS ACTION ALLEGATIONS ......................................................... 13

VI.     CLAIMS FOR RELIEF .......................................................................... 15

VII.    PRAYER FOR RELIEF .......................................................................... 19

VIII.   JURY DEMAND ..................................................................................... 19

Plaintiff Iron Tribe Fitness ("Iron Tribe"), by and through the undersigned counsel, alleges the following against Defendant Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta" or the "Company," also referred to herein as "Facebook" as the underlying events arose in connection with the Company's Facebook social media platform), and asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of Section 17200 of the California Business and Professions Code, and unjust enrichment, on behalf of itself and a Class (defined herein) of similarly situated Facebook advertisers.

## I.    INTRODUCTION

1.      For over four years, Facebook systematically overcharged advertisers, reaping billions of dollars in illicit profits.

2.      The overcharges occurred because Facebook used a flawed "blended price" auction process to price and implement advertisements instead of the "second price" auction process it purported to use.  To calculate the price paid by the auction winner in a "second price" auction, the winning "first" bid is excluded and the winning bidder's cost is the amount of the second-highest bid.  Although that is the process that Facebook purported to use, during the Class Period (defined herein) Facebook instead operated a "blended price" auction: the cost charged to the winning bidder was a blend of the highest "first" bid and the second-highest bid.  The result was an overcharging of winning bidders, who paid higher prices than they would have under a "second price" auction.

3.      As an illustrative example, suppose Alice and Bob bid for a book.  Alice bids $100 and Bob bids $50.  In a "first price" auction, Alice wins and pays $100.  In a "second price" auction (which Facebook claimed to use), Alice wins but pays only $50: the amount needed to displace the "second price" bid.  One benefit of a "second price" auction is that bidders can safely bid their true value without risking overpayment:  Alice could have bid $150 or more and still would win and pay just $50.  In contrast, in a "blended price" auction (which Facebook actually used), Alice wins but pays a "blended price" between her $100 "first price" and Bob's $50 "second price."  In a "blended price" auction, Alice's high bid is not excluded, so the price she pays increases from

the $50 "second price" to the higher "blended price."  Facebook purported to use a "second price" auction, but instead used a "blended price" auction.

4.      Facebook's "blended price" auction process led to overcharges of advertisers in two ways.  First, Facebook's process mechanically inflated the prices paid by the winning bidders, because Facebook's auction calculations included the winning bids from advertisers when they should have excluded those bids.

5.      Second, because Facebook purportedly operated a "second price" auction process, advertisers were incentivized to bid high given the expected protection against overbidding. Because Facebook's process was supposed to exclude the highest bids from the price paid by advertisers, advertisers could submit higher bids than they otherwise would, confident that the actual price they paid would not be based on the highest submitted bids.

6.      Thus, Facebook's auction process exacerbated the harm to advertisers.  By hiding the fact that the highest bids impacted the price advertisers paid, Facebook elicited higher bids from advertisers than advertisers otherwise would have submitted.  Then, Facebook secretly calculated and charged higher prices based on those higher bids.

7.      Facebook engineers changed the auction process in a 2013 update to the software code used to run Facebook's advertisement auctions.  This update introduced the "blended price" auction with no disclosure to advertisers.  Facebook personnel noted an immediate, material spike in advertising revenues following the implementation of that update.

8.      In 2016 and 2017, Facebook engineers ran numerous experiments to try to understand the auction process better.  By no later than September 2016, Facebook engineers had identified a pricing disparity impacting the amount that Facebook charged advertisers.  A PowerPoint presentation discussing that pricing disparity referred to "individual examples where pricing doesn't make sense" and noted "we cannot explain the pricing."

9.      Facebook advertisers were not informed of the overcharges, which have never been publicly disclosed.  The hidden "blended price" auction made it impossible for advertisers to uncover the overcharges.

10.    When Facebook engineers finally identified the source of the overcharges in late 2017, tracking it to a single line of code from that 2013 update, the Company did not immediately correct the auction process.  Instead, to keep the overcharges secret, Facebook slow-rolled the correction, applying it initially to just 2% of advertisers.

11.    Kurt Runke, then Facebook's Director of Auction and Delivery Science, quantified the impact of that 2013 coding change at "$1B a year."  During the Class Period, that amounted to roughly $4 billion in excess, illicit advertising revenues for Facebook, at the expense of its own customers.

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over the causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed Class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative Class, and at least one Class member is a citizen of a different state than Meta.

13.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because under the agreements between Plaintiff and Defendant, the parties consented to submit to the jurisdiction of this District. In addition, actions that Facebook undertook that give rise to the claims asserted herein occurred in the Menlo Park, California headquarters of Facebook, which is located in this District.

## III.    PARTIES

### A.    Plaintiff

14.    Plaintiff Iron Tribe is a fitness company incorporated under the laws of the State of Delaware and with its headquarters in Mount Pleasant, South Carolina.  Iron Tribe advertised on Facebook through its advertising auction process during the Class Period, and was damaged thereby.

### B.    Defendant

15.    Defendant Meta operates the world's largest family of social networking sites. These social networking platforms include Facebook, which is accessible via a webpage and via

mobile applications, and Instagram.  Meta is incorporated under the laws of the State of Delaware, with its principal place of business in Menlo Park, California.

## IV.    FACTUAL ALLEGATIONS

### A.    Facebook's Advertisement Auctions

16.    During the Class Period, Facebook purportedly used a version of the "second price" auction process for pricing advertisements and determining which ads were shown to which users, and where in the user's "feed" a given advertisement appeared.   The type of auction process purportedly used by Facebook at the relevant time is often referred to as a "Vickrey-Clarke-Groves (VCG) auction."  For example, a 2014 peer-reviewed publication stated that "Facebook uses a Vickrey-Clarke-Groves (VCG) auction."  Hal R. Varian & Christopher Harris, *The VCG Auction in Theory and Practice*, 104 Am. Econ. Rev.: Papers & Proc. 442-45 (2014), available at https://courses.cs.washington.edu/courses/cse490z/20sp/slides/Varian.pdf.   This is sometimes referred to as a "generalized second price auction."  Indeed, there was extensive academic and popular reporting on Facebook's auction process and methodology during the Class Period.  *See, e.g.*, Cade Metz, *Facebook Doesn't Make as Much Money as It Could—On Purpose*, *Wired* (Sept. 21, 2015), https://www.wired.com/2015/09/facebook-doesnt-make-much-money-couldon-purpose (last visited Mar. 13, 2025) (describing Facebook's use of the VCG auction); Clark Boyd & Ximena Sanchez, *Breaking Down the Facebook Auction*, 6 J. of Dig. & Soc. Media Mktg. 160-67 (2018), https://hstalks.com/article/2120/breaking-down-the-facebook-auction (last visited Mar. 13, 2025).  Facebook's modification of the VCG auction reduced some of the computational complexity of a true VCG auction while it preserved the "second price" feature of its auction process, meaning that winning bids should not have been used in calculating the price the winning advertiser would pay.

17.    Accordingly, the process by which the Facebook advertising auction was supposed to work was well known to Facebook advertisers.  In simple terms, it was widely understood that Facebook's "second price" auction protected advertisers against being overcharged when they submitted high bids, because their winning bids would not be used to calculate the price paid.

18.     For a Facebook customer seeking to place an advertisement, Facebook offered the ability to specify the types of users targeted by the ad, including by demographic factors (age, gender, location, etc.) and areas of interest (such as basketball fans, or knitters).  Facebook referred to this as "Targeting," and a given advertiser could combine demographic factors and interests to define their target audience (such as 18-19 year old men in Minnesota who are fans of hockey, or every woman in the United States who enjoys jazz).  For any given user, there would be tens of thousands of potential advertisements for which that user fit the Targeting factors.

19.     The auction system also enabled advertisers to specify the desired interaction with the user.  Facebook referred to this as a "Primary Objective."  Possible objectives included "reach" or "impressions" (simply exposing the user to the advertisement), "clicks" (having the user click the advertisement to visit a website), or "conversions" (having the user click the advertisement to make a purchase or other transactions).

20.     The third element of the auction process was the price.  This could be determined by the customer's use of a bid or a budget.

21.     Bids and budgets enabled advertisers to define the constraints under which the Facebook advertising auction system would work for that particular advertiser.  Bids and budgets were mechanisms for Facebook advertisers to both specify how much they value a particular objective, and to place a constraint on the total amount to be spent on the advertising campaign. Facebook provided two primary mechanisms to do so.

22.     First, advertisers could state a maximum bid for a particular objective.  Those bids could be a flat bid for a number of impressions, or a fixed amount for a particular objective (such as $10 for the installation of an application, or $0.30 for each user who clicks the ad to open a website).   When an advertiser stated that they were willing to spend $10 per application installation, what they were effectively telling Facebook was:  "We are willing to accept any number of installations until such time that the cost is greater than $10 / installation."

23.     Second, advertisers could state a maximum budget (say $1 million) and a time period (say 1 week) and ask Facebook to maximize the number of objectives (impressions, clicks

or conversions) among the targeted users within those budgetary constraints. To implement auction bids for budget constrained advertisers, Facebook provided an automatic bidder ("autobid"), a dynamic control system that attempted to ensure that the advertiser's budgets were spent efficiently. Eventually, for each ad, an advertiser's bid would either be computed by Facebook (in the case of autobids) or input by the advertiser.

24.     In addition to the factors determined by the advertising customer, Facebook added to the auction process what it referred to as an "organic" bid component. The organic bid component was designed to capture the value to the user of seeing the ad from the advertiser and thereby strike a balance between enabling advertisers to target desirable users and ensuring that ads in a user's "news feed" were relevant and of interest to the user.

25.     A given user would typically meet the targeted characteristics of multiple advertisers, with potentially tens of thousands of ads competing for a premium placement in that user's news feed. To determine which ads were shown to a given user (and where each ad was placed in the news feed), Facebook used a formula that took into account the bid specified by the advertiser, the probability of conversion, and the "organic" bid component determined by Facebook. That organic bid component was assigned a dollar value, reflecting the advertisement's value to the user.

26.     The auction process involved a comparison of competing bids, meaning bids that targeted the same Facebook user). A simplified example of such a comparison is below:

|  | Advertiser A | Advertiser B |
|---|---|---|
| Bid for Conversion | $2 | $1.5 |
| Probability of Conversion | 50% | 60% |
| Organic Bid | $1 | $0.5 |
| Total Bid | $(2 x 0.5) + $1 = $2 | $(1.5 x 0.6) + 0.5 = $1.4 |

27.    As reflected in the chart, each bid would be multiplied by the probability of achieving conversion and then added to the organic bid component.  The result would give Advertiser A a Total Bid of up to $2 per conversion, and Advertiser B a Total Bid of up to $1.40. Advertiser A would have won this auction with a $2 bid, beating Advertiser B's $1.40 bid.

28.    However, Advertiser A would not have paid Facebook $2 per conversion in this example.  Instead, Advertiser A would pay only $1.40 (or slightly above), just enough to displace Advertiser B's Total Bid of $1.40.  (Because Advertiser A's ad had an organic bid component of $1, meaning it delivered $1 of value to the user, and therefore to Facebook, Advertiser A would pay the value of Advertiser B's bid less the organic bid component of Advertiser A's ad:  $1.40 - $1.00 = $0.40.)  In other words, Advertiser A would pay Advertiser B's "second price," not Advertiser A's own, higher price.

29.    In contrast, if the auction process instead provided that Advertiser A would pay an amount per conversion that depended on its own bid as well as Advertiser B's second-best bid, then Advertiser A would pay a higher price.  For example, if the auction process provided that Advertiser A would pay the average of the two bids, then Advertiser A would pay $1.75 instead of $1.40 (the half-way point between $1.40 and $2).  A "weighted average" or "blended" auction process would result in Advertiser A paying more than it would pay in a "second price" auction.

30.    Importantly, the "second price" auction process would inherently protect bidders from overbidding.  Advertiser A could bid $2 (or more), confident that it would only be charged the amount needed to displace the second-highest bid ($1.40).  This implicit feature of the Facebook auction system encouraged customers to bid their "true" bid—the maximum they were willing to pay—ostensibly without risk of overbidding.  A "weighted average" or "blended" auction process would not provide the same protection and instead would systematically overcharge advertisers who submitted high, winning bids.  Facebook's purported use of a modified VCG auction created incentives for advertisers to submit high bids, given the inherent protections offered by the VCG mechanism.  But, because Facebook's auction was not operating as a "second-

price" auction, that protection was absent and the higher advertisers bid, the higher price Facebook charged them.

31.     All of this was invisible to the Facebook user.  Upon opening the Facebook mobile app or launching Facebook on a web browser, the user was presented with their news feed. Interspersed among the posts from friends or items selected by Facebook's algorithm were the advertisements selected through Facebook's auction process.  Ads shown to users earlier in their news feeds were deemed more valuable, with ads placed in lower slots (and thus only shown to users if they continued to scroll through their news feeds) were thus supposed to be discounted, based on their placement in the news feed.

32.     Facebook's purported second price auction process was summarized and contrasted with Google's advertising auction process, in an article in *Wired* magazine, published in the midst of the Class Period:

> With Google's system, based on what's called a "generalized second price auction," advertisers bid for a spot on the page when someone searches for a particular keyword. The winning bidder gets to place an ad for the price bid by the next highest bidder. Or at least, that's the gist. Bids are weighted according to ad relevance and other factors. But with its VCG auction, Facebook adds a different element. It calculates price according to how much value is lost from the rest of the system if the ad lands on the page. This value is a mix of how much other advertisers bid for placement and how relevant the ad is to the particular situation at hand.[1]

33.     That same article quoted John Hegeman, then Facebook's Chief Economist:

> If you're an advertiser and you're getting a chance to show your ad, you're going to take away the opportunity from someone else. The price can be determined based on how much value is being displaced from those other people. An advertiser will only win this placement if their ad really is the most relevant, if it really is the best ad to show to this person at this point in time.[2]

---

[1] Metz, *Facebook Doesn't Make as Much Money as It Could—On Purpose*, *Wired* (Sept. 21, 2015).
[2] *Id.*

**B.    Facebook Unfairly Overcharged Advertisers**

34.    During the Class Period, Facebook's auction process did not operate as a second price auction. A single line of code during an update implemented in 2013 caused Facebook's auction system to systematically overcharge advertisers using a "blended price" between the first and second bids. The auction process failed to exclude the winning bid in the calculation of charges for advertisements sold on Facebook properties (other than at Instagram, which had a separate auction process).

35.    Facebook's advertising system, during the Class Period, had three important stages: adindexer, adfinder, and multifeed. The 2013 software update impacted the multifeed stage of the auction system, which determined the pricing of advertisements.

36.    The impact of the 2013 software update was immediately evident to Facebook, although it was hidden from advertisers. The update caused a material increase in advertising revenues, which Facebook engineers could not explain. Facebook engineers questioned the revenue spike at that time, but it was not investigated for several years.

37.    Internal Facebook documents reflect that, by 2016, Facebook was investigating pricing irregularities in its advertising auction process. For example, a September 2016 PowerPoint presentation, in a section titled "Bids vs Charges," discussed the pricing anomalies being observed. Notes in that presentation stated that "we cannot explain the pricing" and "[t]here is something weird in the alternate best gain computation in multi-feed."

38.    That PowerPoint presentation documented an experiment that compared the same advertisement bids being placed on Facebook versus Instagram (which Facebook owned, and which used a rewritten auction process). The results of that experiment showed significant cost disparities between advertisements placed on Facebook compared to Instagram.

39.    The PowerPoint presentation depicted dramatic differences between the prices that advertisers ultimately paid for precisely the same bids on Instagram versus Facebook. On Instagram, where a second price auction process was in effect, advertisers ultimately paid roughly the same amount regardless of whether they bid $100 CPM, $200 CPM, $300 CPM, or $400 CPM.

The prices they paid hewed closely together.  But on Facebook, advertisers paid progressively higher prices as their bids increased:  more for $200 CPM than for $100 CPM, more for $300 CPM than for $200 CPM, and so on.

40.    Simply put, Facebook unfairly overcharged advertisers, as shown below:





41.    Note that the top chart depicts a single line for the range of Instagram bids:  the price the advertisers paid was independent of their bids.  They could safely bid $400 instead of $100 and still pay just the "second price" bid, because their winning bid was excluded from the price calculation.  In contrast, the bottom chart depicts four varying lines for the range of Facebook bids:  the price the advertisers paid was correlated with their bids.  If they bid $400, they would pay more than if they bid $300 or less, even if the "second price" was the same.

42.     The PowerPoint presentation stated that the individual pricing results did not "make sense."

43.     The final slide in the "Bids vs Charges" section of the PowerPoint presentation addressed the scale of the pricing disparity, in terms of its impact on Facebook advertising revenues, and noted that "we cannot explain the pricing."

44.     To discuss their work and seek input from colleagues, the engineers leading the effort to correct the pricing disparity created a new discussion group on the internal "Facebook Workplace" forum, which they named "Pay What You Bid."  The "Pay What You Bid" discussion group was used to post the results of experiments, solicit input and answer questions from other engineers.

45.     Facebook engineers continued to run pricing experiments through the Third Quarter of 2017, in an effort to locate the source of the overcharges, and correct them.

46.     The engineers ultimately described the key line of code, introduced in the 2013 update, that was preventing the auction from functioning as intended, and their other findings to senior executives, including Facebook's then Director of Engineering, Chinmay Karande. Facebook then took steps to quantify the size of the overcharges and the impact on Facebook revenues of correcting the auction process.

47.     First, after running multiple experiments to quantify the revenue impact, Facebook engineers estimated that correcting the auction process would materially impact revenues.  In response to this finding, the engineers then ran more conservative tests.  Those tests showed that Facebook's auction process impacted nearly all Facebook advertisers, and that the revenue impact was between 0.5% to 2.5% of Facebook's 2016 advertising revenues, which totaled $27 billion, amounting to an impact of roughly $135 million to $675 million for fiscal year 2016.

48.     The second follow-up step was to develop a launch plan for correcting the pricing disparity.  Facebook determined that simply reverting to a correct auction process would be so significant that doing so would destabilize the entire Facebook advertisement auction system, and could require disclosure to Facebook investors.  Instead of simply correcting the auction process

for all advertisers, in order to protect its own interests and prevent discovery of the overcharging, Facebook instead launched a slow rollout of the correction.

49.    For example, in a September 14, 2017, email, Chinmay Karande, then Facebook's Director of Engineering, wrote "We agree on a (possibly slow) rollout timeline" and instructed his team to "Find a way to do 'slow' rollout."

50.    Facebook engineers initially corrected the auction process to reduce overcharges for just 2% of advertisers, and gradually expanded the change to 100% of users over a period of time.

51.    This slow rollout of the correction was done specifically to conceal the overcharges from advertisers, and to avoid impacting the auction equilibrium.  Indeed, Facebook never disclosed the fact that it had systematically overcharged advertisers throughout the Class Period. Facebook never took any steps to compensate advertisers, and instead unfairly retained the massive overpayments to boost its own revenues.

52.    The overcharges from Facebook's auction process were only discovered by Plaintiff through the investigation of undersigned counsel.  This investigation included interviews of former Facebook employees to develop information that was not otherwise publicly available. Absent that investigation, the existence of the rampant, multi-year overcharging of Plaintiff and the Class would not have been discovered by Facebook advertisers.

C.    **Facebook's Contract With Plaintiff and the Class**

53.    The contract between Facebook and its advertisers, including Plaintiff and the Class, is comprised of Facebook's "Statement of Rights and Responsibilities," which was posted on Facebook's website, and certain related documents and webpages expressly incorporated therein.  At certain points during the Class Period, the Statement of Rights and Responsibilities specified that "You will pay for your Orders in accordance with our Payments Terms. The amount you owe will be calculated based on our tracking mechanisms."  Later in the Class Period, one of the webpages expressly incorporated by reference in the Statement of Rights and Responsibilities was Facebook's "Self-Service Ad Terms."  The Self-Service Ad Terms specified that "You will

pay for your Orders in accordance with our Payments Terms. The amount you owe will be calculated based on our tracking mechanisms."

54.    The documents referenced and incorporated in the Statement of Rights and Responsibilities did not include an explanation of the "tracking mechanisms" used to calculate the amounts owed by advertisers.

55.    Other Facebook webpages, however, did address advertisement pricing.  For example, the "How ad billing works on Facebook" page of the "Facebook Ads Help Center" assured advertisers that "[Y]ou're always in control of how much you spend."  That same webpage provided the following guidance:

> The pricing of Facebook ads is based on an auction system where ads compete for impressions based on bid and performance. When you run your ad, you'll only be charged for the number of clicks or the number of impressions your ad received. Learn more about the Facebook ads delivery system (ad auctions).

56.    The last sentence of that quote included a hyperlink to another page of the Facebook Ads Help Center, entitled "About ad auctions," which provided additional detail about the advertisement auction process.[3]  These webpages made clear that advertisements were to be priced according to Facebook's auction process.  As discussed above, that auction process was widely understood to be Facebook's version of the VCG auction, as a second price auction the details of which were extensively discussed in academic and popular media.

## V.    CLASS ACTION ALLEGATIONS

57.    Plaintiff re-alleges and incorporates by reference the allegations set forth above. Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this class action individually, and seeks certification of the Class of all customers of Facebook that purchased advertisements during the period when the 2013 coding change caused Facebook to overcharge advertising customers (the "Class Period") and were damaged thereby (the "Class").

---

[3] *About ad auctions*, Facebook.com, https://www.facebook.com/business/help/430291176997542?id=561906377587030&helpref=faq_content (last visited Mar. 26, 2025).

58.    Excluded from the Class are Defendant and any of its affiliates, and their officers and directors, and the judicial officer(s) and judicial staff overseeing this litigation, as well as any of their spouses or immediate family members.

59.    Class members are so numerous that their individual joinder is impracticable. Facebook has thousands of customers that purchased advertisements during the Class Period.  The Class therefore satisfies the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1).

60.    Facebook's Statement of Rights and Responsibilities during the Class Period also provided that:

> You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for the purpose of litigating all such claims.

Accordingly, the entire Class is subject to the laws of the State of California.

61.    Once certified, Class members may be notified of the pendency of this action by customary means pursuant to the requirements of due process, including via mail, media publication, electronic communication, or other appropriate means and methods.

62.    Common questions of law and fact also exist and predominate with respect to the claims of all members of the Class.  These common questions of law and fact include the following:

(a)    The terms of Facebook's contract with the Class as it pertains to the pricing of advertisements and the advertisement auction process;

(b)    The extent to which Facebook breached the terms of that agreement;

(c)    The existence and nature of the 2013 code update and the impact of that update on Facebook's advertising auction pricing;

(d)    Whether Facebook breached the implied covenant of good faith and fair dealing with members of the Class;

(e)    Whether Facebook was unjustly enriched by its wrongful conduct;

    (f)    The extent to which Class members are entitled to damages or other monetary relief; and

    (g)    Whether and to what extent Plaintiff and Class members are entitled to the award of attorneys' fees and the reimbursement of litigation expenses.

63.    Plaintiff's claims are typical of the claims of the other members of the Class because it was a Facebook customer that paid for advertisements during the Class Period, when the Facebook auction process and pricing were impacted by the overcharges discussed herein. Plaintiff's claims are typical of the claims of the other members of the Class because they arise from the same advertising program, and were all impacted by the same auction process. In addition, the relief sought by members of the Class is common to such members.

64.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained skilled counsel who are experienced in the prosecution of complex class action litigation.

65.    Plaintiff has no interests that are adverse to the interests of the members of the Class.

66.    A class action is a superior vehicle for the present dispute compared to all other available means to redress the claims of Plaintiff and the other members of the Class. The financial harm that each individual Class member has suffered is small relative to the cost and burden required for each Class member to individually litigate claims against Defendant. Absent certification of this case as a class action, it would be virtually impossible for individual Class members to obtain effective redress for the wrongs alleged herein.

67.    Superiority is further satisfied here, where the law of California will apply to all state law claims under the terms of Facebook's contracts with its customers.

## VI.    CLAIMS FOR RELIEF

### COUNT I

### Breach of Contract

68.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

69.     Facebook's Statement of Rights and Responsibilities, and the documents and webpages incorporated therein, constitute a binding contract between Facebook and the Facebook advertisers that comprise the Class, including Plaintiff.

70.     These documents required Facebook to charge Plaintiff and the Class for advertisements in accordance with its advertising auction process.  That process required Facebook to implement software code that correctly executed the auction process, and charged Plaintiff and the Class the correct amounts for their advertisements.

71.     Given the opacity of the multi-step and multi-factor auction process, it was not possible for advertisers to verify that the prices charged by Facebook for individual advertisements were accurately calculated by Facebook's auction process.  Rather, Facebook placed advertisers in a position that necessitated trust in Facebook's auction process.

72.     The software code introduced in 2013 undermined Facebook's auction process, and caused a pricing disparity that resulted in material overcharges to Facebook advertisers.  Because such pricing disparities represented a deviation from the intended operation of the auction process, the overcharges constituted a breach of Facebook's contract with Plaintiff and the Class.

73.     As a direct and proximate result of that breach of contract, Plaintiff and the Class sustained actual damages in an amount to be proven at trial, plus prejudgment thereon.

## <u>COUNT II</u>

### Breach of the Implied Covenant of Good Faith and Fair Dealing

74.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

75.     Facebook advertising customers entered into a written contract with Facebook, the terms of which are contained in and incorporated into Facebook's Statement of Rights and Responsibilities, and the additional documents and webpages incorporated therein, which were drafted by Facebook.  These documents were and are, for all purposes relevant hereto, contracts between Facebook and the Facebook advertisers that comprise the Class.

76.    Inherent in these contracts was an implied covenant of good faith and fair dealing, requiring Facebook to deal fairly with Plaintiff and other customers, to fulfill its obligations to Plaintiff and the Class members in good faith, and to not deprive Plaintiff and the Class of the fruits of their bargain.

77.    By first overcharging Plaintiff and the Class, and then concealing the overcharges and failing to reimburse Plaintiff and the Class for the overcharges, Facebook breached the implied covenant of good faith and fair dealing inherent in the contracts.  Through the implied covenant of good faith and fair dealing, Facebook was obligated to charge Plaintiff and the Class the appropriate fee for advertisements, as dictated by its own advertisement auction process.  By failing to do so, Facebook violated the reasonable expectations of the members of the Class.  Upon its discovery of the overcharging of advertisers, the implied covenant of good faith and fair dealing required Facebook to reimburse advertisers the amounts improperly overcharged.

78.    As a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class sustained actual damages in an amount to be proven at trial, plus interest thereon.

## COUNT III

### Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

79.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

80.    Defendant's conduct described herein violates the "unfair" prong of California's Unfair Competition Law (the "UCL"), codified at California Business and Professions Code §§ 17200, *et seq.*

81.    By its conduct alleged herein, Facebook violated the "unfair" prong of the UCL by overcharging advertising customers.

82.    Facebook's conduct alleged herein is unethical, oppressive, and substantially injurious to Plaintiff and the Class.  By its conduct alleged herein, Facebook overcharged its

advertising customers millions of dollars.  There was no utility to Facebook's conduct, which simply provided advertisers with the same access to Facebook users but at higher charges.

83.    By its conduct alleged herein, Facebook proximately caused harm to Plaintiff and the Class.  As a direct and proximate result of Facebook's unfair conduct, Plaintiff and the Class lost money in which they have a vested interest.

84.    Plaintiff further seeks an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

## COUNT IV

### Unjust Enrichment

85.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein, and brings this claim in the alternative to the preceding claims to the extent it is duplicative of any such claim.

86.    Defendant's wrongful conduct caused Plaintiff and the other members of the Class to overpay for Facebook advertisements and Defendant derived the benefit of such overpayment.

87.    As a result, Defendant was unjustly enriched by its misconduct, and Plaintiff and the other members of the Class conferred a benefit upon Defendant, solely because of the overcharges caused by Defendant's 2013 software update, which impacted Facebook's advertisement auction pricing and process.

88.    Defendant understood, accepted, and retained the benefits conferred by Plaintiff and the other members of the Class, including after Facebook discovered the overcharging and determined to (a) conceal the fact and impact of the overcharges; and (b) retain the benefits Facebook derived therefrom.

89.    It would be inequitable and unjust for Defendant to retain the benefits of its misconduct, including the excess advertising fees charged to Plaintiff and the Class due to the overcharges.

90.    Plaintiff and the other members of the Class suffered financial harm from Defendant's misconduct and are entitled to damages, including the restitution and disgorgement

of the profits unjustly obtained by Defendant, in an amount to be proven at trial, plus interest thereon.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)    For an order certifying the proposed Class, and appointing Plaintiff and Plaintiff's counsel to represent the proposed Class;

(b)    For an order awarding Plaintiff and Class members damages in an amount to be proven at trial, together with interest thereon;

(c)    For an order awarding Plaintiff and Class members restitution, disgorgement, or such other and further relief as the Court deems proper; and

(d)    For an order awarding Plaintiff and the Class reasonable attorneys' fees and costs of suit, including expert witness fees.

## VIII.    JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

DATED: April 11, 2025                    Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

-and-

AVI JOSEFSON
(avi@blbglaw.com)
MICHAEL D. BLATCHLEY
(michael.blatchley@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

**BISHOP PARTNOY LLP**

ROBERT E. BISHOP
(bobby@bishoppartnoy.com)
FRANK PARTNOY
(frank@bishoppartnoy.com)
1717 K Street, NW Suite 900
Washington, DC 20006
Tel: (202) 787-5769

*Counsel for Plaintiff Iron Tribe Fitness*