1

**BERNSTEIN LITOWITZ BERGER**
2    **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
3    jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
4    Los Angeles, CA 90067
Tel: (310) 819-3481

5    *Counsel for Plaintiff Iron Tribe Fitness*

6    [Additional counsel appear on signature page.]

7                    **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
8

9  | IRON TRIBE FITNESS, on behalf of itself
and all others similarly situated,
10

11                    Plaintiff,

v.
12

META PLATFORMS, INC.,
13

                    Defendant
14

15

16

Case No. 3:25-cv-3281-CRB

**PLAINTIFF IRON TRIBE FITNESS'S
OPPOSITION TO DEFENDANT META
PLATFORMS INC.'S MOTION TO
DISMISS**

<u>CLASS ACTION</u>

Date: October 3, 2025
Time: 10:00 a.m.

Before: The Hon. Charles R. Breyer

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Iron Tribe Fitness ("Plaintiff") respectfully submits this opposition to Defendant Meta Platforms, Inc.'s ("Facebook" or "Defendant") Motion to Dismiss.

<strong>STATEMENT OF ISSUES</strong>

1.    Whether the discovery rule applies, delaying the tolling of the statute of limitations on Plaintiff's claims.

2.    Whether Plaintiff has stated a claim for breach of the implied covenant of good faith and fair dealing.

3.    Whether Plaintiff has stated a claim for breach of contract.

4.    Whether Plaintiff has stated a claim for violation of California's Unfair Competition Law (UCL) under the "unfair" prong.

5.    Whether Plaintiff has stated a claim for unjust enrichment.

## TABLE OF CONTENTS

**PAGE**

STATEMENT OF ISSUES ........................................................................... i

SUMMARY OF ARGUMENTS ....................................................................1

FACTUAL BACKGROUND .........................................................................4

I.      FACEBOOK CHANGED ITS AUCTION MODEL WITHOUT NOTICE
        TO ADVERTISERS AND KEPT IT SECRET ...................................4

        A.      Facebook's Purported "Second-Price" Auction Incentivized Bids
                From Advertisers ...............................................................4

        B.      The 2013 Coding Change Defied Advertisers' Expectations and
                Unjustly Enriched Facebook...............................................6

        C.      Facebook Conceals the Coding Change and Overcharges to
                Advertisers .......................................................................8

ARGUMENT ............................................................................................9

I.      THE DISCOVERY RULE TOLLS THE STATUTE OF LIMITATIONS........................9

II.     PLAINTIFF ADEQUATELY ALLEGES FACEBOOK BREACHED ITS
        CONTRACTUAL OBLIGATIONS .................................................11

        A.      Facebook Breached the Implied Covenant of Good Faith and Fair
                Dealing ...........................................................................11

        B.      Facebook Breached Its Contract with Iron Tribe and the Members
                of the Class By Retaining the Overcharges Resulting from the
                Coding Change.................................................................16

III.    FACEBOOK'S CONDUCT VIOLATED THE "UNFAIR" PRONG OF
        THE UCL..................................................................................20

IV.     FACEBOOK WAS UNJUSTLY ENRICHED BY SECRETLY
        OVERCHARGING ADVERTISERS ...............................................23

CONCLUSION........................................................................................25

# TABLE OF AUTHORITIES

CASES                                                                                               PAGE(S)

*Ante v. Office Depot Bus. Servs.*,
    641 F. Supp. 2d 906 (N.D. Cal. 2009) ...................................................................................25

*April Enter., Inc. v. KTTV and Metromedia, Inc.*,
    147 Cal. App. 3d 805 (1983) ......................................................................................2, 10, 11

*Astiana v. Hain Celestial Group, Inc.*,
    783 F.3d 753 (9th Cir. 2015) ...............................................................................................23, 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................................................9

*Bevis v. Terrace View Partners, LP*,
    33 Cal. App. 5th 230 (Cal. 2019)...........................................................................................15

*Boobuli's LLC v. State Farm Fire & Casualty Co.*,
    562 F. Supp. 3d 469 (N.D. Cal. 2021) ...............................................................3, 15, 23, 24

*Bruton v. Gerber Prods. Co.*,
    703 F. App'x 468 (9th Cir. 2017) .........................................................................................23

*Calcagno v. Kipling Apparel Corp.*,
    2024 WL 3261205 (S.D. Cal. Jul. 1, 2024) ...........................................................................20

*Capello v. Walmart, Inc.*,
    394 F. Supp. 3d 1015 (N.D. Cal. 2019) ................................................................................23

*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
    2 Cal. 4th 342 (Cal. 1992)...................................................................................2, 11, 12, 13

*Checkmate Strategic Grp. v. Yahoo! Inc.*,
    2005 WL 8252495 (C.D. Cal. Dec. 19, 2005) ................................................................17, 20

*Coronavirus Reporter v. Apple, Inc.*,
    85 F. 4th 948 (9th Cir. 2023) ................................................................................................18

*Cover v. Windsor Surry Co.*,
    2015 WL 4396215 (N.D. Cal. Jul. 17, 2015)........................................................................10

*Daly v. United Healthcare Ins. Co.*,
    2010 WL 4510911 (N.D. Cal. Nov. 1, 2010) ........................................................................16

*Day v. GEICO Cas. Co.*,
    580 F. Supp. 3d 830 (N.D. Cal. 2022)...................................................................20, 22, 23

*Deerpoint Grp., Inc. v. Agrigenix, LLC*,
    345 F. Supp. 3d 1207 (E.D. Cal. 2018)................................................................................21

*El Pollo Loco, Inc. v. Hashim*,
  316 F.3d 1032 (9th Cir. 2003) ................................................................................................10

*Ellsworth v. U.S. Bank, N.A.*,
  908 F. Supp. 2d 1063 (N.D. Cal. 2012) ........................................................................ *passim*

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021), *rev'd on other grounds*, 67 F.4th 946
  (9th Cir. 2023) ......................................................................................................................20

*First Nationwide Savings v. Perry*,
  11 Cal. App. 4th 1657 (1992) ................................................................................................23

*Fraley v. Facebook, Inc.*,
  830 F. Supp. 2d 785 (N.D. Cal. Dec. 16, 2011) ...................................................................23

*Gabana Gulf Distrib., Ltd. v. GAP Int'l Sales, Inc.*,
  2008 WL 111223 (N.D. Cal. Jan. 9, 2008), *aff'd*,
  343 F. App'x 258 (9th Cir. 2009) .........................................................................................21

*Gardiner v. Walmart, Inc.*,
  2021 WL 4992539 (N.D. Cal. Jul. 28, 2021) ........................................................................24

*Gardiner v. Walmart Inc.*,
  2021 WL 2520103 (N.D. Cal. Mar. 5, 2021) .........................................................................24

*Gunn v. FCA US, LLC*,
  2023 WL 5418736 (N.D. Cal. Aug. 22, 2023) ......................................................................22

*Gutierrez v. Wells Fargo & Co.*,
  622 F. Supp. 2d 946 (N.D. Cal. 2009) ..................................................................................13

*Guz v. Bechtel National*,
  24 Cal. 4th 317 (Cal. 2000) ...........................................................................................14, 15

*Hammerling v. Google LLC*,
  615 F. Supp. 3d 1069 (N.D. Cal. July 18, 2022) .......................................................17, 18, 25

*Hartford Casualty Ins. Co. v. J.R. Marketing, L.L.C.*,
  61 Cal. 4th 988 (2015) ..........................................................................................................23

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) ..............................................................................................23

*Hirsch v. Bank of Am.*,
  107 Cal. App. 4th 220 (2003) ...............................................................................................23

*Holmes v. Hospira, Inc.*,
  2013 WL 12132046 (C.D. Cal. Jan. 10, 2013) .....................................................................22

*HSBC Bank USA, Nat'l Ass'n v. Dara Petroleum, Inc.*,
    2010 WL 2197525 (E.D. Cal. May 28, 2010) ..............................................19

*Letizia v. Facebook Inc.*,
    267 F. Supp. 3d 1235 (N.D. Cal. July 14, 2017) .......................................... *passim*

*Lever Your Bus. Inc. v. Sacred Hoops & Hardwood, Inc.*,
    2020 WL 2465658 (C.D. Cal. May 11, 2020) ..............................................13

*Lewis v. Google LLC*,
    461 F. Supp. 3d 938 (N.D. Cal. 2020) ........................................................15

*Lloyd v. Facebook, Inc.*,
    2024 WL 5121035 (N.D. Cal. Dec. 16, 2024) ..............................................18

*Marsu, B.V. v. Walt Disney Co.*,
    185 F.3d 932 (9th Cir. 1999) ........................................................................12

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ......................................................................20

*McKell v. Washington Mut., Inc.*,
    142 Cal. App. 4th 1457 (Cal. App. 2006) ....................................................20

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
    863 F. Supp. 2d 928 (N.D. Cal. 2012) ...............................................9, 14, 15

*Millam v. Energizer Brands, LLC*,
    2024 WL 2988210 (9th Cir. June 14, 2024) ................................................22

*Nat. Res. Defense Council, Inc. v. Cnty. of Los Angeles*,
    725 F.3d 1194 (9th Cir. 2013) ......................................................................20

*Norgart v. Upjohn*,
    981 P.2d 79 (Cal. 1999) .........................................................................9, 10

*Oracle Corp. v. SAP AG*,
    2008 WL 5234260 (N.D. Cal. Dec. 15, 2008) ..............................................24

*Pirozzi v. Apple, Inc.*,
    966 F. Supp. 2d 909 (N.D. Cal. 2013) ........................................................23

*Price v. Apple, Inc.*,
    2022 WL 1032472 (N.D. Cal. Apr. 6, 2022) ................................................22

*Puentes v. Wells Fargo Home Mortgage, Inc.*,
    160 Cal. App. 4th 638 (2008) ......................................................................21

*Rosell v. Wells Fargo Bank, N.A.*,
    2014 WL 4063050 (N.D. Cal. Aug. 15, 2014) ..............................................21

*Santa Barbara Smokehouse, Inc. v. Aquachile, Inc.*,
  2020 WL 6743592 (C.D. Cal. Jul. 7, 2020) ........................................................21

*Saroya v. Univ. of Pac.*,
  503 F. Supp. 3d 986 (N.D. Cal. 2020) ...............................................................24

*Schertzer v. Bank of America*,
  109 F. 4th 1200 (9th Cir. 2024) ........................................................................16

*Shaked & Posner v. ReachLocal, Inc.*,
  2014 WL 12968062 (C.D. Cal. Dec. 4, 2014) ...............................................12, 16

*Shared P'ship v. Meta Platforms, Inc.*,
  2024 WL 4280936 (N.D. Cal. Sept. 23, 2024) ...................................................24

*Song Fi Inc. v. Google, Inc.*,
  108 F. Supp. 3d 876 (N.D. Cal. 2015) ...............................................................15

*Supermail Cargo, Inc. v. United States*,
  68 F.3d 1204 (9th Cir. 1995) ..............................................................................9

*Taleshpour v. Apple Inc.*,
  549 F. Supp. 3d 1033 (N.D. Cal. 2021), *aff'd*, 2022 WL 1577802
  (9th Cir. May 19, 2022) ....................................................................................22

*TopDevz, LLC v. LinkedIn Corp.*,
  2021 WL 3373914 (N.D. Cal. Aug. 3, 2021) ......................................................10

*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*,
  1 Cal.3d 586 (1970) ..........................................................................................11

*Walters v. Fid. Mortg. of Cal.*,
  2010 WL 1493131 (E.D. Cal. Apr. 14, 2010).....................................................24

*Wartell v. Wells Fargo Bank, N.A.*,
  755 F. Supp. 3d 1252 (N.D. Cal. 2024) .............................................................11

*In re Wells Fargo Cash Sweep Litig.*,
  2025 WL 1785315 (N.D. Cal. June 27, 2025) ....................................................16

*Wen v. Greenpoint Mortg. Funding, Inc.*,
  2021 WL 5449048 (N.D. Cal. Nov. 22, 2021) ...................................................11

*Williams v. J.P. Morgan Chase Bank, N.A.*,
  2023 WL 3590682 (N.D. Cal. May 22, 2023) ....................................................22

*Williamson v. McAfee, Inc.*,
  2014 WL 4220824 (N.D. Cal. Aug. 22, 2014) ...................................................22

*Woods v. Google Inc.*,
  2011 WL 3501403 (N.D. Cal. Aug. 2011) .........................................................16

*Woods v. Google Inc.*,
2013 WL 1435224 (N.D. Cal. Apr. 9, 2013) ...........................................................................16

*In re Yahoo! Litig.*,
251 F.R.D. 459 (C.D. Cal. 2008) ..................................................................... *passim*

*Young v. Facebook, Inc.*,
790 F. Supp. 2d 1110 (N.D. Cal. 2011) ...........................................................................18

**STATUTES**

Cal. Bus. & Prof. Code §§ 17200, *et seq.* ...................................................................1

Cal. Civ. Code § 1654 ...........................................................................................19

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a) ...........................................................................................8

Fed. R. Civ. P. 12(b)(6) ...................................................................................2, 9

Fed. R. Civ. P. 15(a) ...........................................................................................25

Williston on Contracts § 63:22 (4th ed.) .....................................................................13

## SUMMARY OF ARGUMENTS

Over a period of more than four years, Facebook overcharged its advertising customers, reaping billions of dollars in illicit revenue according to its own executives.  The Complaint alleges in detail, with reference to internal Facebook documents and emails, that these revenues were generated by a striking deviation from the established and expected procedures for Facebook's advertising auctions.  That deviation, which was neither disclosed to nor discoverable by Facebook advertisers, resulted from a change in the computer code used in Facebook's auction process and resulting tracking mechanisms, triggering an immediate and material increase in Facebook revenues.  Facebook engineers quickly recognized and questioned the revenue spike, but it was not until years later that they corrected the coding change so that Facebook's advertising auctions would function the way they were supposed to.  The conduct of Facebook and its engineers, first in struggling to identify the cause of the revenue spike, which they could not explain, and then developing a correction for the coding change, demonstrates that Facebook neither intended to change its auction process or believed that doing so was permitted by its advertiser agreements.  Rather than inform Plaintiff and the members of the Class of the issue and refund their money, Facebook concealed it and intentionally delayed the correction so advertisers would not discover that they had been overcharged.  In fact, it was only through the investigation of Plaintiff's counsel, which included interviews with former employees and review of internal documents, that Plaintiff discovered Facebook's misconduct, which was never made public before this lawsuit was filed.

These facts adequately state a claim for breach of the implied covenant, breach of contract, violations of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and unjust enrichment under the liberal pleading standards of Rule 8.  *See, e.g., Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1240 (N.D. Cal. July 14, 2017) (finding Facebook's overstatement of advertising metrics gave rise to claims for breach of the implied covenant and violations of the UCL's unfairness prong); *In re Yahoo! Litig.*, 251 F.R.D. 459, 471 (C.D. Cal. 2008) (sustaining breach of contract, breach of the implied covenant, and UCL claims where defendant collected illegitimate revenues by placing advertisements that failed to target plaintiffs' likely customers).

In seeking dismissal, Defendant ignores the Complaint, and contends that Facebook made

no actionable promises to advertisers about how they would charged, that its conduct in identifying billions of dollars in overcharges and then covering them up breached no duty, and that, in any event, Plaintiff brought its claims too late. None of these arguments have any merit.

Defendant first argues that Plaintiff's claims are untimely. But Defendant's brief does not even acknowledge California's "discovery rule," let alone address the facts in the Complaint making clear that, under this well-established doctrine, the statute of limitations did not run until Plaintiff knew or had reason to know of the facts giving rise to the claim. *April Enter., Inc. v. KTTV and Metromedia, Inc.*, 147 Cal. App. 3d 805, 832 (1983) (discovery rule tolls claims for contract and implied breaches "committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time"). Here, Facebook concealed its overcharges by "slow roll[ing]" the correction to avoid raising suspicion and to cover up its wrongdoing, which was only uncovered through counsel's investigation. ¶¶48-52.[1] These are paradigmatic facts of concealment triggering the discovery rule. *See April Enter.*, 147 Cal. App. at 832-33. As Defendant now apparently concedes, Facebook's statute of limitations defense will require discovery, making it unsuitable for resolution under Rule 12(b)(6). ECF No. 36 at 2.

Next, Defendant argues that Plaintiff's claims fail on the merits, focusing primarily on Plaintiff's breach of contract claim and then arguing that the rest of Plaintiff's claims fail because Facebook's contract did not explicitly promise it would run a "second-price" auction. To start, as California law makes clear, a breach of an express contractual provision is not required for Plaintiff's implied covenant claim. *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (Cal. 1992). Faced with well-pleaded allegations that Facebook's conduct evinces quintessential bad faith, Facebook makes inappropriate fact-based arguments about the agreement and advertisers' understanding of Facebook's auction process to argue its overcharging of its customers breached no duty it owed them. But the Complaint more than adequately pleads the basis of that duty, including from the contract, the parties' course of dealing, the statements of

---

[1] Citations to "¶_" are to the Class Action Complaint (ECF No. 1) ("Complaint"). All internal citations are omitted and emphasis is added unless otherwise noted.

Facebook's Chief Economist, the highly publicized and widespread understanding of Facebook's auction process, and Facebook's own engineers' acknowledgment that the auction process did not operate as it was supposed to during the Class Period. Nor does Facebook point to any provision permitting its conduct (indeed, it does not even submit the agreement), which is fatal on a motion to dismiss. *See In re Yahoo! Litig.*, 251 F.R.D. at 471.

Facebook similarly argues that it did not breach its agreement with advertisers, stating that its contracts did not specify any particular auction process, and then asking the Court to make inappropriate fact-based determinations about the meaning of ambiguous and highly disputed contractual terms before it has produced any discovery. Again, Facebook's approach is improper, as the Court must accept Plaintiff's well-pleaded allegations as true. The Complaint alleges that the contract required Facebook to charge advertisers "based on our tracking mechanisms" and "Payments Terms" used in Facebook's advertising auction process—terms that were breached because Facebook's own engineers internally acknowledged that the auction pricing mechanism was not functioning properly. ¶¶37, 44-45, 53. This states a claim for breach of contract. *See In re Yahoo! Litig.*, 251 F.R.D. at 471.

Facebook also contends that its conduct in secretly altering its auction process, overcharging customers by billions of dollars, and keeping those overcharges a secret did not breach the "unfair" prong of the UCL. It contends that these are simple "garden-variety" allegations of a "repackage[d]" contract claim. Def. Br. at 13. Nothing could be further from the truth, and the allegations here are near mirror images of UCL claims routinely sustained by California courts. *See, e.g.*, *Letizia*, 267 F. Supp. 3d at 1245-46 (finding UCL "unfairness" claim alleged for misreporting advertising metrics).

Last, unable to deny it was unjustly enriched by billions of dollars, Facebook seeks dismissal of Plaintiff's unjust enrichment claim by misstating California law, badly misciting a decision by this Court, and arguing that Plaintiff cannot assert claims for both breach of contract and unjust enrichment at the pleading stage. *See, e.g.*, *Boobuli's LLC v. State Farm Fire & Casualty Co.*, 562 F. Supp. 3d 469, 486 (N.D. Cal. 2021). As recent decisions from the Ninth Circuit and California Supreme Court make clear, Defendant's arguments are wrong, and Plaintiff

has adequately stated a claim for unjust enrichment.

Defendant's motion to dismiss should be denied.

FACTUAL BACKGROUND

## I.    FACEBOOK CHANGED ITS AUCTION MODEL WITHOUT NOTICE TO ADVERTISERS AND KEPT IT SECRET

### A.    Facebook's Purported "Second-Price" Auction Incentivized Bids From Advertisers

Facebook's advertising platform sells advertising space and places advertisements in each Facebook user's "feed," the primary system through which users are exposed to content posted on the Facebook site.  ¶16.  An individual user's Facebook feed is unique to that user, and the content shown to the user, including organic content (such as other Facebook users' "posts") as well as paid advertisements, are determined by Facebook's advertisement algorithms.  Advertisers pay Facebook to access and connect with Facebook's users through the feed, and advertisers rely on Facebook's algorithms to place advertisements in its users' feeds.  ¶¶18-31.

The secret overcharges at the heart of this case occurred because a coding flaw caused Facebook to use a "blended-price" auction process to price and implement advertisements instead of the "second-price" auction process it purported to use.  ¶¶2, 34-41.  To calculate the price paid by the auction winner in a "second-price" auction, the winning "first" bid is excluded and the winning bidder's cost (*i.e.*, the price for the advertisement) is calculated using the second highest bid.  ¶¶2, 17.  Although Facebook purported to use a "second-price" auction, told advertisers it was using a "second price" auction, and advertisers expected that Facebook actually employed a "second-price" auction, during the Class Period, Facebook instead operated a "blended-price" auction.  ¶¶2, 34.  Under the "blended-price" auction, the price charged to the winning bidder was a blend of the highest bid and the second-highest bid, a price that will always be higher than the price in a second-price auction.  ¶¶2, 16-17, 32, 34.

Specifically, a coding change in 2013 caused Facebook's advertising platform to perform a "blended-price" auction in which the value of the winning bids was incorporated into the price charged to advertisers, which secretly and immediately led to a material spike in revenue for Facebook (the "Coding Change").  ¶¶7, 17, 34-35, 46.  The result of the Coding Change was that

the winning bid impacted the price of an advertisement, such that the amount that an advertiser would pay Facebook was correlated with how high they bid.  ¶¶40-44.  This programming error caused winning bidders to be systemically overbilled and charged higher prices than they would have been under the "second-price" auction Facebook purported to be using.  Facebook's advertising auction incorporated three different parameters for advertisers, including for example, the ability to specify the types of users targeted by the ad ("Targeting"), the advertising goals, *i.e.*, to achieve a certain number of "impressions," "clicks," or "conversions" (or "Primary Objective"), as well as to determine how much they would pay for the advertisements, which would either be through the use of a bid or a budget.  ¶¶18-20.  In addition to the three inputs determined by the advertiser, Facebook also included in the auction process an "organic" bid component which was designed to capture the value to the user of seeing the ad from the advertiser.  ¶24.

Once they have recorded these preferences, advertisers must then trust Facebook's nonpublic algorithms to fulfill their objectives and place advertisements in users' feeds.  In that regard, there was a wide understanding among advertisers that Facebook's advertising auction used a modified "Vickrey-Clarke-Groves (VCG) auction," a version of a "second-price" auction whereby the value of a winning bid was not a factor affecting the price charged to the winning advertiser.  ¶¶32-33.

Under Facebook's modified VCG auction, the highest bidder (according to Facebook's auction calculation) wins the auction and pays the price or value of the second highest bid.  ¶¶26-30.  This "second-price" auction feature encouraged advertisers to bid their "true" value because, under this auction method, the actual price of the winning bid was not a factor in the price of an advertisement.  ¶30.  This version of a "second-price" auction protects advertisers from overbidding because advertisers know they will not be penalized for authorizing significantly more spending than their competitors.  ¶¶27-30.  This understanding was confirmed by Facebook's Chief Economist, and news media stories like those in *Wired* magazine that explain that the virtue of Facebook's VCG auction was that "bidders can't game the auction" and are only successful "if they're truthful in placing a value (a bid) on each item."  ¶16; Cade Metz, *Facebook Doesn't Make as Much Money as It Could—On Purpose*, *Wired* (Sept. 21, 2015),

https://www.wired.com/2015/09/facebook-doesnt-make-much-money-couldon-purpose (last visited Aug. 14, 2025). The widespread expectation and Facebook's own representations that Facebook advertisements were priced through a second-price auction encouraged advertisers to bid the maximum amount they were willing to pay for an advertisement without running the risk of paying that much. ¶30. This protection from overbidding is lost where the winning bid is used to calculate how much the winning advertiser will pay. (*id.*)

Facebook's contracts with advertisers, incorporated in its "Statement of Rights and Responsibilities" stated that "[t]he amount you owe will be calculated based on our tracking mechanisms." ¶53. Facebook's Ads Help Center confirmed this expectation, stating "When you run your ad, you'll only be charged for the number of clicks or the number of impressions your ad received." ¶55. Further, as numerous industry publications reported and as Facebook explained to the public and advertisers, under Facebook's contracts, advertisements were to be priced based on Facebook's auction process, widely known in the industry and confirmed by Facebook's Chief Economist to be a second-price auction process (¶16), one which did not take the price or value of the winning bid into consideration when charging the winning bidder. ¶56.

**B.     The 2013 Coding Change Defied Advertisers' Expectations and Unjustly Enriched Facebook**

Contrary to the description provided by Facebook's Chief Economist, the widely accepted understanding of Facebook's auction process, and advertisers' expectations, Facebook improperly incorporated the highest bid into the price the winning advertiser paid, and thereby systemically overcharged advertisers during the Class Period. ¶¶17, 34-35. There was no way for an advertiser to know this, since Facebook was ostensibly administering a second-price auction and advertisers had every incentive to place high bids and trust that they would only be charged based on the value of the advertisement they placed (the second-highest bid). ¶31, 52.

As soon as the Coding Change was implemented in 2013, Facebook engineers observed the material spike in revenues it caused, but they could not explain that increase. ¶¶36-42. Facebook engineers ran experiments to try to understand the revenue spike and identify its cause, which showed that while Facebook advertisers paid higher prices based on how much they bid, advertisers on Instagram did not, even though Instagram used a second-price auction. ¶¶37-39.

Facebook's engineers internally documented their alarming findings, stating that this result did not "make sense" and "we cannot explain the pricing." ¶¶42-43. Facebook ran multiple pricing experiments, formed numerous working teams to address the issue, and eventually located the Coding Change that caused Facebook advertisers to materially overpay for the winning bids they placed. ¶¶44-47. These efforts by Facebook engineers to understand the spike in revenue and the prices paid for Facebook advertisements make clear that the Coding Change was not implemented by Facebook as part of an intentional modification of Facebook's auction process. It was not the case that someone at Facebook determined that Facebook should run a blended-price auction rather than a second-price auction, or that Facebook's attorneys had reviewed the Coding Change and agreed that the new auction methodology would conform to Facebook's agreements with advertisers. ¶¶36-37. Rather, the hunt to identify the problem by Facebook engineers, and the decision to fix the problem once identified, make clear that the Coding Change was a mistake that was introduced inadvertently and fixed silently. ¶¶37, 45-52. If Facebook believed this change, which was enabling the Company to reap billions in additional revenues, conformed to its advertisers' expectations and agreements with Facebook, Defendant would never have turned it off.

An internal slide deck showing the differences between the prices paid by Instagram and Facebook advertisers vividly captured the problems with Facebook's auction. ¶38. For Instagram, the slide deck showed that advertisers could safely bid their "true" value (*i.e.*, $400 per one thousand impressions, "Cost Per Mille" or "CPM," instead of $100) and still pay just the "second bid" because the winning bid was excluded from the price calculation. ¶¶30, 37-41. By contrast, for Facebook advertisers, the price they paid was directly correlated with the amount they bid, and advertisers would pay more if they bid $400 than if they bid $300 or less, even if the "second price" was the same. ¶41.

The engineering group tasked with identifying and fixing the Coding Change described in the 2017 documents created an internal Facebook Workplace group called "Pay What You Bid," a name that perfectly encapsulated the problem Facebook's engineers had identified. ¶44. Under Facebook's auction system, advertisers were ***not*** supposed to "Pay What [They] Bid," and the fact

that a group was created to specifically address the "Pay What You Bid" problem confirms both advertisers' understanding of how the auction process was supposed to work and Facebook's internal recognition that its platform was not working as it was supposed to.  ¶¶44-46.

## C.    Facebook Conceals the Coding Change and Overcharges to Advertisers

Rather than correct the systematic overcharging of advertisers on its platform, Facebook elected to secretly prolong use of the blended-price auction to avoid detection of the Coding Change.  In or around 2016, after identifying Coding Change, Facebook engineers discussed how they would approach fixing it.  ¶¶37-52.  Specifically, Facebook engineers determined that immediate correction of the Coding Chang would materially and immediately decrease Facebook's overall advertising revenue, so they developed a plan to perform a "slow rollout" to fix the Coding Change that would avoid detection by advertisers and slowly reduce overcharges (and revenues) over time.  ¶¶47-51.  Facebook initially corrected the auction process to revert to a second-price auction only for 2% of advertisers.  ¶50.  Then, Facebook gradually expanded this change to apply to 100% of advertisers.  ¶50.  Facebook referred to this internally as a "slow rollout," and it was overseen by Facebook's Director of Engineering.  ¶49.

Facebook did not inform advertisers that they had been overcharged or that Facebook employed a blended-price auction model instead of the second-price auction advertisers expected, and advertisers had no means of discovering these facts.  ¶52.  Rather, Facebook retained all revenues derived from the Coding Change and deliberately concealed them by fixing the auction through a "slow rollout" that avoided raising any suspicions.  ¶¶49-51.  The systematic overcharging of advertisers was only discovered through the investigation of counsel, which included interviews with former Facebook employees and a review of internal documents, and Facebook's concealment is the only reason these facts became public with the filing of this lawsuit.  ¶52.

## ARGUMENT

The notice pleading standard of Fed. R. Civ. P. 8(a) that applies to Plaintiff's claims is a "relatively light" burden. *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 948 (N.D. Cal. 2012). A complaint does not need detailed factual allegations to survive dismissal but need only include enough facts "plausibly suggesting" a right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

## I.    THE DISCOVERY RULE TOLLS THE STATUTE OF LIMITATIONS

In its motion to dismiss, Facebook seeks to benefit from its concealment of the Coding Change and surreptitious overcharging of advertisers by invoking a statute of limitations defense. Facebook emphasizes numerous times that it stopped overcharging advertisers years ago. Def. Br. at 6-7. But Facebook ignores the well-pleaded allegations that Facebook concealed its overcharging of advertisers, which is more than sufficient to invoke California's discovery rule.

Here, Plaintiff alleges that, after identifying and developing a correction to the Coding Change that had resulted in billions of dollars in advertiser overcharges, Facebook deliberately developed and implemented a "slow rollout" of the correction specifically in order to conceal the error and resulting overcharges. ¶¶47-51. This "slow rollout" was approved by Facebook's senior management, including Chinmay Karande, then Facebook's Director of Engineering, and initially corrected the auction process to reduce overcharges to just 2% of advertisers, and then expanded to cover 100% of advertisers over a period of time. ¶¶49-50. The slow rollout was specifically undertaken in order to avoid alerting advertisers to the change. (*id.*) At no time did Facebook disclose the Coding Change or resulting overcharges, which was only discovered through the investigation of Plaintiff's counsel, which included interviews with Facebook employees to develop nonpublic information about the alleged misconduct. ¶52.

On a Rule 12(b)(6) motion, "a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206-07 (9th Cir. 1995). These allegations are more than sufficient to toll the statute of limitations under California's discovery rule because no advertiser had any reason to suspect Facebook's secret overcharges in light of Defendant's

1   deliberate and successful efforts to conceal them. *See Norgart v. Upjohn*, 981 P.2d 79, 93 (Cal.

2   1999) (discovery rule tolls statute of limitations for claims until plaintiffs "came at least to suspect,

3   or [had] reason to suspect, a factual basis for their elements").

4          Defendant's focus on when the overcharging occurred (Def. Br. at 6) is misplaced: it is

5   black letter law that, under California's discovery rule, the statute of limitations on Plaintiff's

6   claims is not measured based on when the misconduct occurred, but rather when Plaintiff knew or

7   had reason to know that it occurred. *Norgart*, 981 P.2d at 93. Indeed, courts routinely apply the

8   discovery rule to find claims are timely under similar or longer intervals. *See, e.g.*, *El Pollo Loco,

9   Inc. v. Hashim*, 316 F.3d 1032, 1040 (9th Cir. 2003) (discovery rule applied where plaintiff's

10  discovery of breach was hindered by defendant's misrepresentation, rendering timely suit brought

11  more than seven years later). California's discovery rule applies to each of Plaintiff's claims, and

12  is routinely held to toll limitations periods in cases alleging similar facts of concealment as those

13  here. *See April Enter.*, 147 Cal. App. 3d at 832 (applying discovery rule for contract and implied

14  covenant claims for six-year period because tolling applies where breaches are "committed in

15  secret" and "harm flowing from those breaches will not be reasonably discoverable by plaintiffs

16  until a future time"); *Cover v. Windsor Surry Co.*, 2015 WL 4396215, at *3 (N.D. Cal. Jul. 17,

17  2015) (UCL claims subject to delayed discovery rule).

18         Facebook ignores the discovery rule, yet seeks dismissal on statute of limitations grounds

19  without pointing to any allegation or facts suggesting when Plaintiff had any knowledge of its

20  claims, or could have suspected Facebook's overcharges. For example, Facebook has not argued,

21  and cannot argue, that advertisers had access to internal Facebook data or were privy to its

22  engineers' internal acknowledgment that advertisers had been overcharged. Nor could it.[2]

23         Instead, Defendant claims the statute of limitations bars Plaintiff's claims because the

24

25  ───────────────

26  [2] Highlighting the significance of Facebook's concealment here, when Facebook **has** disclosed
    problems with its advertising platform, advertisers have been able to timely assert their rights. *See,
27  e.g., Letizia*, 267 F. Supp. 3d at 1240 (lawsuit filed after Facebook publicly disclosed its advertising
    metrics had been overstated); *see also TopDevz, LLC v. LinkedIn Corp.*, 2021 WL 3373914, at *8
28  (N.D. Cal. Aug. 3, 2021) (LinkedIn voluntarily disclosed advertising metrics were misstated and
    repaid overcharges to advertisers).

Complaint does not allege specific instances of misconduct following the "slow rollout" of the Coding Change in September 2017.  But no continuing misconduct is required to toll Plaintiff's claims under the discovery rule.  Defendant's cases, which deal with the "continuing wrong" doctrine, a separate and inapplicable tolling doctrine, demonstrate this point.  For example, in *Wen v. Greenpoint Mortg. Funding, Inc.*, 2021 WL 5449048, at *3-4 (N.D. Cal. Nov. 22, 2021), the plaintiff did not even argue she was entitled to tolling or that the discovery rule applied but rather sought to excuse the delay in filing based on the "continuing wrong" doctrine.  But that doctrine is recognized in only narrow circumstances (in civil rights and employment discrimination cases), and was not applicable in *Wen* because the plaintiff had not adequately alleged any ongoing misconduct, which is required to invoke it (but not the discovery rule).  By contrast, here, Defendant's concealment of the overcharges is alleged in detail and that concealment prevented Plaintiff from discovering its claims.  There was nothing in the public domain that could have possibly alerted anyone to Defendant's misconduct, rendering the claims timely under the discovery rule.  *April Enter.*, 147 Cal. App. 3d at 832.

In all events, and as Facebook now apparently concedes, whether the discovery rule applies requires discovery and cannot be decided on a motion to dismiss.  Order Denying Discovery Stay, ECF No. 36 at 2 (noting Defendant's apparent abandonment of prior argument that statute of limitations defense did not require discovery).  As the California Supreme Court has held, "[t]here are no hard and fast rules for determining what facts or circumstances will compel inquiry by the injured party and render him chargeable with knowledge," which "is a question for the trier of fact."  *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 597 (1970); *Wartell v. Wells Fargo Bank, N.A.*, 755 F. Supp. 3d 1252, 1256 (N.D. Cal. 2024) (discovery rule tolled implied duty claim).

## II.    PLAINTIFF ADEQUATELY ALLEGES FACEBOOK BREACHED ITS CONTRACTUAL OBLIGATIONS

### A.    Facebook Breached the Implied Covenant of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing is incorporated into every contract and prevents a party from "unfairly frustrating the other party's right to receive the benefits" of the contract.  *Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1085 (N.D. Cal. 2012).  Contrary to

Facebook's argument, under California law, a "breach of a specific provision of the contract is ***not a necessary prerequisite***" to allege a breach of implied covenant. *Carma*, 2 Cal. 4th at 373. That is because, "[w]ere it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract." *Id.*; *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938 (9th Cir. 1999) (under California law, it is "well-settled" that a breach of an express provision is not required under an implied covenant claim).

Here, Facebook breached the implied covenant of good faith and fair dealing by overcharging Plaintiff and other advertisers through the undisclosed implementation of a blended-price auction through the Coding Change, covering up the resulting overcharges through a "slow rollout" of the correction to the Coding Change that was deliberately undertaken to avoid detection, and secretly retaining the billions of dollars in improper advertising revenues the Coding Change generated for Facebook. ¶¶46-51. These allegations state a claim for breach of the implied covenant, and are similar to those routinely sustained by courts, including in cases against Facebook based on the same advertising agreement here. *See, e.g.*, *Letizia*, 267 F. Supp. 3d at 1248 (sustaining implied covenant claim arising out of Facebook's Statement of Rights and Responsibilities, finding implied duty to report accurate advertising viewership metrics based on parties' course of performance and that complaint adequately alleged Facebook breached that duty by overstating metrics); *see also In re Yahoo! Litig.*, 251 F.R.D. at 471 (sustaining breach of implied covenant claim where defendant placed advertisements in an untargeted manner instead of targeted to plaintiffs' likely customers, thereby collecting revenues for placements Yahoo knew, or reasonably should have known, were illegitimate); *Shaked & Posner v. ReachLocal, Inc.*, 2014 WL 12968062, at *4 (C.D. Cal. Dec. 4, 2014) (sustaining implied covenant claim where defendant marketer allegedly abused discretion in spending advertising budget on "less valuable" "directory clicks" as opposed to "search engine clicks" and acted in "bad faith in not disclosing the true amount" spent on "clicks" by instead reporting only an overall "spend" figure that included defendant's profits).

The implied covenant is particularly applicable in cases like this one, where Facebook had exclusive control over the operation of the ad auction process on which Plaintiff and the members

1    of the Class relied to determine what they would be charged.  ¶¶36, 51-52.  As California courts

2    hold, the "covenant of good faith finds particular application in situations where one party is

3    invested with a discretionary power affecting the rights of another," a power which "must be

4    exercised in good faith."  *Carma*, 2 Cal. 4th at 348.  Under California law, a party violates that

5    covenant if it subjectively lacks belief in the validity of its act *or* if its conduct is objectively

6    unreasonable.  *Id.*; *see also* Williston on Contracts § 63:22 (4th ed.) ("breach of the implied

7    obligation of good faith and fair dealing is obviously present where a party acts in bad faith").

8    This duty, though it may be "implied by law," "is as much a part of the contract as if expressly set

9    forth."  *Letizia*, 267 F. Supp. 3d at 1249.

10        Here, Facebook's efforts and experiments to identify the Coding Change, and its work to

11   fix the Coding Change, evinces both Facebook's "subjective" disbelief in the "validity" of its

12   conduct (Facebook knew the Coding Change violated the parties' expectations about how

13   advertisers would be charged) and was also "objectively unreasonable."  *Carma*, 2 Cal. 4th at 372.

14   Rather, in the context of advertisers' expectations and Facebook's own understanding about how

15   its auctions were supposed to operate, Facebook's conduct evinces quintessential "bad faith."  This

16   is corroborated by Facebook's secrecy in implementing a slow rollout when it finally fixed the

17   Coding Change.  *See, e.g., Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 954 (N.D. Cal.

18   2009) (sustaining breach of implied covenant claim even though contractual provision permitted

19   bank to post items to plaintiff's checking account "in any order the bank chooses" where bank

20   posted larger withdrawals before smaller ones to maximize the number of overdraft penalties, as

21   bank's exercise of discretion was "subject to good faith […] and not so as to maximize bank

22   revenue and to penalize customers"); *Ellsworth*, 908 F. Supp. 2d at 1086 (sustaining implied

23   covenant claim where contract gave defendant bank discretion to purchase flood insurance, whose

24   costs would be charged to plaintiff mortgagee, when bank purchased high-cost insurance and

25   profited from kickbacks paid by insurer); *Lever Your Bus. Inc. v. Sacred Hoops & Hardwood, Inc.*,

26   2020 WL 2465658, at * 6 (C.D. Cal. May 11, 2020) (sustaining implied covenant claim where

27   contract provided defendant with discretion to enforce a pricing policy which it failed to enforce

28   against plaintiff's competitors).

In response to these allegations, Facebook raises two arguments that can be readily dismissed. ***First***, Facebook argues that Plaintiff cannot enforce obligations on Facebook that are "inconsistent with the terms of the parties' purported written contract." Def. Br. at 11. But Facebook does not point to any "inconsistent" terms. Rather, Facebook argues that the contract does not specifically proscribe its conduct, and that nothing in the contract required Facebook to use a particular auction process. This argument badly misapprehends California law, which does not require a breach of an express contractual provision, as well as Facebook's implied duty. *Letizia*, 267 F. Supp. 3d at 1249. Indeed, another court rejected Facebook's argument that its agreement with advertisers did not give rise to implied duties to convey accurate advertising metrics because the contract did not say anything specifically about the two disputed metrics at issue there. *Id.* Rather, the contract and advertisers' course of dealing with Facebook clearly "contemplated" that duty, given references to advertising metrics in Facebook's advertising guidelines and the importance of that metric to advertisers. *Id.*

The same is true here, as Facebook's faithful execution of the second-price auction Facebook purported to use was fundamental to the parties' agreement. ¶¶16-17, 32-33, 53-56. Tellingly, though Facebook purports to rely on the contract terms as the basis to dismiss the implied covenant claim, it does not identify any provision that remotely sanctions its conduct (or even submit the full agreement to the Court), because there is no language permitting its conduct. This is fatal to Facebook's argument on a motion to dismiss. *See In re Yahoo! Litig.*, 251 F.R.D. at 472 (sustaining implied covenant claim where search engine collected revenues from advertisement placements defendant knew were not targeted to plaintiffs' likely customers because that "did not necessarily conflict with the express provisions of the agreement"); *McNeary-Calloway*, 863 F. Supp. 2d at 956 (denying motion to dismiss implied covenant and contract claim where it was not clear "the contracts' terms unambiguously authorized Defendants' alleged behavior").

Defendant's cases do not hold otherwise. For example, in *Guz v. Bechtel National*, 24 Cal. 4th 317 (Cal. 2000), following discovery, an employee who was terminated after his work unit was eliminated could not bring an implied covenant claim for wrongful discharge to a jury because

1   he was an at-will employee, under California statutory law and the express terms of his

2   employment contract, and the employer's termination decision followed the contract.  *Id.* at 340-

3   50.  Similarly, in *Bevis v. Terrace View Partners, LP*, 33 Cal. App. 5th 230, 256-57 (Cal. 2019),

4   after trial, the appellate court reversed the implied covenant verdict because the evidence showed

5   defendants' challenged rate increases were in fact "objectively determined" consistent with the

6   contractual formula, and defendants could not be liable for a breach of any implied duty when the

7   contract "expressly grant[ed] them the discretion to take a different action." *Id.* at 256.  And in

8   *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 961 (N.D. Cal. 2020), the contract expressly prohibited

9   users from posting "hateful content," and thus YouTube did not breach the implied covenant by

10  exercising discretion in remove plaintiff's "hate speech" posts. *Id.*; *see also Song Fi Inc. v. Google,*

11  *Inc.*, 108 F. Supp. 3d 876, 885 (N.D. Cal. 2015) (dismissing claim alleging improper exercise of

12  discretion in removing advertisements that did not comply with terms of service).

13       In contrast, Facebook does not and cannot rely on any express terms permitting its conduct

14  here.  Nothing in the parties' agreement allowed Facebook to operate the advertising auctions in a

15  manner that contradicted the one Facebook represented it used.  That Facebook engineers struggled

16  to identify the Coding Change and opined that the resulting prices it caused did not make sense

17  (¶¶43-44) confirms that the blended-price auction was a deviation from how Facebook itself

18  understood and intended the ad auctions to function.  That Facebook in fact fixed the Coding

19  Change—as Facebook's own engineers described their actions in internal documents(¶¶45-48)—

20  even though it was making them money, confirms that the ad auctions were not operating as

21  Facebook believed they should.  And the fact that Facebook deliberately hid the Coding Change

22  and its impact from advertisers through the "slow rollout" of the fix to the Coding Change makes

23  clear that Facebook understood that it had something to hide.  ¶¶47-51.  None of these actions

24  reflect the conduct of a party that believes it is acting in compliance with its customer agreements.

25  In all events, Defendant's contention that certain "provisions that actually appear" in the contract

26  (which it never identifies) purportedly permitted its alleged conduct raises issues of fact requiring

27  discovery.  Def. Br. at 9; *see, e.g., Boobuli's LLC*, 562 F. Supp. 3d at 486; *McNeary-Calloway*,

28  863 F. Supp. 2d at 957-59.

***Second***, Facebook argues that the implied covenant claim fails "for the same reasons as its breach of contract claim." Def. Br. at 11. Again, Facebook is wrong. Though the implied covenant is predicated on the existence of a contract, the claims are distinct. Here, Plaintiff alleges Facebook breached the implied covenant and acted in bad faith in covering up the Coding Change, "slow roll[ing]" the fix, and failing to "reimburse advertisers the amounts improperly overcharged"—conduct separate and apart from the express contractual breach. ¶¶49-51, 76-78. Facebook's failure to reimburse advertisers upon discovering the Coding Change was not an express requirement of the contract but rather ***implied*** as part of Facebook's good faith. Facebook's bad faith makes clear the implied covenant claim is not "duplicative," and certainly cannot be dismissed as such as a matter of law at this stage. Def. Br. at 12; *see, e.g., Daly v. United Healthcare Ins. Co.*, 2010 WL 4510911, at *5-6 (N.D. Cal. Nov. 1, 2010) (implied covenant claim not duplicative of contract claim where breaching party allegedly acted in bad faith); *ReachLocal, Inc.*, 2014 WL 12968062, at *4 (refusing to dismiss implied covenant claim as duplicative of contract claim); *Ellsworth*, 908 F. Supp. 2d at 1086 (similar).[3]

### B.     Facebook Breached Its Contract with Iron Tribe and the Members of the Class By Retaining the Overcharges Resulting from the Coding Change

Facebook's conduct in implementing the Coding Change in 2013, overcharging advertisers in operating a blended-price auction instead of second-price auction, and then failing to disclose or return those overcharges, violated Facebook's contracts. This conduct breached Facebook's Statement of Rights and Responsibilities, which provided that advertisers would only pay for

---

[3] Defendant's cases are not to the contrary. In *Woods v. Google Inc.*, 2011 WL 3501403, at *6 (N.D. Cal. Aug. 2011), the court refused to dismiss the implied covenant claim as duplicative, and instead held the contract did not impose the alleged implied duty Google failed to discharge, there, an alleged obligation not to partner with other advertisers on different terms. *See also subsequent decision at Woods v. Google Inc.*, 2013 WL 1435224, at *1-2 (N.D. Cal. Apr. 9, 2013) (sustaining breach of contract and implied covenant claims following amendment). And in *Schertzer v. Bank of America*, 109 F. 4th 1200, 1214 (9th Cir. 2024), dismissal of the implied covenant claim was upheld at summary judgment because the evidence showed it was "indistinguishable" from the sustained breach of contract and thus "superfluous." But this is a motion to dismiss, and Facebook argues there is no express contractual breach, which necessarily means the implied covenant claim cannot be dismissed as "duplicative" now. *See, e.g., In re Wells Fargo Cash Sweep Litig.*, 2025 WL 1785315, at *3 (N.D. Cal. June 27, 2025) (refusing to dismiss implied covenant claim as duplicative at the pleading stage because the "parties dispute the meaning of the contracts' terms").

orders in "accordance with our Payments Terms;" that the amounts owed would be "calculated based on our tracking mechanisms;" and that advertisers would "only be charged for the number of clicks or number of impressions your ad received" based on Facebook's advertising auction process. ¶¶53-56.  As the Complaint alleges, Facebook's own engineers acknowledged that the Coding Change altered the proper functioning of Facebook's auction process, and resulted in billions of dollars in overcharges to advertisers.  ¶¶37, 44-45.

As courts have held in highly analogous cases, these facts state a breach of contract.  *See, e.g.*, *In re Yahoo! Litig.*, 251 F.R.D. at 471 (denying motion to dismiss contract claim where plaintiffs alleged that contract's references to undefined terms for "Sponsored Search" and "Content Match" products constituted a promise to "target" plaintiffs' advertisements, which was breached when web platform charged plaintiffs for untargeted advertising placements); *Checkmate Strategic Grp. v. Yahoo! Inc.*, 2005 WL 8252495, at *5 (C.D. Cal. Dec. 19, 2005) (plaintiff pleaded breach of contract because term "Overture Marketplace rules" was ambiguous and at least "plausibly susceptible" to meaning alleged by plaintiff that advertisers would not be charged for "click fraud").

In response, Facebook argues that the Complaint's well-pleaded allegations detailing billions of dollars in overcharges, supported by internal documents and emails from Facebook senior engineers, do not allege a contract claim as a matter of law.  ***First***, Facebook argues that its contracts did not actually promise that Facebook would only charge customers according to its "advertising auction process," despite the plain language of agreement limiting charges based on Facebook's "tracking mechanisms" and the obvious necessity that the auction process work as intended for Facebook to hold up its end of the bargain.  Def. Br. at 8.  Facebook is essentially arguing that it never promised ***not*** to overcharge advertisers, and as support cites *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1095 (N.D. Cal. July 18, 2022) (Breyer, J.), a privacy case where this Court held Google had not made a specific promise to collect data only from apps that used Google's services.  But the agreement in *Hammerling* disclosed that Google "may" collect data and was not a promise to collect data "only" from Google apps.  *Id.*  By contrast, Facebook's contract defined affirmative obligations and delineated that advertisers would be charged "based

on our tracking mechanisms" and other webpages clarified that this meant advertisers would "only be charged for the number of clicks or number of impressions your ad received" in Facebook's auctions. ¶¶53-55. This Court noted the distinction in *Hammerling* when it wrote "[t]he question is whether Google breached anything that it promised, not whether Google did anything it did not promise." *Id.* Here, Facebook internally concluded advertisers were not charged in accordance with Facebook's auction process and interdependent "tracking mechanisms" as promised in the contract. ¶¶53-56.[4]

Indeed, Facebook engineers compared auction pricing between Facebook and Instagram as part of its experiments to identify the source of the revenue spike specifically because they expected auctions on the two platforms to operate in parallel. That Facebook engineers documented a disparity between the Facebook and Instagram auction results demonstrates that the Facebook auction process was ***not*** correctly operating Facebook's "advertising auction process" or pricing ads based on its "tracking mechanisms." ¶¶37-45.

***Second***, Facebook argues that the Complaint does not state a contract claim because it does not specify that the amounts advertisers were overcharged were not "calculated based on Facebook's tracking mechanisms," as its contracts required. Def. Br. at 9. But this is not correct, as the Complaint alleges in detail that Facebook's "tracking mechanisms"—including, specifically, the multi-feed mechanism—was improperly calculating what advertisers would owe. ¶¶36-47. Indeed, Facebook engineers internally recognized these tracking mechanisms were not charging advertisers as they should, that there was "something weird in the alternate vest gain computation in multi-feed," and the "pricing" was unexplainable and incorrect until the Coding Change was identified and fixed. ¶37. Again, the disparity in ad pricing between Facebook and

---

[4] Defendant's other cases only underscore that Plaintiff has stated a claim. In *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023), an antitrust case, the agreement contained no promise limiting Apple's ability to exclude other app developers from its platform, but rather an express provision saying the opposite. And both *Lloyd v. Facebook, Inc.*, 2024 WL 5121035, at *1 (N.D. Cal. Dec. 16, 2024) and *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1113 (N.D. Cal. 2011) involved claims by dissatisfied Facebook users (not advertisers) who alleged Facebook breached its Statement of Rights and Responsibilities by failing to prevent harassment by other Facebook users (*Lloyd*) or were removed from Facebook for harassing other users (*Young*), and have no bearing on Facebook's promises to advertisers here.

Instagram documented by Facebook engineers highlights Facebook's failure to charge advertisers correctly.  ¶¶38-41.

**Third**, Facebook lodges a series of factual disputes about whether the alteration to the auction process resulting from the Coding Change was improper under the contract because the "blended-price" auction Facebook secretly ran throughout the Class Period was still an "auction system."[5]  But as courts routinely hold, these fact-based arguments about a defendant's preferred reading of the terms on its website are not appropriate for resolution on a motion to dismiss.  *See, e.g., In re Yahoo! Litig.*, 251 F.R.D. at 471 (on a motion to dismiss, the court is "unable to dismiss, out of hand, plaintiffs' contention that extrinsic evidence will show that they bargained for targeted advertising services, even if the Agreement appears on its face to state otherwise").

**Fourth**, Facebook argues that advertisers' understanding of Facebook's usage of a "second-price" auction is irrelevant because, Defendant argues, the contract permitted the use of a "blended-price" auction, citing *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1076-77 (N.D. Cal. 2012).  But that case undermines Facebook's argument, as the plaintiff there did not assert a breach of contract claim; rather, the defendant, Apple, sought to invoke the user agreements in its defense of a privacy class action.  There, the court held the terms were sufficiently ambiguous and refused to resolve the parties' competing interpretations at the motion to dismiss stage.  *Id.*  Similarly, here, the Court should not rule as a matter of law that Plaintiff's interpretation is incorrect, especially when the contract must be interpreted against its drafter, Facebook.  Cal. Civ. Code § 1654.  That is particularly appropriate here, as Plaintiff's interpretation gives meaning to the contract's terms, imposing the commonsense obligation to abide by the auction process as described by Facebook's own employees and extensively discussed in the media and academia

---

[5] Facebook advances this interpretation of the contract despite not having submitted any relevant evidence supporting it, such as contemporaneous webpages or disclosures to advertisers describing its "tracking mechanisms."  Plaintiff has requested such information in discovery, which will reveal whether the blended-price auction was a "tracking mechanism" contemplated by the contract and Facebook's subsequent efforts to conceal changes to its auction process.  ¶51; *HSBC Bank USA, Nat'l Ass'n v. Dara Petroleum, Inc.*, 2010 WL 2197525, at *4 (E.D. Cal. May 28, 2010) (court applying California law cannot dismiss a contract claim without reviewing extrinsic evidence where one party claims such evidence will show the contract is ambiguous).

(¶¶16, 56) while Facebook's reading renders its obligation to use "tracking mechanisms" to determine price meaningless.  *See, e.g.*, *Nat. Res. Defense Council, Inc. v. Cnty. of Los Angeles*, 725 F.3d 1194, 1206 (9th Cir. 2013) (courts should avoid construing provisions to render them meaningless); *In re Yahoo! Litig.*, 251 F.R.D. at 471; *Checkmate Strategic Grp.*, 2005 WL 8252495, at *5.

      ***Fifth***, Defendant argues that Plaintiff failed to allege any damage.  But Plaintiff has done just that by alleging that it purchased advertisements on Facebook during the Class Period, ***all*** of which were impacted by the Coding Change, conducted under a blended-price auction, and resulted in overcharges.  ¶¶14, 34, 40, 90.  This is sufficient.  *See, e.g.*, *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011) ("quintessential injury-in-fact" occurs when plaintiffs allege that they "spent money that, absent defendants' actions, they would not have spent").

## III.    FACEBOOK'S CONDUCT VIOLATED THE "UNFAIR" PRONG OF THE UCL

      Plaintiff alleges that Facebook violated the "unfair" prong of the UCL under both the "balancing" test, where the harms flowing from the challenged conduct outweigh its benefits, and the "tethering" test, where the challenged conduct has a close nexus to a specific public policy. Facebook's conduct in secretly overcharging advertisers (¶¶34-52) by using a different auction method than the one it represented and advertisers understood it used (¶¶16-17, 34) had no societal benefit (¶82) and only served to enrich Facebook.  These facts easily state a claim under both tests, particularly in light of the fact that unfairness claims generally require a "review of the evidence" that cannot be resolved the pleading stage.  *See, e.g., McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (Cal. App. 2006); *Day v. GEICO Cas. Co.*, 580 F. Supp. 3d 830, 845 (N.D. Cal. 2022) (allegation that COVID insurance policy which offered "only minimal relief to new and renewing policyholders and nothing to overcharged policyholders who did not renew their policies" stated claim under both balancing and tethering tests); *Calcagno v. Kipling Apparel Corp.*, 2024 WL 3261205, at *9 (S.D. Cal. Jul. 1, 2024) (UCL statute itself exhibits a legislatively-declared policy in favor of pricing transparency, and misleading pricing information influencing consumer spending constitutes an unfair practice under the UCL); *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1055 (N.D. Cal. 2021) (integrity in pricing information is particularly critical

and "tethered to legislative policy," especially in the context of technology markets), *rev'd on other grounds*, 67 F.4th 946 (9th Cir. 2023).

Perhaps recognizing the strength of Plaintiff's claims, Facebook makes arguments that are inapplicable and irrelevant to the circumstances here. ***First***, Facebook contends that the UCL claim must fail because it relies on "the same allegations that underlie [Plaintiff's] legally insufficient breach of contract claim." Def. Br. at 12. Not so. While Facebook's conduct breached its contract, a plaintiff can state a UCL claim without alleging a contractual breach. *See generally, Deerpoint Grp., Inc. v. Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1235 (E.D. Cal. 2018) ("statutory UCL claim exists separate and apart from any contract"); *Puentes v. Wells Fargo Home Mortgage, Inc.*, 160 Cal. App. 4th 638, 645 (2008).[6]

Facebook's cases illustrate why Plaintiff states a UCL claim. For example, in *Santa Barbara Smokehouse, Inc. v. Aquachile, Inc.*, 2020 WL 6743592, at *6-7 (C.D. Cal. Jul. 7, 2020), the court refused to apply a UCL claim because the case concerned a single supplier who had a contractual obligation to sell to a single distributor under the parties' agreement and there was no allegation that the supplier had access to unique information, concealed its conduct, and enriched itself at the expense of the plaintiff. The court specifically distinguished the facts before it from conduct similar to that alleged here, a "systematic breach of form contract affecting many customers or producers." *Id.* at *7; *cf. Rosell v. Wells Fargo Bank, N.A.*, 2014 WL 4063050, at *6 (N.D. Cal. Aug. 15, 2014) (in foreclosure proceeding, only conclusory allegation was that Wells Fargo's decision to foreclose was unfair after refusing to take a borrower's payments).

***Second***, Facebook argues Plaintiff's UCL claims fail because the Complaint only "state[s] the legal standard." Def. Br. at 14. But this just ignores the Complaint, which alleges Facebook's Coding Change resulted in billions of dollars in overcharges, that Facebook placed its profits before advertisers' rights in failing to identify and report the Coding Change, and instead concealed

---

[6] The opposite is not true, because, like here, a common law breach of the implied covenant of good faith and fair dealing can serve as a predicate claim for UCL purposes. *Gabana Gulf Distrib., Ltd. v. GAP Int'l Sales, Inc.*, 2008 WL 111223, at *10 (N.D. Cal. Jan. 9, 2008) (denying summary judgment on UCL claim because "Gabana may use the covenant claim as a predicate for § 17200 liability"), *aff'd*, 343 F. App'x 258 (9th Cir. 2009).

this massive overcharging through a "slow rollout" of the fix to correct the advertising platform so that the overcharges would not be detected. ¶¶47-51. Even Facebook's own engineers recognized this conduct was wrongful (¶¶37-50) and there was no societal benefit from Facebook using a different auction process than the one it purported to use and secretly retaining a financial windfall on the order of billions of dollars. ¶¶81-82. This is more than sufficient. *Ellsworth*, 908 F. Supp. 2d at 1086.[7]

***Third***, Facebook states that its conduct is not unfair under any test used by California courts, arguing that Plaintiff has not pled that the harm to consumers outweighs the utility of Defendant's conduct despite the "lenient" standard on a motion to dismiss. *Ellsworth*, 908 F. Supp. 2d at 1090. In doing so, Facebook cites inapposite product labeling cases that bear no resemblance to the facts here. *See Taleshpour v. Apple Inc.*, 549 F. Supp. 3d 1033, 1045 (N.D. Cal. 2021), *aff'd*, 2022 WL 1577802 (9th Cir. May 19, 2022) (dismissing UCL claim where plaintiff did not experience any defect until after warranty expired); *Holmes v. Hospira, Inc.*, 2013 WL 12132046, at *7 (C.D. Cal. Jan. 10, 2013) (plaintiff alleged defendants made false claims to induce physicians to prescribe antibiotic that led to a rare skin infection but did not allege any harm outweighed the utility of the antibiotics); *Gunn v. FCA US, LLC*, 2023 WL 5418736, at *4 (N.D. Cal. Aug. 22, 2023) (allegation that consumers paid substantially more than they otherwise would have did not state claim because there was a full disclosure of the charges); *Millam v. Energizer Brands, LLC*, 2024 WL 2988210, at *2 (9th Cir. June 14, 2024) (unfairness claim dismissed where only alleged misconduct was the alleged false statement that batteries "may" last up to 50% longer, which was not false because plaintiffs only alleged batteries did not "always" last more than 50% longer). Rather, this case is like *GEICO* and numerous other UCL cases where a defendant has obtained a financial windfall from unfair conduct impacting thousands of victims. 580 F. Supp.

---

[7] Facebook's cases are inapposite. *Price v. Apple, Inc.*, 2022 WL 1032472, at *5 (N.D. Cal. Apr. 6, 2022) (user complained it was unfair for Apple to terminate his Apple ID without comparing the harm of Apple's conduct to its utility); *Williamson v. McAfee, Inc.*, 2014 WL 4220824, at *7 (N.D. Cal. Aug. 22, 2014) (complaint did not have any allegations about why McAfee's auto-renewal program was injurious to consumers); *Williams v. J.P. Morgan Chase Bank, N.A.*, 2023 WL 3590682, at *4 (N.D. Cal. May 22, 2023) (plaintiff failed to allege why it was unfair for bank to refund charges that plaintiff paid to a third party).

1   3d at 845.[8]

2   **IV.   FACEBOOK WAS UNJUSTLY ENRICHED BY SECRETLY OVERCHARGING ADVERTISERS**

3

4       Facebook's conduct in overcharging customers through the undisclosed Coding Change

5   unjustly enriched Defendant at the expense of Plaintiff and other Facebook advertisers by billions

6   of dollars.  As the Complaint alleges, Facebook unfairly retained these overpayments, and

7   continued overcharging advertisers even after it determined that the Coding Change required

8   correction to avoid raising suspicion.  These are quintessential facts supporting a claim for unjust

9   enrichment.  *See, e.g., Hirsch v. Bank of Am.*, 107 Cal. App. 4th 220, 229 (2003) (plaintiffs stated

10   unjust enrichment claim based on bank defendants' unjustified overcharges and retention of

11   excessive fees); *First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1664 (1992) (restitution

12   is remedy against defendant who has reason to know it retained funds to which it was not entitled).

13       Facebook makes two meritless arguments in seeking dismissal.  ***First***, Facebook argues

14   that Plaintiff's unjust enrichment claim should be dismissed because California law does not

15   recognize it as a stand-alone cause of action, citing *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d

16   753, 762 (9th Cir. 2015).  This is a misstatement of law, as both the Ninth Circuit and California

17   Supreme Court do just that and, following *Astiana*, have clarified that independent claims for

18   unjust enrichment can proceed alongside contract-based claims.  *Bruton v. Gerber Prods. Co.*, 703

19   F. App'x 468, 470 (9th Cir. 2017) (citing clarification of unjust enrichment claims under California

20   law by the California Supreme Court in *Hartford Casualty Ins. Co. v. J.R. Marketing, L.L.C.*, 61

21   Cal. 4th 988, 999 (2015)); *see also Boobuli's*, 562 F. Supp. 3d at 486 ("To the extent that State

22

23   ────────────────────

[8] Facebook offers nothing in the way of "reasons, justifications, or motives," or "utility of [its] conduct," which is alone fatal to its "balancing" argument. *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 922 (N.D. Cal. 2013).  Moreover, beyond pointing out that "tethering" requires a nexus to a specific policy, Facebook does not attempt to argue secretly overcharging advertisers does not violate clear, "established public policy," because it clearly does.  *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (finding a public policy against misleading pricing information); *see also GEICO*, 580 F. Supp. 3d at 845 (finding public policy against overcharging insurance holders); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 813 (N.D. Cal. Dec. 16, 2011) (finding public policy against appropriation of an individual's likeness without consent); *Capello v. Walmart, Inc.*, 394 F. Supp. 3d 1015, 1024 (N.D. Cal. 2019) (finding public policy in favor of holding companies accountable to their own privacy policies).

Farm asserts that there is no standalone cause of action for unjust enrichment, I find that argument unconvincing.") (citing *Astiana*, 783 F.3d at 762).[9]

      *Second*, Facebook argues that Plaintiff cannot sustain an unjust enrichment claim because it also brought a breach of contract claim. Again, this ignores California law and the Federal Rules, which allow Plaintiff to assert claims in the alternative. Indeed, Facebook's exact argument was rejected by Judge Orrick in *Boobuli's* as ignoring the clarification of California law in *Hartford*, as well as plaintiffs' ability to plead in the alternative under Rule 8. Judge Orrick rightly held that, at the pleading stage, unjust enrichment claims can "co-exist alongside a contract remedy because the Court has yet to determine whether a contract remedy is available to Plaintiff." *Boobuli's*, 562 F. Supp. 3d at 486 (citing *United States ex rel. Begole v. Trenkle*, 2010 WL 11596170, at *11-12 (C.D. Cal. July 16, 2010)); *see also Oracle Corp. v. SAP AG*, 2008 WL 5234260, at *9 (N.D. Cal. Dec. 15, 2008) (unjust enrichment claim can proceed alongside breach of contract claim because "[a] defendant is not entitled to have a cause of action dismissed for failure to state a claim simply because it conflicts with another cause of action"); *Shared P'ship v. Meta Platforms, Inc.*, 2024 WL 4280936, at *6 (N.D. Cal. Sept. 23, 2024) (allowing contract and UCL claims to proceed).[10] Defendant's motion should be denied.[11]

---

[9] Courts interpreting California law construe unjust enrichment claims as alleging a "quasi-contract claim seeking restitution," which is simply another name for the same claim. *Astiana*, 783 F.3d at 762 (alleging that defendant was unjustly enriched was "sufficient to state a quasi-contract cause of action"). To state a claim for restitution, a plaintiff "must plead receipt of a benefit and the unjust retention of the benefit at the expense of another." *Walters v. Fid. Mortg. of Cal.*, 2010 WL 1493131, at *12 (E.D. Cal. Apr. 14, 2010). Improper retention of payments is a prime example of conduct leading to an unjust enrichment claim. *Ellsworth*, 908 F. Supp. 2d at 1088 (improper retention of commissions alleged unjust enrichment).

[10] Defendant's cited cases do not contradict this. *See Saroya v. Univ. of Pac.*, 503 F. Supp. 3d 986, 998 (N.D. Cal. 2020) ("A plaintiff may assert inconsistent theories of recovery at the pleading stage, including inconsistent claims alleging both the existence and the absence of an enforceable contract"). *Gardiner v. Walmart, Inc.* is distinguishable because in that case, the plaintiff's amendment did not cure any deficiencies the court identified in the previous decision dismissing the complaint and only added a cause of action for unjust enrichment. 2021 WL 4992539, at *8 (N.D. Cal. Jul. 28, 2021); *see also Gardiner v. Walmart Inc.*, 2021 WL 2520103, at *11 (N.D. Cal. Mar. 5, 2021).

[11] In arguing otherwise, Defendant badly miscites this Court's decision in *Hammerling*, which recognized the subsequent clarification of the status of unjust enrichment claims in California

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss in its entirety.  To the extent the Court grants any portion of Defendant's motion, Plaintiff respectfully requests leave to amend.  Fed. R. Civ. P. 15(a); *Ante v. Office Depot Bus. Servs.*, 641 F. Supp. 2d 906, 908 (N.D. Cal. 2009) (leave to amend should be freely given).

[SIGNATURE PAGE FOLLOWS]

---

following *Hartford*, but instead dismissed the unjust enrichment claims there because plaintiffs had "not plausibly pleaded an actionable wrong."  615 F. Supp. 3d at 1096-98.

1  Dated: August 15, 2025                   Respectfully Submitted,

2                                           **BERNSTEIN LITOWITZ BERGER**
3                                               **& GROSSMANN LLP**

4                                           */s/ Avi Josefson*
5                                           AVI JOSEFSON (*pro hac vice*)
                                            (avi@blbglaw.com)
6                                           MICHAEL D. BLATCHLEY (*pro hac vice*)
                                            (michaelb@blbglaw.com)
7                                           AVI MEDIRATTA
                                            (avi.mediratta@blbglaw.com)
8                                           1251 Avenue of the Americas
                                            New York, New York 10020
9                                           Tel: (212) 554-1400
                                            Fax: (212) 554-1444
10
11                                          JONATHAN D. USLANER (Bar No. 256898)
                                            (jonathanu@blbglaw.com)
12                                          2121 Avenue of the Stars, Suite 2575
                                            Los Angeles, CA 90067
13                                          Tel: (310) 819-3481

14
15                                          **BISHOP PARTNOY**
                                            ROBERT E. BISHOP (*pro hac vice*)
                                            (bobby@bishoppartnoy.com)
16                                          FRANK PARTNOY
                                            (frank@bishoppartnoy.com)
17                                          1717 K Street, NW, Suite 900
                                            Washington, D.C. 20006
18                                          (202) 787-5769

19
                                            *Counsel for Plaintiff Iron Tribe Fitness*
20
21
22
23
24
25
26
27
28