James P. Rouhandeh (*pro hac vice*)
rouhandeh@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

Andrew Yaphe (SBN 274172)
andrew.yaphe@davispolk.com
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile: (650) 752-2111

*Counsel for Defendant*
*Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IRON TRIBE FITNESS, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:25-cv-03281-CRB<br><br>**DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**<br><br>Date: October 3, 2025<br>Time: 10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Before the Honorable Charles R. Breyer |

## STATEMENT OF ISSUES

1.      Whether all of plaintiff's claims should be dismissed as time-barred, given that all of them are subject to a four-year statute of limitations and the complaint is devoid of factual allegations that Facebook did anything allegedly unlawful within the last *seven* years.

2.      Whether plaintiff's breach of contract claim should be dismissed, given that plaintiff does not identify any contractual provision that Facebook supposedly breached and does not make any factual allegations showing that it was injured due to Facebook's purported breach.

3.      Whether plaintiff's claims for breach of the implied covenant of good faith and fair dealing, violation of the California Unfair Competition Law ("UCL"), and unjust enrichment—all of which rely on the same factual allegations and seek the same damages as plaintiff's breach of contract claim—should be dismissed for the same reasons as the breach of contract claim, in addition to further reasons specific to those claims.

# TABLE OF CONTENTS

_____

PAGE

SUMMARY OF ARGUMENTS ...........................................................................1

FACTUAL ALLEGATIONS ..............................................................................2

ARGUMENT .......................................................................................4

I.      THIS ACTION IS TIME-BARRED ...........................................................4

II.     PLAINTIFF'S BREACH OF CONTRACT CLAIM SHOULD BE
        DISMISSED BECAUSE PLAINTIFF DOES NOT ALLEGE THAT
        FACEBOOK BREACHED ANY CONTRACT ...............................................5

III.    PLAINTIFF'S REMAINING CLAIMS SHOULD BE DISMISSED.............................11

        A.    Plaintiff's Breach of Implied Covenant of Good Faith and Fair
              Dealing Claim Should Be Dismissed...........................................11

              1.    Plaintiff Cannot Use an Implied Covenant Claim to Impose
                    Additional Substantive Duties on Facebook .............................11

              2.    The Implied Covenant Claim Should Be Dismissed as
                    Duplicative ...........................................................14

        B.    Plaintiff's UCL Claim Should Be Dismissed ......................................16

        C.    Plaintiff's Unjust Enrichment Claim Should Be Dismissed....................18

CONCLUSION.......................................................................................20

# TABLE OF AUTHORITIES

—————————————

Page(s)

## Cases

*Astiana v. Hain Celestial Grp.*,
783 F.3d 753 (9th Cir. 2015) ............................................................................. 18, 19

*Balboa Cap. Corp. v. JAAM Transp. LLC*,
2023 WL 3089999 (C.D. Cal. Mar. 1, 2023) ............................................................ 13

*Barnett v. Kapla*,
2020 WL 7428321 (N.D. Cal. Dec. 18, 2020) ........................................................... 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................... 2

*Bodenburg v. Apple Inc.*,
146 F.4th 761 (9th Cir. 2025) ................................................................... 6, 7, 18

*Boobuli's LLC v. State Farm Fire & Casualty Co.*,
562 F. Supp. 3d 469 (N.D. Cal. 2021) .................................................................. 20

*Cappello v. Walmart Inc.*,
394 F. Supp. 3d 1015 (N.D. Cal. 2019) ................................................................. 18

*Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
2 Cal. 4th 342 (1992) ....................................................................................... 12

*Checkmate Strategic Grp. v. Yahoo! Inc.*,
2005 WL 8252495 (C.D. Cal. Dec. 19, 2005) ......................................................... 7

*Cover v. Windsor Surry Co.*,
2015 WL 4396215 (N.D. Cal. July 17, 2015) ......................................................... 5

*Cruz v. Townsquare Media, Inc.*,
2025 WL 2076626 (N.D. Cal. July 23, 2025) ........................................................ 15

*Daniels v. Alphabet Inc.*,
2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ........................................................ 15

*Day v. GEICO Cas. Co.*,
580 F. Supp. 3d 830 (N.D. Cal. 2022) .................................................................. 17

*De Havilland v. FX Networks, LLC*,
21 Cal. App. 5th 845 (2018) ............................................................................... 18

*Durell v. Sharp Healthcare*,
183 Cal. App. 4th 1350 (2010) ............................................................................ 19

*Ellsworth v. U.S. Bank*,
908 F. Supp. 2d 1063 (N.D. Cal. 2012) ............................................................ 12, 14

*In re Facebook PPC Advert. Litig.*,
709 F. Supp. 2d 762 (N.D. Cal. 2010) ........................................................................ 10

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) ...................................................................................................... 4

*Fraley v. Facebook, Inc.*,
830 F. Supp. 2d 785 (N.D. Cal. 2011) ...................................................................... 18

*In re Google RTB Consumer Privacy Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022) ...................................................................... 13, 14

*Guz v. Bechtel Nat'l, Inc.*,
24 Cal. 4th 317 (2000) .................................................................................................... 11

*Hall v. YouTube, LLC*,
2025 WL 1482007 (N.D. Cal. May 5, 2025) .............................................................. 6

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. July 18, 2022) ......................................... 7, 18, 19, 20

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013) ...................................................................................... 17

*HSBC Bank USA v. Dara Petroleum, Inc.*,
2010 WL 2197525 (E.D. Cal. May 28, 2010) .......................................................... 10

*Husain v. Campbell Soup Co.*,
747 F. Supp. 3d 1265 (N.D. Cal. 2024) .................................................................... 18

*Huynh v. Quora, Inc.*,
2019 WL 11502875 (N.D. Cal. Dec. 19, 2019) ...................................................... 19

*Langan v. United Servs. Auto. Ass'n*,
69 F. Supp. 3d 965 (N.D. Cal. 2014) ........................................................................ 10

*Letizia v. Facebook Inc.*,
267 F. Supp. 3d 1235 (N.D. Cal. 2017) .................................................................... 12

*Lever Your Bus. Inc. v. Sacred Hoops & Hardwood, Inc.*,
2020 WL 2465658 (C.D. Cal. May 11, 2020) ........................................................ 12

*Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*,
184 Cal. App. 3d 1479 (1986) ...................................................................................... 6

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) ...................................................................................... 11

*Mendoza v. Countrywide Home Loans, Inc.*,
2009 WL 4706350 (N.D. Cal. Dec. 3, 2009) .......................................................... 13

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) ................................................................ 6

*Oracle Corp. v. SAP AG*,
   2008 WL 5234260 (N.D. Cal. Dec. 15, 2008) ....................................... 20

*Pearl v. Coinbase Glob., Inc.*,
   2024 WL 3416505 (N.D. Cal. July 15, 2024) ........................................ 19

*Plumlee v. Pfizer, Inc.*,
   664 F. App'x 651 (9th Cir. 2016) ....................................................... 4, 5

*Ramirez v. Charter Commc'ns, Inc.*,
   16 Cal. 5th 478 (2024) ......................................................................... 6

*Ray v. Google LLC*,
   2025 WL 2058822 (9th Cir. July 23, 2025) ......................................... 6, 7

*Robalo LLC v. Ramey*,
   2012 WL 244340 (E.D. Cal. Jan. 25, 2012) .......................................... 13

*Rutherford Holdings, LLC v. Plaza Del Rey*,
   223 Cal. App. 4th 221 (2014) .............................................................. 19

*Schrader Cellars, LLC v. Roach*,
   2021 WL 9816545 (N.D. Cal. June 10, 2021) ....................................... 18

*Sepanossian v. Nat'l Ready Mixed Concrete Co.*,
   97 Cal. App. 5th 192 (2023) ................................................................ 20

*Shared Partnership v. Meta Platforms, Inc.*,
   2024 WL 4280936 (N.D. Cal. Sept. 23, 2024) ..................................... 20

*Stapleton v. JPMorgan Chase Bank*,
   779 F. Supp. 3d 1059 (N.D. Cal. 2025) ........................................... 19, 20

*Taleshpour v. Apple Inc.*,
   549 F. Supp. 3d 1033 (N.D. Cal. 2021) ................................................ 17

*Tawfik v. JPMorgan Chase Bank*,
   2020 WL 5074398 (N.D. Cal. Aug. 26, 2020) ....................................... 19

*Third Story Music, Inc. v. Waits*,
   41 Cal. App. 4th 798 (1995) ................................................................ 14

*Wartell v. Wells Fargo Bank*,
   755 F. Supp. 3d 1252 (N.D. Cal. 2024) ................................................. 5

*Weisberg v. Stripe, Inc.*,
   2016 WL 3971296 (N.D. Cal. July 25, 2016) ......................................... 9

*Wright v. Charles Schwab & Co.*,
   2020 WL 6822887 (N.D. Cal. Nov. 20, 2020) ................................. 17, 19

*In re Yahoo! Litig.*,
    251 F.R.D. 459 (C.D. Cal. 2008) .................................................................................... 7, 10

STATUTES & RULES

Fed. R. Civ. P. 8 ................................................................................................................ 19, 20

OTHER

Meta Business Help Center, *About ad auctions*, https://www.facebook.com/busi-ness/help/430291176997542?id=561906377587030 ....................................................................9

## SUMMARY OF ARGUMENTS[1]

Plaintiff's complaint, along with each of its claims, is entirely predicated on the idea that Facebook was contractually obligated to employ a second-price auction. But the complaint does not allege that Facebook *ever promised* to use a second-price auction. Plaintiff does not identify any contractual language in which Facebook committed to use such a process. Nor does it point to any allegation that Facebook *ever represented* that it would use such a process. Plaintiff instead points to a handful of articles—none published by Facebook or written by Facebook employees— whose authors characterized the auction process used by Facebook as a "Vickrey-Clarke-Groves auction." On that basis, plaintiff claims that Facebook breached its contract with advertisers, or alternatively violated an implied duty to them. Plaintiff's position, in a nutshell, is that if an author for *Wired* magazine believed that Facebook's auction process worked in a certain way, Facebook was contractually bound to conduct its auctions per that author's understanding. That extraordinary position finds no support in the law and should be rejected by this Court.

Faced with the reality that the complaint is devoid of factual allegations that would support its claims, plaintiff's opposition repeatedly misstates what is in the complaint. The opposition effectively concedes that the complaint does not allege that Facebook contractually promised to use a second-price auction process—which is why it instead requests that the Court "impos[e]" on defendant the "obligation to abide by" that pricing methodology. Opp. at 19. And although the opposition repeatedly contends that Facebook "purported" to use a second-price auction process (*id.* at 4, 5, 14, 22), the complaint *never alleges* that Facebook made any such representation to anyone. In sum: the alleged contract did not require Facebook to use that methodology, and the complaint never alleges that Facebook told advertisers that it would use that methodology. Thus, even taking all of the complaint's allegations as true, all of its claims fail.

The opposition seeks to portray a nefarious picture of Facebook "concealing" its conduct so it could continue to "overcharge" advertisers. But the narrative that plaintiff tries to advance is predicated on the assumption that Facebook was somehow *obligated* to use a second-price auction

---

[1]    Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.

process or represented to advertisers that it was doing so.  Because those assumptions are not supported by any factual allegation in the complaint, plaintiff's factual narrative falls apart, and its claims fail to cross the "line between possibility and plausibility."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  Stripped of rhetoric, plaintiff is merely describing ordinary business activity—e.g., alleged software updates and internal analysis of Facebook's auction methodology.  Facebook did not "conceal" that activity, because the concept of "concealment" would only apply if Facebook were under an obligation to use the second-price auction process or to disclose its pricing methodology to advertisers.  And the amounts Facebook charged to advertisers could be characterized as "overcharges" only if Facebook were obligated to determine those amounts using a different auction process—which, again, it was not.  If plaintiff's theory were endorsed, any time a company changes its internal code or operations, it would be required to tell the world about it—despite the absence of any contract provision or representation on the topic—if any third party anywhere made an assertion regarding how that code operated.  And, even more remarkably, companies in such circumstances would be *forbidden* from making a change to their internal code or processes—even if nothing in their contracts or public statements says anything about such topics.  That would turn every change to any company's code into grounds for a lawsuit.

For these reasons, as well as those set forth below and in the opening brief, the Court should dismiss the complaint with prejudice.

## FACTUAL ALLEGATIONS

The opposition brief repeatedly mischaracterizes plaintiff's own complaint, suggesting that it alleges facts that it does not.  In the chart below, defendant highlights several of those discrepancies to demonstrate what the complaint *actually* alleges.

| Argument in plaintiff's opposition | Allegation in plaintiff's complaint |
| --- | --- |
| "Although Facebook purported to use a 'second-price' auction, told advertisers it was using a 'second price' auction, and advertisers expected that Facebook actually employed a | The complaint is devoid of any factual allegation that Facebook "purported to use" a second-price auction or "told advertisers" it was doing that.  The two paragraphs plaintiff cites do not include any such factual allegations. |

| | |
|---|---|
| 'second-price' auction, during the Class Period, Facebook instead operated a 'blended-price' auction." Opp. at 4 (citing Compl. ¶¶ 2, 34). | Paragraph 2 says that Facebook "purported to use" a second-price auction process, but does not plead *any* supporting facts or allege any representation by Facebook on the topic.  Paragraph 34 does not allege anything about what Facebook "told" advertisers or anyone else about its auction process. |
| "Facebook's auction process [was] . . . confirmed by Facebook's Chief Economist to be a second-price auction process . . . ." Opp. at 6 (citing Compl. ¶ 16). | Paragraph 16 does not include any statement from "Facebook's Chief Economist"—or from any Facebook employee.  Paragraph 33, which contains the only alleged statement attributed to an identified Facebook employee, attributes the following statement—which says nothing about a "second-price auction process"—to "Facebook's Chief Economist":  "If you're an advertiser and you're getting a chance to show your ad, you're going to take away the opportunity from someone else.  The price can be determined based on how much value is being displaced from those other people.  An advertiser will only win this placement if their ad really is the most relevant, if it really is the best ad to show to this person at this point in time." |
| "Even Facebook's own engineers recognized this conduct was wrongful . . . ." Opp. at 22 (citing Compl. ¶¶ 37–50). | There is no allegation that Facebook's engineers thought they were doing anything "wrongful."  The complaint alleges that Facebook's engineers "investigat[ed] pricing irregularities in its advertising auction process," |

|  | Compl. ¶ 37, and that an unspecified person wrote that they "cannot explain the pricing," *id.* ¶¶ 37, 43, and saw "something weird" in the pricing model, *id*. ¶ 37.  In keeping with these allegations, the complaint alleges pricing "irregularities," "anomalies," and "disparities." *Id.* ¶¶ 36–47. |
|---|---|

## ARGUMENT

### I.    This Action Is Time-Barred

As shown in Facebook's opening brief, all of plaintiff's claims are time-barred.  Plaintiff does not dispute that all of its claims are subject to a four-year statute of limitations, as Facebook demonstrated.  *See* Mot. at 6.  Nor does plaintiff contest the fact that the complaint is devoid of any factual allegations of purported misconduct later than 2017.  *See id.* at 7.  Thus, because the expiration of the applicable statute of limitations "is apparent from the face" of the complaint—as plaintiff does not dispute—"it must be dismissed."  *Barnett v. Kapla*, 2020 WL 7428321, at \*20 (N.D. Cal. Dec. 18, 2020) (citing *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)).

Plaintiff's only argument is that its claims should be tolled under California's discovery rule, notwithstanding that the statute of limitations lapsed years ago.  *See* Opp. at 9–11.  But plaintiff misapprehends that rule.  It does not permit a plaintiff to file suit whenever it likes—even years after the limitations period—and avoid a finding that its claims are time-barred merely by asserting that it did not have "reason to know" of its claims.  *Id.* at 10.  Rather, to invoke the rule, a plaintiff "must *specifically plead facts* to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005).  "In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to 'show diligence'; 'conclusory allegations will not withstand [a motion to dismiss].'"  *Id.*; *see Plumlee v. Pfizer, Inc.*, 664 F. App'x 651, 653 (9th Cir. 2016) (affirming dismissal of complaint because plaintiff "failed to allege any facts that she was unable to discover the factual bases of her claims earlier despite exercising reasonable diligence").

Here, plaintiff fails to meet its burden of showing reasonable diligence—or indeed, any diligence at all.  The complaint merely alleges that the supposed "overcharges" were "discovered by Plaintiff through the investigation of undersigned counsel."  Compl. ¶ 52.  There are no factual allegations—let alone facts alleged with the requisite specificity—as to the "time" when that "discovery" took place; what steps, if any, plaintiff took to discover the alleged overcharges; or anything showing that plaintiff "was unable to discover [such facts] earlier despite exercising reasonable diligence."  *Plumlee*, 664 F. App'x at 653.  Indeed, plaintiff's own cases underscore the inadequacy of plaintiff's allegations.  *See, e.g.*, *Cover v. Windsor Surry Co.*, 2015 WL 4396215, at *4 (N.D. Cal. July 17, 2015) (plaintiff "routinely inspected his property throughout each year"); *Wartell v. Wells Fargo Bank*, 755 F. Supp. 3d 1252, 1256 (N.D. Cal. 2024) (plaintiff specifically alleged the date when he discovered he was owed money).

Finally, plaintiff's claim that Facebook "concede[d]" that discovery is necessary to determine whether the discovery rule applies (Opp. at 11) is a misstatement of both Facebook's briefing on its motion to stay discovery and the Court's order on that motion.  In connection with its motion to stay discovery, Facebook explained that the Court "need not consider" the statute of limitations issue to resolve that motion, because Facebook's other motion-to-dismiss arguments were dispositive of the whole case.  Dkt. No. 33 at 1.  In its order, the Court recognized that this explanation was limited to the motion to stay, noting that Facebook had stated that the "statute of limitations argument" did not need to be addressed "in connection with this motion [i.e., the motion to stay discovery]."  Dkt. No. 36 at 2.  Plaintiff's suggestion that Facebook "abandon[ed]" the argument (Opp. at 11)—or that the Court stated as much—is simply wrong.

## II.    Plaintiff's Breach of Contract Claim Should Be Dismissed Because Plaintiff Does Not Allege that Facebook Breached Any Contract

The opening brief demonstrated that plaintiff's breach of contract claim should be dismissed for multiple reasons.  This claim hinges on plaintiff's assertion that Facebook was contractually obligated to "operat[e] a blended-price auction instead of [a] second-price auction."  Opp. at 16.  But, as the opening brief showed, the complaint does not identify any contractual provision requiring Facebook to use a second-price auction.  *See* Mot. at 8–9.  And plaintiff's opposition

does not point to any such contractual language.  Indeed, plaintiff effectively *concedes* the point when it asks the Court to "impos[e]" on Facebook the "obligation to abide by the [second-price] auction process."  Opp. at 19.  It is clear that plaintiff's argument is nothing more than a request that the Court retroactively impose on Facebook a contractual obligation that plaintiff acknowledges was not part of its agreement with Facebook.  But courts may not "impose" obligations that are not part of the contract the parties agreed to.  *See, e.g.*, *Ramirez v. Charter Commc'ns, Inc.*, 16 Cal. 5th 478, 516 (2024) ("Courts cannot rewrite agreements and impose terms to which neither party has agreed."); *Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*, 184 Cal. App. 3d 1479, 1486 (1986) ("Courts will not add a term about which a contract is silent."); *see also Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 679 (9th Cir. 2007) (reciting "the unremarkable proposition of contract law that a court will not create new obligations that do not exist within the four corners of a contract").

*First*, the purported contractual language on which plaintiff's breach of contract claim is predicated does not require Facebook to use a second-price auction process.  *See* Mot. at 8.  Plaintiff's failure to identify any contractual provision that would have required Facebook to use a second-price auction process is fatal to its claim.  To state a claim for breach of contract, a plaintiff "must identify a specific contract provision breached by the defendant"—and if the plaintiff "cannot point to any provision of the agreement that expresses the obligation sued upon," the "breach of contract claim fails."  *Bodenburg v. Apple Inc.*, 146 F.4th 761, 767–68 (9th Cir. 2025) (citation modified).  In light of this principle, "[c]ourts have consistently dismissed breach of contract claims where plaintiffs fail to allege the relevant promise or term that was supposedly breached."  *Hall v. YouTube, LLC*, 2025 WL 1482007, at *4 (N.D. Cal. May 5, 2025).

The Ninth Circuit's recent decisions in *Bodenburg* and *Ray v. Google LLC*, 2025 WL 2058822 (9th Cir. July 23, 2025), are instructive.  In *Bodenburg*, the plaintiff alleged that Apple had breached its contract because the contract promised her "additional storage" beyond the amount of free storage that all customers receive.  146 F.4th at 767.  The Ninth Circuit explained that her argument "founders on the actual language of the contract under which she sues," because while that contract "obligated Apple to provide additional storage," it did not obligate Apple to

provide the specific additional amount that the plaintiff "subjectively believed" she was entitled to.  *Id.* at 768.  Likewise, in *Ray*, the plaintiff alleged that "Google contracted to pay him $22 per view of his YouTube videos."  2025 WL 2058822, at *1.  In affirming the dismissal of the breach of contract claim, the Ninth Circuit explained that none of the plaintiff's alleged agreements with Google "contain such a pay-per-view promise" and held that "Google cannot breach a promise that does not exist."  *Id.*  The same is true here:  Facebook cannot breach a promise to use a second-price auction process "that does not exist," and plaintiff's inability to point to any provision of its contract that contains the "obligation sued upon" dooms its breach of contract claim.[2]

In an attempt to avoid dismissal, plaintiff relies on two out-of-district cases.  Opp. at 17 (citing *In re Yahoo! Litig.*, 251 F.R.D. 459, 471 (C.D. Cal. 2008) and *Checkmate Strategic Grp. v. Yahoo! Inc.*, 2005 WL 8252495, at *5 (C.D. Cal. Dec. 19, 2005)).  But those cases only underscore the insufficiency of plaintiff's allegations.  In them, the plaintiff alleged that the defendant's marketing materials were incorporated into the parties' contract and made specific promises about advertising tools the defendant would provide.  In *In re Yahoo!*, the plaintiff claimed that the contract's promises to provide certain products amounted to a promise that the defendant would provide the plaintiff with advertising services described in separate marketing materials.  251 F.R.D. at 471.  The court allowed discovery because it determined that the plaintiff presented a "reasonable alternative interpretation" that did "not add to, detract from, or vary the Agreement's express terms."  *Id.* at 471–72.  The same judge came to the same conclusion in *Checkmate Strategic Group*, where the plaintiff claimed that the contract's promise to charge "for all clicks on your search listings . . . which shall be computed according to [certain] rules" incorporated a promise to use certain software that the defendant described on a separate webpage.  2005 WL 8252495, at *1–2.  In other words, in both cases, the court relied on statements that the defendant *itself* had made.  Here, by contrast, plaintiff argues that *third-party assertions* about Facebook's auction

---

[2]    Plaintiff tries to distinguish this Court's decision in *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069 (N.D. Cal. July 18, 2022), by asserting that "Facebook's contract [here] defined affirmative obligations."  Opp. at 17.  But that attempt fails because, again, plaintiff does not show that its agreement with Facebook imposed the only *relevant* "affirmative obligation," i.e., the obligation to use a second-price auction process.

processes (not alleged to be part of the contract) should dictate the interpretation of the term "auction process" in Facebook's contract with advertisers.  Plaintiff cites no precedent allowing a claim to proceed based on such allegations.

Apparently recognizing that the complaint is devoid of allegations that would support the claim that Facebook was obligated to use a second-price auction process, plaintiff pivots to arguing that a different provision—stating that amounts owed by advertisers were "calculated based on our tracking mechanisms"—supports this claim.  Opp. at 17–18; *see* Compl. ¶ 53.[3]  Plaintiff asserts that the "obvious necessity" of this provision is that Facebook was required to use a second-price auction.  Opp. at 17.  But plaintiff does not (and cannot) offer any explanation of why a commitment to calculate amounts owed based on unspecified "tracking mechanisms" would make it "necessary" for Facebook to use a second-price auction process in particular.  Instead, plaintiff's own allegations confirm that Facebook's "tracking mechanisms" are distinct from its auction process. The complaint quotes a Facebook webpage describing the "*pricing* of Facebook ads" as "based on an auction system."  Compl. ¶ 55; *see also* Opp. at 6 ("advertisements were to be priced based on Facebook's auction process").  That same webpage makes clear that advertisers are subsequently "charged" based on Facebook's tracking of "the number of clicks or the number of impressions your ad received."  Compl. ¶ 55.  Plaintiff does not allege that such tracking dictated the methodology that is used when advertisers compete to win an auction, giving them the right to place their ad.  Nor does the opposition attempt to explain how that could be the case.

In any event, the complaint does not include any factual allegation that Facebook was *not* calculating the amounts owed to advertisers "based on our tracking mechanisms."  Though the opposition asserts that Facebook "was improperly calculating what advertisers would owe," Opp.

---

[3]    Plaintiff also advances breach allegations based on two other alleged provisions: a sentence providing that advertisers "will pay for your Orders in accordance with our Payments Terms," Compl. ¶ 53, and a page in the "Facebook Ads Help Center" stating that advertisers would "only be charged for the number of clicks or number of impressions your ad received" based on Facebook's auction process, *id*. ¶ 56.  Plaintiff's opposition does not make any argument regarding these terms.  In any event, the complaint does not allege that advertisers did *not* pay in accordance with the Payment Terms, or that advertisers were *not* charged based on clicks and impressions, so neither of those can support plaintiff's claim for breach of contract.

at 18, the complaint contains no allegations of any improper calculation of "clicks" or "impres-

sions."  Instead, it quotes snippets of purported internal Facebook materials stating that someone

allegedly believed there "is something weird in the alternate best gain computation in multi-feed,"

someone "cannot explain" an unspecified "pricing" issue, and someone believed that unspecified

"pricing results" did not "make sense."  Compl. ¶¶ 36–47.  Whatever those alleged snippets may

mean in their true context, they do not amount to an allegation that Facebook was not calculating

amounts owed based on its "tracking mechanisms"[4] or that the use of such "tracking mechanisms"

had anything to do with the auction at all, let alone required the use of any particular auction

pricing methodology.

The alleged internal investigations of Facebook's code by its engineers that plaintiff relies

upon are also irrelevant.  A plaintiff cannot bootstrap its way into a breach of contract claim, not-

withstanding the absence any contractual obligation, by alleging that a defendant performed

technical experiments on its own code.[5]  Nor can plaintiff manufacture a contractual obligation

from snippets of alleged internal conversations between Facebook employees.

*Second*, plaintiff incorrectly suggests that Facebook is raising "factual disputes" about

whether a blended-price auction is an "auction system."  Opp. at 19.  Not so.  This is not a "fact-

based argument[] about a defendant's preferred reading of the terms on its website" or "interpre-

tation of the contract," as plaintiff contends, *id*. & n.5, but a description of *plaintiff's own allega-

tions*.  The complaint repeatedly describes a "blended price" auction as "an auction process."

---

[4]    The allegations plaintiff relies upon in support of this argument describe a purported internal "experiment" that allegedly compared pricing of ads on Facebook with pricing of ads on another service (Instagram).  Even taken as true, these allegations merely show that Facebook priced ads *differently* than Instagram.  But that is irrelevant:  the complaint alleges that Instagram "had a separate auction process" from Facebook (Compl. ¶ 34), and the complaint does not allege that Facebook was obligated to price ads in the same manner as Instagram did.

[5]    In fact, in a webpage that the complaint cites, Facebook expressly notified advertisers that it may "make adjustments that could affect auction outcomes and prices, such as to improve ad quality and relevance, test or support ad types and ad products, [or] optimize the auction."  Meta Business Help Center, *About ad auctions*, available at https://www.facebook.com/business/help/430291176997542?id=561906377587030 (cited at Compl. ¶ 56 n.3); *Weisberg v. Stripe, Inc.*, 2016 WL 3971296, at *2 (N.D. Cal. July 25, 2016) (finding that webpage expressly relied upon by plaintiff is incorporated into the complaint and considering content of webpage).

Compl. ¶ 2 (alleging that "Facebook used a flawed 'blended price' auction process . . . ."); *id.* ¶ 4 (describing "Facebook's 'blended price' auction . . . ."). In any event, the question is not whether Facebook *did* use a blended-price auction process, but whether it was *required contractually* to use a second-price auction process. It was not. And plaintiff can point to no contractual provision stating otherwise.

*Third*, despite plaintiff's attempt to suggest that there are competing interpretations of "auction system," it has failed to allege any facts that would shed any light on the meaning of that phrase. In *In re Yahoo!*, the court agreed to consider extrinsic evidence because defendants allegedly made extracontractual representations to advertisers "in their sales and marketing materials" about the meaning of an undefined contract term. 251 F.R.D. at 471. Here, the complaint lacks any allegations that anyone at Facebook told advertisers anything about what the term "auction system" meant. Instead, the complaint relies on statements from academics and reporters who were not employees of Facebook. *See* Compl. ¶¶ 16, 32. Those statements are irrelevant as a matter of law, because California courts only "allow extrinsic evidence of the *parties'* understanding and intended meaning of the words used in their written agreement.'" *In re Facebook PPC Advert. Litig.*, 709 F. Supp. 2d 762, 768–69 (N.D. Cal. 2010). Therefore, the articles plaintiff points to are "immaterial with respect to the intentions of the parties." *Id.* at 769.[6]

Plaintiff further suggests—without explanation—that defendant's position "renders its obligation to use 'tracking mechanisms' to determine price meaningless." Opp. at 20. But what the complaint actually alleges is that Facebook was obligated to charge advertisers "for the number of clicks or the number of impressions [the] ad received," Compl. ¶ 55, and there is no allegation that Facebook failed to do so. Plaintiff separately alleges that Facebook was contractually obligated to price ads based on "an auction system." *Id.* ¶¶ 55–56. But plaintiff fails to allege that Facebook did *not* use an auction process, and thus fails to allege a breach on this basis as well.

---

[6]    In attempting to fault Facebook for "not having submitted any relevant evidence" with its motion to dismiss, Opp. at 19 n.5, plaintiff ignores that it carries the burden of pleading the existence of the contractual obligation it claims was breached. *See, e.g.*, *Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 979–80 (N.D. Cal. 2014). Unlike in *HSBC Bank USA v. Dara Petroleum, Inc.*, there is no contract term alleged to be "unintelligible on its face" or "illogical" that would require extrinsic evidence. 2010 WL 2197525, at *5 (E.D. Cal. May 28, 2010).

*Fourth*, plaintiff fails to allege that it was overcharged due to any breach.  *See* Mot. at 10. The sole case cited by plaintiff stands for the banal proposition that homeowners who overpaid for homes as a result of the defendant's actions suffered an "injury-in-fact."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011).  But the question is whether plaintiff has sufficiently alleged that it was injured at all.  The only relevant allegation is the following: "Iron Tribe advertised on Facebook through its advertising auction process during the Class Period."  Compl. ¶ 14.[7]  The complaint contains no factual allegations about plaintiff's supposed purchases of Facebook ads, and therefore fails to sufficiently allege damages.

## III.    Plaintiff's Remaining Claims Should Be Dismissed

With its remaining claims, plaintiff tries to get around the fact that it does not allege that Facebook ever promised advertisers that it would use a second-price auction process.  But these claims are nothing more than attempts to dress up the same breach of contract claim in different guises.  They rely on the same factual allegations as the breach of contract claim and fail for the same reasons, in addition to other legal reasons specific to each claim.

### A.    Plaintiff's Breach of Implied Covenant of Good Faith and Fair Dealing Claim Should Be Dismissed

#### 1.    *Plaintiff Cannot Use an Implied Covenant Claim to Impose Additional Substantive Duties on Facebook*

As shown in the opening brief, a plaintiff cannot use an implied covenant claim to "impose substantive duties . . . on the contracting parties beyond those incorporated in the specific terms of their agreement."  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349–50 (2000); *see* Mot. at 11–12. But that is precisely what plaintiff seeks to do: impose on Facebook the duty of operating a specific type of auction—a second-price auction—even though plaintiff can point to no "specific terms of [its] agreement" with Facebook requiring it to use that type of auction.  *See Guz*, 24 Cal. 4th at

---

[7]    Plaintiff's complaint does not define a specific time period for the "Class Period," which it alleges as running until the unspecified point "when the 2013 coding change caused Facebook to overcharge advertising customers."  *See* Compl. ¶ 57.

1    349–50.  Imposing such an obligation on Facebook would clearly go beyond the terms of the pur-

2    ported contract alleged in the complaint.[8]

3         Indeed, plaintiff's own cited cases explain that "the scope of conduct prohibited by the

4    covenant of good faith is circumscribed by the purposes and *express terms* of the contract."  *Carma*

5    *Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992); *accord Ellsworth v. U.S.*

6    *Bank*, 908 F. Supp. 2d 1063, 1086 (N.D. Cal. 2012).  And in the case plaintiff principally relies on

7    (*Letizia v. Facebook Inc.*), the court found that the plaintiffs adequately alleged that the defendant

8    had an implied "duty to provide [certain] advertising metrics" because plaintiff had "sufficiently

9    alleged a course of performance [by the defendant] that gives rise" to such a duty—and in fact, the

10   court found that the defendant had "concede[d] that it did in fact provide purchases of video ad-

11   vertisement[s] with advertising metrics."  267 F. Supp. 3d 1235, 1251–52 (N.D. Cal. 2017).  By

12   contrast, plaintiff fails to allege any "course of performance" by Facebook that would support any

13   implied duty.  To the contrary:  as shown, plaintiff fails to identify *any* written or oral representa-

14   tion (or any other "course of performance") from Facebook promising to use a second-price auc-

15   tion.  *See* Compl. ¶¶ 32–33.

16        Plaintiff attempts to salvage this claim by pointing to several cases in which courts sus-

17   tained implied covenant claims.  But as those cases explain, to allege a claim "for breach of the

18   covenant of good faith and fair dealing, a plaintiff must allege bad faith conduct, 'which unfairly

19   frustrates the agreed common purposes and disappoints the reasonable expectations of the other

20   party thereby depriving that party of the benefits of the agreement.'"  *Lever Your Bus. Inc. v.*

21   *Sacred Hoops & Hardwood, Inc.,* 2020 WL 2465658, at *5 (C.D. Cal. May 11, 2020) (citing

22   *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990)).  Plaintiff fails

23   to state an implied covenant claim because the complaint does not allege that plaintiff had any

24   "expectations"—much less "reasonable expectations"—about which auction process Facebook

---

25   [8]  Plaintiff asserts that "[n]othing in the parties' agreement allowed Facebook to operate the ad-
26   vertising auctions in a manner that contradicted the one that *Facebook represented it used*."
     Opp. at 15.  But as explained, this contention rests on a mischaracterization of plaintiff's own
27   complaint, which nowhere alleges that Facebook made any "representation" that it used a sec-
     ond-price auction.  *See* Compl. ¶ 32 (quoting *Wired* magazine article claiming that Facebook
28   uses a "VCG auction").

would use.  Instead, the complaint merely alleges that it was "widely understood" that Facebook used a second-price auction, based on one article in *Wired* magazine and two academic publications.  Compl. ¶¶ 16, 17.  But the complaint fails to allege facts suggesting that *plaintiff* read those articles, or had *any of its own* expectations about the auction process Facebook used.  Instead, it merely alleges that "Iron Tribe is a fitness company [that] advertised on Facebook through its advertising auction process . . . and was damaged thereby."  *Id.* ¶ 14.  The absence of any allegations regarding the "agreed common purposes" of Iron Tribe and Facebook or the "reasonable expectations" of Iron Tribe is fatal to this claim, and renders plaintiff's cases inapt.  *See, e.g.*, *Robalo LLC v. Ramey*, 2012 WL 244340, at *6 (E.D. Cal. Jan. 25, 2012) (dismissing implied covenant claim because the complaint's "allegations are insufficient to demonstrate that Defendant made a conscious and deliberate act that frustrated the agreed-upon common purposes of the agreement"); *Mendoza v. Countrywide Home Loans, Inc.*, 2009 WL 4706350, at *3–4 (N.D. Cal. Dec. 3, 2009) (dismissing implied covenant claim where complaint offered "nothing to substantiate the conclusory allegation that Defendants frustrated Plaintiffs' reasonable expectations"); *see also* *Balboa Capital Corp. v. JAAM Transp. LLC*, 2023 WL 3089999, at *2 (C.D. Cal. Mar. 1, 2023) (dismissing implied covenant counterclaim because defendants conclusorily alleged that conduct "was not within the reasonable expectations of the parties" but "do not provide any factual allegations as to why").

Moreover, the conclusory assertion that Facebook acted in supposed "bad faith"—which is all plaintiff ultimately offers, Opp. at 16—is not enough to salvage a legally deficient implied covenant claim.  *See In re Google RTB Consumer Privacy Litig.*, 606 F. Supp. 3d 935, 945 (N.D. Cal. 2022) (dismissing implied covenant claim and rejecting conclusory allegations of "bad faith").  Nor do allegations that Facebook investigated how its code functions and *fixed* its code show any "bad faith" on the part of Facebook.

Plaintiff fares no better with its suggestion that this claim should be sustained because Facebook was "invested" with "discretionary power."  Opp. at 12–13.  Plaintiff's brief acknowledges that multiple courts have held that assertions of an "improper exercise of discretion" do not support an implied covenant claim.  *Id.* at 14–15.  The alleged fact that one Facebook website described

the pricing of ads as being "based on an auction system" (Compl. ¶ 55) does not amount to an allegation that the parties agreed to a contract under which Facebook was "expressly given a discretionary power" to choose between the auction processes plaintiff identifies. *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808 (1995); *cf. Ellsworth*, 908 F. Supp. 2d at 1086 (explaining that in cases where the covenant is applicable, it is because the agreement between the parties "expressly permitted" the defendant to act "in any order the [defendant] chooses," making the defendant's "discretionary authority" subject to the covenant).

Plaintiff's suggestion that Facebook "subjectively lack[ed] belief in the validity" of its conduct or that its conduct was "objectively unreasonable" (Opp. at 13) is baseless. Plaintiff tries to substantiate these assertions by describing ordinary business conduct—e.g., software updates or internal inquiries into how computer code was functioning—as nefarious. But that narrative relies on the unsupported (and incorrect) presupposition that Facebook was *required* to use a second-price auction. In the absence of any obligation to use that type of auction, there is no basis for the Court to conclude that such allegations of ordinary behavior support a finding of wrongful conduct.

At bottom, plaintiff's argument as to this claim boils down to its contention that "Facebook's faithful execution of the second-price auction Facebook purported to use was fundamental to the parties' agreement." Opp. at 14. But that sentence encapsulates why the claim should be dismissed. As shown, the complaint offers no factual allegations showing either that (a) Facebook "purported to use" the second-price auction or (b) it was so much as *mentioned* in the "parties' agreement," much less "fundamental" to it. *See, e.g.*, *In re Google RTB*, 606 F. Supp. 3d at 944–45 ("If there exists a contractual relationship between the parties . . . the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract.").

### 2.    The Implied Covenant Claim Should Be Dismissed as Duplicative

The opening brief demonstrated that the implied covenant claim should be dismissed for the independent reason that it is duplicative of the breach of contract claim, because it relies "on the same alleged acts" and seeks "the same damages or other relief" sought for breach of contract. Mot. at 12. Plaintiff's opposition does not argue that implied covenant claims are *not* subject to

dismissal on that basis as a matter of law, thus conceding the point.  Instead, it attempts to argue that the implied covenant claim here is "distinct" from the breach of contract claim because it is predicated on alleged conduct "separate and apart from the express contractual breach."  Opp. at 16.  This argument borders on frivolous.  As shown in the opening brief, both the breach of contract and implied covenant claims are based on the same factual allegations—i.e., that Facebook allegedly made a coding change in 2013 that violated its contract with advertisers, and overcharged them for several years due to that coding change—and seek the same damages.  Mot. at 12.  In fact, plaintiff's opposition essentially *concedes* that the claims are predicated on the same allegations.  Plaintiff argues that its implied covenant claim is based on the following conduct: "covering up the Coding Change, 'slow roll[ing]' the fix, and failing to 'reimburse advertisers the amounts improperly overcharged.'"  Opp. at 16.  But at the bottom of the *same page*, plaintiff argues that the same conduct underpins its breach of contract claim:  "Facebook's conduct in implementing the Coding Change in 2013, overcharging advertisers in operating a blended-price auction instead of second-price auction, and then failing to disclose or return those overcharges, *violated Facebook's contracts.*"  *Id.*

Beyond plaintiff's acknowledgement that the two claims are based on the same factual allegations, it is clear that both claims (and indeed, the entirety of the complaint) rely on the same alleged conduct—i.e., the purported use of a blended-price auction rather than a second-price auction.  Plaintiff vaguely contends that "covering up" the alleged 2013 coding change and "slow rolling" the alleged subsequent 2017 change constitute "conduct separate and apart from the express contractual breach," but does not explain how they are supposedly "separate"—as opposed to being aspects of the conduct that allegedly constituted the breach.  *See, e.g.*, *Cruz v. Townsquare Media, Inc.*, 2025 WL 2076626, at *8 (N.D. Cal. July 23, 2025) (dismissing implied covenant claim relying on "the same course of conduct that underlies" dismissed breach of contract claim); *Daniels v. Alphabet Inc.*, 2021 WL 1222166, at *9 (N.D. Cal. Mar. 31, 2021) (dismissing implied covenant claim based on alleged acts that "are the same acts that [plaintiff] says are the basis for his breach of contract claim" and seeking "the same relief" as breach of contract claim).

Similarly, plaintiff's suggestion that the implied covenant claim somehow seeks different damages (Opp. at 16) is baseless.  The complaint alleges that Facebook's use of a blended-price auction process led to "overcharges" that constituted "a breach of Facebook's contract with Plaintiff," and seeks "actual damages" for its breach of contract claim.  Compl. ¶ 72–73.  The complaint alleges the same "overcharging of advertisers" in its implied covenant claim and likewise seeks "actual damages" for that claim.  *Id*. ¶ 78.  Those are identical "overcharge" damages.[9]

## B.     Plaintiff's UCL Claim Should Be Dismissed

Plaintiff likewise fails to state a claim for a violation of the "unfair" prong of the UCL.

*First*, as the opening brief showed, plaintiff's UCL claim should be dismissed because it is merely a repackaged version of plaintiff's "garden-variety" breach of contract claim that does not allege unfair conduct "independent of the breach."  *See* Mot. at 13.  Plaintiff does not respond to this argument.  Instead, it asserts that a "plaintiff can state a UCL claim without alleging a contractual breach."  Opp. at 21.  That is a non sequitur: the question is not whether UCL claims may be asserted that do not sound in contract, but rather whether a plaintiff can assert a UCL claim that is merely a duplicate of its breach of contract claim.  The answer to the latter question is "no," as the cases cited in the opening brief (*see* Mot. at 13) demonstrate—and as plaintiff fails to rebut.

Plaintiff's opposition confirms that plaintiff is *not* alleging unfair conduct "independent of the breach," as it would need to do for its UCL claim to be anything but an impermissible carbon-copy of its breach of contract claim.  The opposition identifies the allegations supporting the UCL claim as:  "Facebook's Coding Change resulted in billions of dollars in overcharges," Facebook "fail[ed] to identify and report the Coding Change," and Facebook "concealed this massive over-charging through a 'slow rollout' of the fix."  Opp. at 21–22.  But those are the *same allegations* that underpin the breach of contract claim.  *See* Compl. ¶¶ 68–73 (summarizing breach of contract allegations); *see also* Opp. at 16 (contending, in connection with breach of contract claim, that

---

[9]     Moreover, as explained above, plaintiff fails to sufficiently allege that it suffered any damages at all.

16

1   "Facebook's conduct in implementing the Coding Change . . . overcharging advertisers . . . and

2   then failing to disclose or return those overcharges, violated Facebook's contracts").[10]

3          *Second*, the opening brief demonstrated that plaintiff's allegations merely parrot the legal

4   standard for an "unfair business practice."  That is not enough to state a UCL claim and provides

5   an independent basis for dismissal.  Mot. at 13–14.  In response, plaintiff merely recycles its *breach*

6   *of contract* allegations (as noted above).  And plaintiff does not attempt to show that the UCL

7   claim amounts to anything *more* than a barebones recitation of the legal standard, which—as

8   shown in the opening brief—is insufficient.  *Id.*

9          *Third*, as shown in the opening brief, the claim does not satisfy either of the unfairness tests

10  used by California courts.  *Id.* at 14.  The opposition only confirms that the complaint does not

11  satisfy either test.  The tethering test requires a plaintiff to show that conduct is "tethered to specific

12  constitutional, statutory, or regulatory provisions."  *Id.* (*citing Taleshpour v. Apple Inc.*, 549 F.

13  Supp. 3d 1033, 1045 (N.D. Cal. 2021), *aff'd*, 2022 WL 1577802 (9th Cir. May 19, 2022)).  Neither

14  the complaint nor opposition identifies any such "specific" provision.  At most, the opposition

15  contends that there is a vague "public policy" against "secretly overcharging advertisers" (Opp. at

16  23 n.8), but does not purport to identify any "constitutional, statutory, or regulatory provision" to

17  which the claim is "tethered," as required. *See Wright v. Charles Schwab & Co., Inc.*, 2020 WL

18  6822887, at *5 (N.D. Cal. Nov. 20, 2020) (unfair UCL claims fail if they do not allege "any spe-

19  cific constitutional, statutory, or regulatory provision to which [the allegedly unfair] conduct is

20  tethered").[11]  As to the balancing test, Facebook showed that plaintiff cannot state a UCL claim

21

22  [10]  To the extent the opposition suggests that the UCL claim may be distinguished because "Fa-
    cebook's own engineers" supposedly "recognized this conduct was wrongful" (Opp. at 22),
23  the attempt fails, including because plaintiff (again) misrepresents its own complaint—which
    alleges that engineers concluded that certain prices were unexplained or "weird," not "wrong-
24  ful."  Compl. ¶¶ 37–50.  And even if a Facebook employee *did* believe there was "wrongful"
    conduct, plaintiff does not explain why such a personal opinion would be relevant to whether
25  plaintiff states a claim.

26  [11]  Plaintiff's failure to identify any such provision distinguishes this case from the ones plaintiff
    relies on.  Opp. at 23 n.8; *see Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013),
27  *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) (statutes and regulations show-
    ing that "both state and federal law specifically prohibit retailers from advertising false
28  'sales'"); *Day v. GEICO Cas. Co.*, 580 F. Supp. 3d 830, 845 (N.D. Cal. 2022) (discussing

17

1    under that theory because the claim is predicated on the same allegations that support its (fatally

2    flawed) breach of contract claim.  Mot. at 14.  Plaintiff does not respond to that argument.

3        *Finally*, plaintiff's suggestion that unfairness claims under the UCL "cannot be resolved at

4    the pleading stage" (Opp. at 20) is belied by the numerous cases that have dismissed such claims

5    at this stage.  *See, e.g.*, *Bodenburg*, 146 F.4th at 769–70; *Husain v. Campbell Soup Co.*, 747 F.

6    Supp. 3d 1265, 1275 (N.D. Cal. 2024) (Breyer, J.); *Hammerling v. Google LLC*, 615 F. Supp. 3d

7    1069, 1094 (N.D. Cal. 2022) (Breyer, J.).

8        **C.    Plaintiff's Unjust Enrichment Claim Should Be Dismissed**

9        Finally, plaintiff fails to state a claim for unjust enrichment.  Because defendant did nothing

10   "unjust" or otherwise wrongful or illegal, on the face of the complaint, the claim necessarily fails

11   with plaintiff's other claims.  In any event, California law does not permit standalone unjust en-

12   richment claims.  Even if it did, the overwhelming majority of courts have held that California law

13   does not permit a plaintiff who alleges the breach of an enforceable contract to also assert a claim

14   for unjust enrichment.

15       *First*, plaintiff's main argument supporting this claim is that Facebook allegedly "unfairly

16   retained" what plaintiff characterizes as "overpayments" through "the undisclosed Coding

17   Change."  Opp. at 23.  But as explained above, the complaint alleges nothing unfair or unlawful

18   about Facebook's conduct.  *Supra*, at 5–17.  The unjust enrichment claim should be dismissed for

19   that reason alone.  *See, e.g.*, *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 870 (2018)

20   (explaining that because the plaintiff's other claims failed, "her unjust enrichment claim fails as

21   well" on the principle "[t]here being no actionable wrong, there is no basis for the relief"); *accord*

22   *Schrader Cellars, LLC v. Roach*, 2021 WL 9816545, at *5 (N.D. Cal. June 10, 2021).

23       *Second*, California does not recognize unjust enrichment as a "standalone cause of action,"

24   as the Ninth Circuit has recognized.  *See* Mot. at 15 (citing *Astiana v. Hain Celestial Grp.*, 783

25

26   provisions of California Insurance Code and bulletin from California Insurance Commis-
     sioner); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 813 (N.D. Cal. 2011) (finding that
     "Defendant's practice is contrary to a statutorily declared public policy" and citing California

27   statute); *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1024 (N.D. Cal. 2019) ("this practice
     contravenes California's well-established public policy of protecting consumer data, as re-

28   flected in Section 22576 and other statutes").

1    F.3d 753, 762 (9th Cir. 2015)).  Despite faulting defendant for a "misstatement of law," Opp. at

2    23, plaintiff points to no precedential Ninth Circuit decision overruling *Astiana*.

3        *Finally*, as explained in the opening brief, a plaintiff may not simultaneously allege breach

4    of an enforceable contract (as plaintiff does here) and also assert a claim for unjust enrichment.

5    This Court recognized that principle in *Hammerling*.  *See* 615 F. Supp. 3d at 1096.  The Court

6    relied on decisions from the Ninth Circuit and the California Court of Appeals, explaining that

7    insofar as the court may "construe" an unjust enrichment claim as a "quasi-contract claim seeking

8    restitution," such a claim "does not lie when an enforceable, binding agreement exists defining the

9    rights of the parties."  *See id.* (quoting *Astiana*, 783 F.3d at 762 and *Rutherford Holdings, LLC v.

10   Plaza Del Rey*, 223 Cal. App. 4th 221 (2014)).  A few months ago, this Court reaffirmed that

11   principle, explaining that unjust enrichment "is not available" where the parties "have an enforce-

12   able contract," absent circumstances (e.g., fraud) not alleged here.  *Stapleton v. JPMorgan Chase*

13   *Bank*, 779 F. Supp. 3d 1059, 1075 (N.D. Cal. 2025) (Breyer, J.).  Numerous other courts, state and

14   federal, have confirmed this principle.  *See, e.g.*, *Pearl v. Coinbase Global, Inc.*, 2024 WL

15   3416505, at *8 (N.D. Cal. July 15, 2024) (dismissing unjust enrichment claim because where "the

16   parties have a contract," there "cannot be a separate claim for unjust enrichment"); *Wright*, 2020

17   WL 6822887, at *4 (dismissing unjust enrichment claim because "there is an enforceable contract

18   here"); *Tawfik v. JPMorgan Chase Bank*, 2020 WL 5074398, at *8 (N.D. Cal. Aug. 26, 2020) ("A

19   claim for unjust enrichment fails where parties have an enforceable, binding agreement"); *Durell*

20   *v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010) ("An unjust enrichment theory is inap-

21   plicable because [plaintiff] alleges the parties entered into express contracts.").

22       Plaintiff's argument that it should be allowed to plead both claims "in the alternative" under

23   Rule 8 (Opp. at 24) has been rejected by federal and California courts.  As explained in *Huynh v.*

24   *Quora, Inc.*, though Rule 8 "allows pleading in the alternative," this policy "has its limits"—and a

25   plaintiff "may assert contradictory statements of fact only when legitimately in doubt about the

26   facts in question."  2019 WL 11502875, at *12 (N.D. Cal. Dec. 19, 2019) (quoting *Total Coverage,*

27   *Inc. v. Cendant Settlement Servs. Grp.*, 252 F. App'x 123, 126 (9th Cir. 2007)).  Thus, a plaintiff

28   "cannot plead alternative theories that necessarily fail where an express contract defines the rights

of the parties." *Id.* California courts have held the same. *See, e.g.*, *Sepanossian v. Nat'l Ready Mixed Concrete Co.*, 97 Cal. App. 5th 192, 206–07 (2023) (rejecting unjust enrichment claim pleaded "in the alternative" and holding that plaintiff was "precluded from asserting a quasi-contract claim under the theory of unjust enrichment" because his "breach of contract claim pleaded the existence of . . . enforceable agreements and [his] unjust enrichment claim did not deny the existence or enforceability" of those agreements).

Plaintiff attempts to give the back of its hand to this authority, relying on three district court cases that are either irrelevant or unpersuasive. One of those—*Shared Partnership v. Meta Platforms, Inc.*—does not *mention* unjust enrichment claims; instead, it considered misrepresentation claims. 2024 WL 4280936 (N.D. Cal. Sept. 23, 2024). It is true that in *Boobuli's LLC v. State Farm Fire & Casualty Co.*, another court in this District declined to dismiss an unjust enrichment claim. 562 F. Supp. 3d 469, 487 (N.D. Cal. 2021). That court followed a 2010 out-of-district decision which cursorily concluded that plaintiffs may plead both breach of contract and unjust enrichment, even if those "pleadings are inconsistent," under Rule 8. *See id.* (citing *United States ex rel. Begole v. Trenkle*, 2010 WL 11596170, at *11–12 (C.D. Cal. July 16, 2010)).[12] Respectfully, defendant submits that *Boobuli's* is an outlier and that this Court should follow its decisions in *Hammerling* and *Stapleton*, as well as the other well-reasoned decisions discussed above.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court dismiss the complaint. Because plaintiff's breach of contract claim is fatally flawed, while its other claims fail as a matter of law for multiple reasons—as shown above and in the opening brief—defendant requests that the dismissal be with prejudice.[13]

---

[12]  Plaintiff's only other case—*Oracle Corp. v. SAP AG*—likewise cursorily concluded that a cause of action may not be dismissed "simply because it conflicts with another cause of action." 2008 WL 5234260, at *9 (N.D. Cal. Dec. 15, 2008).

[13]  On September 9, defendant filed an administrative motion for leave to file a reply brief of up to 20 pages, in light of the fact that plaintiff had filed an over-long opposition brief of 25 pages without seeking leave, along with a stipulation. Dkt. Nos. 39, 39-1.

Dated: September 15, 2025

Respectfully submitted,

/s/ James P. Rouhandeh

James P. Rouhandeh (*pro hac vice*)
rouhandeh@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

Andrew Yaphe (SBN 274172)
andrew.yaphe@davispolk.com
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile: (650) 752-2111

*Counsel for Defendant*
*Meta Platforms, Inc.*