James P. Rouhandeh (*pro hac vice*)
rouhandeh@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800

Andrew Yaphe (SBN 274172)
andrew.yaphe@davispolk.com
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111

*Counsel for Defendant*
*Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IRON TRIBE FITNESS, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:25-cv-03281-CRB<br><br>**DEFENDANT META PLATFORMS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>Date: March 27, 2026<br>Time: 10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Before the Honorable Charles R. Breyer |

PLEASE TAKE NOTICE that on March 27, 2026 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 6, 450 Golden Gate Avenue, San Francisco, California 94102, defendant Meta Platforms, Inc. ("Facebook") will and hereby does move the Court for an order dismissing with prejudice the Amended Complaint ("Am. Compl."), Dkt. No. 47, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]  This motion is based on this Notice of Motion, the supporting Memorandum of Points and Authorities, other materials in the record, argument of counsel, and such other matters as the Court may consider.

## STATEMENT OF ISSUES

1.      Whether plaintiff's breach of contract claim should be dismissed, given that plaintiff still does not identify any contractual provision that Facebook supposedly breached—even after being given leave to amend to try to identify such a provision.

2.      Whether plaintiff's claims for breach of the implied covenant of good faith and fair dealing and violation of California's Unfair Competition Law ("UCL")—both of which rely on the same factual allegations and seek the same damages as plaintiff's breach of contract claim—should be dismissed for the same reasons as the breach of contract claim, in addition to further reasons specific to those claims.

---

[1] Because the allegations in the Amended Complaint refer to "Facebook"—as defendant was called prior to 2021—this brief also uses the term "Facebook" when referring to defendant.

# TABLE OF CONTENTS

<u>P</u><u>AGE</u>

SUMMARY OF ARGUMENTS ...................................................................................................1

STATEMENT OF FACTS AND ALLEGATIONS ....................................................................2

      A.     Plaintiff's Original Complaint Alleged that Facebook Broke a "Promise" to Use a Second-Price Auction, but Failed to Identify Any Such Promise ............2

      B.     The Court Dismissed the Original Complaint Because Plaintiff Failed to Allege that Facebook Ever Promised to Use a Second-Price Auction ...................3

      C.     Plaintiff Files an Amended Complaint that Again Asserts that Facebook Was Obligated to Use a Second-Price Auction, but Fails to Identify Such a Promise ..............................................................................................................3

      D.     Plaintiff's Own Factual Allegations Demonstrate that Facebook Was Not Contractually Obligated to Use a Second-Price Auction........................................4

ARGUMENT ...............................................................................................................................6

I.      Plaintiff's Breach of Contract Claim Should Be Dismissed Because Plaintiff Does Not Allege that Facebook Breached Any Contract...............................................................6

II.     Plaintiff's Remaining Claims Should Be Dismissed ......................................................10

      A.     Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim Should Be Dismissed ...........................................................................11

      B.     Plaintiff's UCL Claim Should Be Dismissed .......................................................13

CONCLUSION...........................................................................................................................15

# TABLE OF AUTHORITIES

P<small>AGE(S)</small>

C<small>ASES</small>

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................6

*Bodenburg v. Apple Inc.*,
   146 F.4th 761 (9th Cir. 2025) ...........................................................................6–7

*Calcagno v. Kipling Apparel Corp.*,
   2024 WL 3261205 (S.D. Cal. July 1, 2024) ......................................................15

*Cruz v. Townsquare Media, Inc.*,
   2025 WL 2076626 (N.D. Cal. July 23, 2025) ....................................................11

*Daniels v. Alphabet Inc.*,
   2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ..............................................11, 12

*In re Facebook PPC Advert. Litig.*,
   709 F. Supp. 2d 762 (N.D. Cal. 2010) .................................................................9

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ..............................................................................6

*Godecke v. Kinetic Concepts, Inc.*,
   937 F.3d 1201 (9th Cir. 2019) ..............................................................................6

*In re Google RTB Consumer Priv. Litig.*,
   606 F. Supp. 3d 935 (N.D. Cal. 2022) ...............................................................11

*Hammerling v. Google LLC*,
   615 F. Supp. 3d 1069 (N.D. Cal. 2022) ...............................................................6

*Masry v. Lowe's Cos.*,
   2024 WL 3228086 (N.D. Cal. June 28, 2024) ......................................................3

*Mendoza v. Countrywide Home Loans, Inc.*,
   2009 WL 4706350 (N.D. Cal. Dec. 3, 2009) ......................................................13

*Millam v. Energizer Brands, LLC*,
   2024 WL 2988210 (9th Cir. June 14, 2024) .......................................................15

*Nalbandyan v. CitiBank, N.A.*,
   2022 WL 2783839 (C.D. Cal. June 13, 2022) .....................................................14

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) ..............................................................................10

*Ray v. Google LLC*,
   2025 WL 2058822 (9th Cir. July 23, 2025) ..........................................................6

iii

*Robalo LLC v. Ramey*,
    2012 WL 244340 (E.D. Cal. Jan. 25, 2012) ....................................................................12–13

*Rosell v. Wells Fargo Bank, N.A.*,
    2014 WL 4063050 (N.D. Cal. Aug. 15, 2014) .............................................................13–14

*Taleshpour v. Apple Inc.*,
    549 F. Supp. 3d 1033 (N.D. Cal. 2021)...................................................................................14

*Wright v. Charles Schwab & Co.*,
    2020 WL 6822887 (N.D. Cal. Nov. 20, 2020) ......................................................................15

*Zenger-Miller, Inc. v. Training Team, GmbH*,
    757 F. Supp. 1062 (N.D. Cal. 1991).......................................................................................10

<u>STATUTES & RULES</u>

Fed. R. Civ. P. 12(b)(6) ....................................................................................................................6

---

**SUMMARY OF ARGUMENTS**[2]

In its original complaint, plaintiff alleged that Facebook had breached its contract with advertisers for a period of several years in the mid-2010s because it did not charge them for advertisements under a "second-price" auction process, which the complaint claimed that Facebook had promised to use. Compl. ¶¶ 2–5, 56. The Court dismissed that complaint because plaintiff failed to identify any contractual language in which Facebook made any such promise. Dkt. No. 46. In the Amended Complaint, just like the original complaint, plaintiff again fails to identify any contractual language in which Facebook promised to use a "second-price" auction.

In fact, the materials upon which plaintiff relies in its Amended Complaint affirmatively demonstrate that its theory is incorrect. For instance, the only official Facebook documents that plaintiff can identify that so much as *mention* the concept of a "second-price" auction *contradict* plaintiff's theory that Facebook promised advertisers that it would use such an auction. According to plaintiff, those documents—foreign patent applications—stated that Facebook "*may* use a generalized second price auction, a Vickrey-Clarke-Groves (VCG) auction, *or other auction methodologies that sell several similar-type items*." Am. Compl. ¶ 40. Similarly, plaintiff cursorily alleges that it was "widely understood" among advertisers that Facebook used a second-price auction. *Id.* ¶ 58. But plaintiff repeatedly cites an article from *Wired* magazine stating that Facebook's auction process—far from being "widely understood" to be any particular methodology—was "a black box" and that those "outside Facebook . . . can't really know how it works on the inside." *Id.* ¶¶ 26, 53, 94. Thus, the Amended Complaint's own factual allegations refute plaintiff's theory of the case.

In dismissing the prior complaint, the Court made clear that plaintiff would need to identify a "provision of the contract [that] was breached" if its complaint was to survive. Dkt. No. 46 at 5:24. It is clear from the Amended Complaint that plaintiff cannot identify any such provision and thus cannot state a claim for breach of contract. And its two other claims are fatally flawed as well, both for the same reasons as the breach of contract claim and for independent legal

---

[2] Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.

reasons pertaining to each.  Accordingly, the Court should again dismiss the complaint, this time with prejudice.

## STATEMENT OF FACTS AND ALLEGATIONS

### A.    Plaintiff's Original Complaint Alleged that Facebook Broke a "Promise" to Use a Second-Price Auction, but Failed to Identify Any Such Promise

Plaintiff's original complaint, filed on April 11, 2025, theorized that for an approximately four-year period ending in 2017—i.e., eight years before filing this lawsuit—Facebook charged advertisers pursuant to a "blended-price" auction process rather than a "second-price" auction process that Facebook was supposedly required by contract to use instead.  Compl. ¶¶ 1–2, 56. Plaintiff alleged that under the second-price auction process that Facebook was purportedly con-tractually obligated to use, "the winning bidder's cost is the amount of the second-highest bid." *Id.* ¶ 2.  The original complaint explained that under this supposedly required process, if "Alice bids $100 and Bob bids $50," then under the second-price auction, "which Facebook claimed to use," "Alice wins but pays only $50."  *Id.* ¶ 3.  By contrast, plaintiff alleged that in the "blended-price" auction that Facebook supposedly used instead, "the cost charged to the winning bidder was a blend of the highest 'first' bid and the second-highest bid"—in other words, a number be-tween (but not including) $50 and $100.  *Id.* ¶ 2; *see also id.* ¶ 29.

But plaintiff could not identify any contractual promise requiring Facebook to use a sec-ond-price auction process.  Instead, plaintiff pointed to language from Facebook's Statement of Rights and Responsibilities stating that amounts advertisers owed would be "calculated based on our tracking mechanisms."  *Id.* ¶ 53.  Plaintiff claimed that this language required Facebook to use the specific second-price auction process hypothesized by the complaint.

On June 16, 2025, Facebook moved to dismiss the original complaint.  Dkt. No. 25.  In its opposition brief, plaintiff—apparently recognizing that the complaint failed to identify any contractual promise to operate a second-price auction—instead asked the Court to "impos[e]" on Facebook the "obligation to abide by the [second-price] auction process."  Dkt. No. 37 at 19.

**B.    The Court Dismissed the Original Complaint Because Plaintiff Failed to Allege that Facebook Ever Promised to Use a Second-Price Auction**

On October 3, 2025, the Court dismissed the complaint.  The Court explained that plaintiff failed to allege a breach of contract because the complaint "fail[ed] to identify a commitment by Facebook that [it] would follow" the second-price auction process.  Dkt. No. 46 at 4:21–5:3.  As the Court further explained, plaintiff was required—but had failed—to "identify the breach of contract" and point to a "provision of the contract [that] was breached."  *Id.* at 5:22–24.  The Court granted plaintiff leave to amend to see if plaintiff could identify such a provision.  *Id.* at 5:25–6:1.  The Court explained that whether plaintiff would be able to identify a contractual provision that was breached "is going to be significant in terms of whether the case moves forward."  *Id.* at 7:4–7.

**C.    Plaintiff Files an Amended Complaint that Again Asserts that Facebook Was Obligated to Use a Second-Price Auction, but Fails to Identify Such a Promise[3]**

In its Amended Complaint, plaintiff continues to allege that Facebook was contractually "required . . . to operate a second price auction for advertisements."  Am. Compl. ¶ 147.  As in the original complaint, plaintiff's theory is that Facebook was obligated to use a "second-price" auction process under which "the winning bidder's cost is the amount of the second-highest bid."  *Id.* ¶ 11.  And again, plaintiff contrasts the second-price auction process that Facebook purportedly was obligated to use with the "blended-price" auction that Facebook allegedly operated instead, in which the "cost charged to the winning bidder is a blend of the highest 'first' bid and the second-highest bid."  *Id.* ¶ 16.

Plaintiff's Amended Complaint fails to identify any contractual provision requiring Facebook to use such a second-price auction process.  Plaintiff previously relied—in both the original complaint and the motion to dismiss briefing on that complaint—on language in the Statement of Rights and Responsibilities stating that amounts owed by advertisers would be "calculated based

---

[3] Defendant summarizes the factual allegations in the Amended Complaint, which defendant takes as true solely for purposes of this motion.  *See, e.g.*, *Masry v. Lowe's Cos.*, 2024 WL 3228086, at *2 (N.D. Cal. June 28, 2024).

DEFENDANT META PLATFORMS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. 3:25-CV-03281-CRB

on our tracking mechanisms." Compl. ¶¶ 53–54; Dkt. No. 37 at 1, 3, 6, 17–20. Plaintiff has now abandoned any reliance on "tracking mechanisms" as the basis for its claims. Instead, in the Amended Complaint, plaintiff points to webpages purportedly incorporated in the Statement of Rights and Responsibilities—specifically, one entitled "Why do I generally pay less for a click than what I bid?" and a "Glossary of Ad Terms"—allegedly stating that advertisers "will only be charged" the "minimum amount that you need to pay to have your ad or sponsored story shown" and "the bid necessary to win the auction." Am. Compl. ¶ 109. Nowhere do these webpages say that Facebook would use a second-price auction. Nor does plaintiff identify elsewhere in its Amended Complaint any such contractual promise.

### D. Plaintiff's Own Factual Allegations Demonstrate that Facebook Was Not Contractually Obligated to Use a Second-Price Auction

Plaintiff's theory in the Amended Complaint is that Facebook's alleged statements that advertisers would be charged "the minimum amount that you need to pay" or "the bid necessary to win the auction" constituted a "promise" to use a second-price auction (or a "form of" a second-price auction such as a "VCG" auction).[4] *See id.* ¶¶ 39, 114, 119. The Amended Complaint's own factual allegations do not support that theory.

Plaintiff asserts that Facebook "promised" advertisers that it would use a "second-price auction" in which advertisers would be charged "the amount of the second highest bid." *Id.* ¶¶ 114–15; *see also id.* ¶¶ 11–12. But the "Glossary of Ad Terms" on which plaintiff relies states that the amount advertisers would be charged "*may* be lower than the maximum bid you've set for your ads." *Id.* ¶¶ 8, 106. If Facebook were using the second-price process hypothesized by plaintiff, however, the amount charged would *invariably* and *unequivocally* be "lower than the maximum bid"—i.e., it would be the amount of the second-place bid, which is necessarily lower

---

[4] The Amended Complaint alleges that in a generalized second-price ("GSP") auction, "[t]he winning bidder gets to place an ad for the price bid by the next highest bidder," *id.* ¶ 42, whereas in a VCG auction—which plaintiff alleges is a "specific type of second price auction," *id.* ¶ 13—the amount the winning bidder pays is "based on the *value* of the second-highest bid they displaced," *id.* ¶ 19. According to plaintiff, the amount paid by the winning bidder in a VCG auction is based not just on the price of the second-place bid but also on "the quality and relevance of the ads." *Id.* ¶ 65.

DEFENDANT META PLATFORMS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. 3:25-CV-03281-CRB

than the maximum bid.  Likewise, the other webpage on which plaintiff relies states that the "amount you enter in the bid box is the *maximum* you'll ever pay."  *Id.* ¶ 104.  But under the second-price auction process described in the Amended Complaint, the amount charged to the winning bidder would *never* be the amount that was bid by the winning bidder.  By definition, the *maximum* the winning bidder would ever pay in a second-price auction would be the amount bid by the *second-highest bidder*.  The factual allegations of the Amended Complaint thus directly conflict with the assertion that Facebook promised to use a second-price auction.

Plaintiff also alleges that a statement that advertisers would be charged the "minimum amount required to win" an auction was "akin to saying that the winning bidder is charged the amount needed to displace the next highest bid, i.e., a second-price auction."  *Id.* ¶ 39.  But that assertion depends on the premise that "the amount charged to the winner in a blended price auction is *always* higher than the amount charged in the same auction using a VCG or GSP [second-price] auction process."  *Id.* ¶ 18.  Again, plaintiff's own factual allegations demonstrate that this premise is false.

Specifically, the Amended Complaint describes a "second price auction [] akin to what Facebook purported to use" in which the winning bidder bid $100, the second-place bidder bid $50, and the winning bidder was charged $75 in light of the "full value" of the second-place bid.  *Id.* ¶ 66.  But the Amended Complaint *also* alleges that under a *blended-price* auction in which the winning and second place bidders bid those same amounts—i.e., $100 and $50—the winning bidder could be charged "$60, $70 or $80 depending on the particular auction mechanics."  *Id.* ¶ 17.  Thus, under plaintiff's own allegations in the Amended Complaint, the same bids could result in the winning bidder being charged $60 in a blended-price auction but *more than that*— $75—in a second-price auction.

<div align="center">*    *    *</div>

Based on the foregoing factual allegations, plaintiff asserts three claims.  First, plaintiff claims that Facebook breached its contract with advertisers, which allegedly consisted of Facebook's Statement of Rights and Responsibilities and certain documents and webpages purportedly incorporated therein.  *Id.* ¶¶ 145–50.  Second, plaintiff claims that Facebook breached the

<div align="center">5</div>

1  implied covenant of good faith and fair dealing by allegedly failing to operate a second-price

2  auction, and by purportedly overcharging advertisers as a result. *Id.* ¶¶ 151–55. And third,

3  plaintiff claims that Facebook violated the "unfair" prong of the UCL. *Id.* ¶¶ 156–61.

4  <center>**ARGUMENT**</center>

5  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter,

6  accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

7  662, 678 (2009). Dismissal "can be based on the lack of a cognizable legal theory or the absence

8  of sufficient facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.*,

9  937 F.3d 1201, 1208 (9th Cir. 2019). The Court need not accept "allegations that are merely

10  conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec.*

11  *Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). "Threadbare recitals of the elements of a cause of

12  action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

13
14  **I.     Plaintiff's Breach of Contract Claim Should Be Dismissed Because Plaintiff Does Not Allege that Facebook Breached Any Contract**

15  Despite being given leave to amend, plaintiff has again failed to identify a contractual

16  promise that Facebook allegedly breached, and thus again fails to state a breach of contract

17  claim. *See Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1095 (N.D. Cal. 2022) (Breyer,

18  J.) ("Plaintiffs cannot state a claim for breach of contract without alleging a promise that is

19  breached.").

20  *First*, the purported contractual language on which plaintiff relies for its breach claim

21  does not require Facebook to use a second-price auction process. Plaintiff's inability to identify

22  a contractual provision requiring Facebook to use a second-price auction—even after being af-

23  forded leave to amend specifically to try to do so—dooms its breach of contract claim, as Face-

24  book "cannot breach a promise that does not exist." *Ray v. Google LLC*, 2025 WL 2058822, at

25  *1 (9th Cir. July 23, 2025) (affirming dismissal for failure to state a breach of contract claim

26  where none of the alleged agreements with Google contained the "pay-per-view promise" plain-

27  tiff sought to enforce); *see also Bodenburg v. Apple Inc.*, 146 F.4th 761, 767–68 (9th Cir. 2025)

28

<center>6</center>

(explaining that if a plaintiff asserting a breach of contract claim "cannot point to any provision of the Agreement that express[es] the obligation sued upon," its "breach of contract claim fails").

According to plaintiff, the relevant contract consisted of Facebook's Statement of Rights and Responsibilities and documents and webpages purportedly incorporated by reference therein. Am. Compl. ¶ 100. Plaintiff relies on language that allegedly appeared on two such webpages—a webpage entitled "Why do I generally pay less for a click than what I bid?" and Facebook's "Glossary of Ad Terms." *See id.* ¶ 109. These webpages allegedly stated that advertisers "will only be charged" the "minimum amount that you need to pay to have your ad or sponsored story shown," and that Facebook "will only charge you the bid necessary to win the auction." *Id.*; *see also id*. ¶¶ 104, 106. But what these webpages do *not* say is that Facebook would use a second-price auction—or any "form of" a second-price auction such as a VCG auction. *Id.* ¶ 114. Nor does plaintiff identify such a contractual promise in its Amended Complaint.

Even accepting, solely for purposes of this motion, that these webpages were part of the contract between Facebook and advertisers (they were not), plaintiff's breach of contract claim fails because the webpages *do not state* that Facebook would use a second-price auction process. Despite plaintiff's insistence that Facebook "specifically promis[ed] to operate a second price auction in its contracts with advertisers," *id.* ¶ 15, the webpages on which plaintiff relies do not even *mention* the terms "second-price" or "VCG." To the contrary: it is clear from these webpages that they *cannot* be referring to a second-price auction process. The Glossary of Ad Terms expressly states that the amount charged to the bidder "*may* be lower than the maximum bid you've set for your ads." *Id.* ¶¶ 8, 106. But under the second-price auction process hypothe-sized by plaintiff, the amount charged to the highest bidder would *invariably* be lower than the maximum bid—i.e., it would be "the amount of the second highest bid," which has to be lower than the "maximum bid." *See, e.g.*, *id.* ¶ 115. And the other webpage on which plaintiff relies—entitled "Why do I *generally* pay less for a click than what I bid"—states that the "amount you enter in the bid box is the *maximum* you'll ever pay," which necessarily implies that the winning bidder could pay an amount *equal to* its own bid. *Id.* ¶ 104. But by definition, paying the amount of one's own winning bid necessarily means that it is not a second-price auction.

7

*Second*, plaintiff has not pled that Facebook breached any of the provisions that appear in the purported contract described in the Amended Complaint. Plaintiff relies on Facebook's supposed "promise[]" that advertisers would be charged the "minimum amount that you need to pay to have your ad or sponsored story shown" or the "bid necessary to win the auction." *Id.* ¶¶ 9, 104, 105, 107, 109. According to plaintiff, this constituted a promise "that the winning bidder . . . would be charged only the amount needed to displace the next highest bid," *id.* ¶ 10—an auction process that plaintiff alleges "is widely known and described as a 'second price' auction," *id.* ¶ 11. But the Amended Complaint never alleges that Facebook did *not* charge advertisers the amount "necessary to win the auction" or "the amount needed to displace the next highest bid." Instead, plaintiff posits that these phrases *must* be referring specifically to the amount a winning bidder would pay in a second-price auction—even though they clearly do not say that. In the absence of any contractual promise obligating Facebook to charge the winning bidder the amount of the second-place bid, there is no basis to infer that the phrases "minimum amount that you need to pay" or "bid necessary to win the auction" signify the *second-place bid* in particular. Accordingly, plaintiff has not pled that Facebook breached the terms of the purported contract.

At bottom, the Amended Complaint theorizes that Facebook—by allegedly saying that advertisers would be charged the "minimum" amount needed to win an auction—promised to use a second-price auction. Plaintiff theorizes that the "minimum" amount needed to win an auction is the amount that a winner would pay in a second-price auction. Setting aside that plaintiff can point to no contractual language saying as much, this theory depends on the premise that the amount a winner would pay in a blended-price auction is *always* higher than what a winner would pay in a second-price auction. Plaintiff's own complaint shows that this premise is false.

As explained above, plaintiff acknowledges that the top two bidders in a blended-price or second-price auction could make identical bids (of $100 and $50), but the winner in the blended-price auction could be charged *less* (e.g., $60 or $70) than the winner in the second-price auction (who would be charged $75 based on the "full value" of the second-price bid). *Supra* at 5. This belies plaintiff's conclusory allegation that "the amount charged to the winner in a blended-price auction is *always* higher than the amount charged in the same auction using a VCG or GSP

1    auction process."  Am. Compl. ¶ 18.  And it shows that a statement that an advertiser would be

2    charged "as much as the value [it] displaced from other advertisers" says nothing about whether

3    Facebook used a second-price auction.  To the contrary: in these examples *from plaintiff's com-*

4    *plaint*, the winning bidder in the second-price auction would be charged $75 based on the

5    "value" it displaced, *id.* ¶ 66, but could be charged *less* ($60 or $70) in the blended-price auction.

6    This allegation also belies plaintiff's whole theory of harm, because the putative damages are

7    "overcharges" due to Facebook's alleged use of a "blended price auction."  *See id.* ¶ 131.

8        *Third*, plaintiff's suggestion that it was "widely understood" that Facebook used a sec-

9    ond-price auction process is likewise belied by plaintiff's own factual allegations.  The Amended

10   Complaint repeatedly quotes an article from *Wired* magazine stating that Facebook's auction

11   process was "a black box" and that those "outside Facebook . . . can't really know how it works

12   on the inside."  *Id.* ¶¶ 26, 53, 94.  But if the auction process was viewed as a "black box" whose

13   workings "can't really [be] know[n]" to those outside Facebook, then it cannot be the case that

14   "the process by which the Facebook advertising auction was supposed to work was well known

15   to Facebook advertisers" to be a "second price" auction.  *Id.* ¶ 58.  And it certainly could not be

16   seen as a "black box" if Facebook's contracts with advertisers specifically promised to conduct a

17   second-price auction.

18       In any event, plaintiff's reliance on commentary from news sources and academic papers

19   as to what advertisers "understood" Facebook "intended" its auction to be, *id.* ¶ 117, is mis-

20   placed.  California courts only "allow extrinsic evidence of the *parties'* understanding and in-

21   tended meaning of the words used in their written agreement."  *In re Facebook PPC Advert.*

22   *Litig.*, 709 F. Supp. 2d 762, 768–69 (N.D. Cal. 2010).  Insofar as a reporter for *Wired* magazine,

23   a "Cornell University blog," or a consultant posting on LinkedIn opined on Facebook's auction,

24   those views have no bearing on "the parties' understanding."  Am. Compl. ¶¶ 41–44, 52–53, 55.

25       Nor does plaintiff fare better with its reliance on (non-contractual) statements from Face-

26   book itself.  For example, plaintiff alleges that Facebook's auction process was described in fil-

27   ings with the European Patent Office and Korean Intellectual Property Office stating that Face-

28   book's bidding algorithm "*may* use a generalized second price auction, a Vickrey-Clarke-Groves

9

DEFENDANT META PLATFORMS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. 3:25-CV-03281-CRB

(VCG) auction, *or other auction methodologies that sell several similar-type items.*" *Id.* ¶ 40. But a statement that Facebook may use "*other* auction methodologies" that are *not* second-price auctions only *undermines* the theory that Facebook was obligated to use a second-price auction.

Regardless, under California law, "extrinsic evidence cannot be used to add to, detract from, or vary the terms of a written contract." *Zenger-Miller, Inc. v. Training Team, GmbH*, 757 F. Supp. 1062, 1067 (N.D. Cal. 1991). Yet that is precisely what plaintiff seeks to do. Construing the alleged contractual language as plaintiff requests would create a new affirmative obligation—for Facebook to operate a second-price auction process—that cannot be found in the alleged contract. That would violate the law, because it is axiomatic that "[i]n a contract case between two private parties," courts are "limited to enforcing the obligations to which the private parties agreed." *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 679 (9th Cir. 2007) (reciting "the unremarkable proposition of contract law that a court will not create new obligations that do not exist within the four corners of a contract").[5]

*Finally*, plaintiff's vague allegation that Facebook "reinforced the importance of transparency" by "impos[ing] price transparency rules upon third-party media buyers who used Facebook's platforms," Am. Compl. ¶ 118, is a red herring. The fact that Facebook allegedly imposed disclosure obligations on third parties has no bearing on whether Facebook *itself* was contractually required to use a certain type of auction methodology.[6]

## II. Plaintiff's Remaining Claims Should Be Dismissed

Plaintiff's remaining claims fail for the same reasons its breach of contract claim fails and/or for other reasons specific to those claims.

---

[5] For the same reasons, plaintiff's reference to a paper by European economists that supposedly expressed "thanks" for "comments received" from Facebook employees, its citation to out-of-context slides that purportedly appeared in a 2017 presentation from an academic conference, and its allegations regarding a 2015 discussion group in which a Facebook employee purportedly posted, Am. Compl. ¶¶ 45–50, are all irrelevant.

[6] Plaintiff's allegation that Facebook required its "Audience Network partners" to disclose their auction methodologies to advertisers—and that such a requirement "underscores . . . that Facebook was not permitted to change [its own auction] logic without disclosing the change and impact," *id.* ¶ 125—is baseless for the same reason.

DEFENDANT META PLATFORMS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. 3:25-CV-03281-CRB

### A.     Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim Should Be Dismissed

The Court should dismiss plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  Through this claim, plaintiff impermissibly seeks to impose substantive obligations on Facebook not contemplated by the alleged contract.  The claim should also be dismissed as duplicative of plaintiff's breach of contract claim.

*First*, plaintiff cannot use the implied covenant of good faith and fair dealing to "impose substantive duties" on Facebook "beyond those incorporated in the specific terms of [the parties'] agreement."  *Cruz v. Townsquare Media, Inc.*, 2025 WL 2076626, at *8 (N.D. Cal. July 23, 2025); *see also In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 944–45 (N.D. Cal. 2022) ("If there exists a contractual relationship between the parties . . . the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract.").  But that is precisely what plaintiff seeks to do: the Amended Complaint states explicitly that "[t]o the extent that Facebook's contract with advertisers *is not read to have mandated that Facebook use a second price auction*, Facebook's duty of good faith and fair dealing . . . required it to do so."  Am. Compl. ¶ 120.  That is not how the implied covenant works.  Having been unable to point to "specific terms of [its] agreement" requiring Facebook to use a second-price auction, *Cruz*, 2025 WL 2076626, at *8, plaintiff cannot use its implied covenant claim to manufacture such an obligation.

*Second*, the implied covenant claim should be dismissed for the independent reason that it is duplicative of the breach of contract claim, because "both claims rely on the same alleged acts and seek the same relief."  *Daniels v. Alphabet Inc.*, 2021 WL 1222166, at *9 (N.D. Cal. Mar. 31, 2021) (dismissing implied covenant claim "because it is based on precisely the same allegations as [the plaintiff's] purported breach of contract claim").  Just like the breach of contract claim, the alleged conduct underlying the implied covenant claim is Facebook's purported use of a blended-price rather than a second-price auction.  *Compare* Am. Compl. ¶ 149 (alleging that Facebook breached its purported contract with advertisers by "operat[ing] a blended price auction rather than a second price auction"), *with id.* ¶ 154 (alleging that "[t]hrough the implied covenant of good faith

---

11

and fair dealing, Facebook was obligated to operate a second price auction for advertisements"). The implied covenant claim also seeks the same damages as the breach of contract claim: i.e., supposed "overcharge[]" damages due to the allegedly higher prices that resulted from Facebook's purported use of a blended-price auction. *Compare id.* ¶¶ 146–50, *with id.* ¶¶ 152–55. It should thus be dismissed as duplicative. *See Daniels*, 2021 WL 1222166, at *9 (dismissing implied covenant claim based on "the same [alleged] acts that [plaintiff] says are the basis for his breach of contract claim," where plaintiff sought "the same relief" as breach of contract claim).

Nor do plaintiff's conclusory allegations of bad faith supply a basis to treat the implied covenant claim as distinct from the breach of contract claim. The Amended Complaint seeks to portray a nefarious picture of Facebook "intentionally act[ing] to conceal the overcharges caused by the blended rate auction process by 'slow rolling' the correction of the 2013 coding change," Am. Compl. ¶ 96, and failing to "refund[] to advertisers the additional amounts they had paid due to the secret switch to a blended price auction," *id.* ¶ 127. But that narrative relies on the unsupported (and baseless, as shown above) presupposition that Facebook was contractually *required* to use a second-price auction. In the absence of any obligation to use that type of auction, plaintiff is merely describing ordinary business activity—e.g., alleged software updates, internal analysis of Facebook's auction methodology, and steps taken by Facebook to *fix* its code. Facebook did not "conceal the overcharges," because (i) the concept of "concealment" would only apply if Facebook were under an obligation to use the second-price auction process or to disclose its pricing methodology to advertisers; and (ii) the amounts Facebook charged to advertisers could be characterized as "overcharges" only if Facebook were obligated to determine those amounts using a different auction process—which, again, it was not. As noted above, plaintiff alleges that Facebook told advertisers that the "amount you enter in the bid box is the *maximum* you'll ever pay." *Id.* ¶ 104. Plaintiff does not allege that advertisers were ever charged *more* than the amount "enter[ed] in the bid box"—as it would have to do to substantiate its claim of "overcharges."

In any event, an implied covenant claim requires "a failure or refusal to discharge contractual responsibilities, prompted *not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act*, which unfairly frustrates the agreed common purposes and

---

12

1    disappoints the reasonable expectations of the other party thereby depriving that party of the ben-

2    efits of the agreement." *Robalo LLC v. Ramey*, 2012 WL 244340, at *6 (E.D. Cal. Jan. 25, 2012).

3    But the Amended Complaint does not allege that Facebook "conscious[ly] and deliberate[ly]" en-

4    gaged in the purportedly violative conduct—i.e., supposedly implementing an algorithm that used

5    a blended-price auction process.  To the contrary, plaintiff affirmatively alleges that "[t]he re-

6    sponse of Facebook employees following the implementation of the coding change demonstrates

7    that Facebook *did not intend this coding change to switch the advertising auction process from a*

8    *VCG or GSP auction to a blended rate auction*."  Am. Compl. ¶ 74.

9       Nor does the Amended Complaint contain factual allegations that plaintiff had *any* "expec-

10   tations"—much less "reasonable" ones—about which auction process Facebook would use.  In-

11   stead, the Amended Complaint alleges that advertisers' purported understanding that "Facebook

12   intended its advertising auction to operate as a second price auction . . . is reflected in the com-

13   mentary of multiple third parties." *Id.* ¶ 117.  But as explained above, plaintiff's reliance on com-

14   mentary from news sources and academic papers as to what advertisers "understood" Facebook

15   "intended" its auction to be misses the mark.  *Supra* at 9.  The Amended Complaint does not allege

16   facts suggesting that *plaintiff* was aware of that third-party commentary or had *any* expectations

17   whatsoever about the auction process Facebook used.  This is fatal to the implied covenant claim.

18   *See Mendoza v. Countrywide Home Loans, Inc.*, 2009 WL 4706350, at *3–4 (N.D. Cal. Dec. 3,

19   2009) (dismissing implied covenant claim where complaint offered "nothing to substantiate the

20   conclusory allegation that Defendants frustrated Plaintiffs' reasonable expectations").

21      **B.    Plaintiff's UCL Claim Should Be Dismissed**

22      Plaintiff's claim under the "unfair prong" of the UCL fares no better.  Plaintiff relies on

23   the same alleged conduct that underlies its breach of contract claim, rendering its UCL claim both

24   duplicative and inadequate.  In addition, plaintiff's allegations do not meet any of the standards

25   that California courts have developed to evaluate "unfairness" under the UCL.  For these reasons,

26   the UCL claim should also be dismissed.

27      *First*, plaintiff's UCL claim is merely a repackaged version of plaintiff's breach of contract

28   claim.  This is insufficient: a breach of contract violates the UCL only if a plaintiff alleges unfair

DEFENDANT META PLATFORMS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. 3:25-CV-03281-CRB

conduct "independent of the breach" and includes "a 'plus' factor to make it independently action-able." *Rosell v. Wells Fargo Bank, N.A.*, 2014 WL 4063050, at *6 (N.D. Cal. Aug. 15, 2014). "Otherwise, every garden-variety breach of contract claim, which often includes the charge that the breach was 'unfair' to the non-breaching party, would double as a UCL claim." *Id.*

Because plaintiff cannot identify supposedly unfair conduct "independent of the breach," plaintiff offers nothing in support of its UCL claim but allegations that are duplicative of its breach of contract claim. It alleges that Facebook acted "unfair[ly]" insofar as it "[u]sed a blended price auction" rather than the "second price auction" it supposedly "represent[ed] publicly" that it used and "[o]vercharged all advertisers due to its use of a blended price auction." Am. Compl. ¶ 131. That is the *same alleged conduct* that underpins the breach of contract claim. *See id.* ¶ 119 (alleg-ing Facebook "breached its contract" by "charg[ing] advertisers pursuant to a blended price auc-tion" rather than a "second price auction," thus "overcharg[ing] every advertiser").

In sum, plaintiff's UCL claim boils down to allegations that it was "unfair" for Facebook to engage in the same alleged conduct that forms the basis of plaintiff's breach of contract claim. The UCL claim should be dismissed for that reason alone. *See Rosell*, 2014 WL 4063050, at *6 (dismissing UCL claim where plaintiffs failed to "allege a plus factor showing an independent violation of the UCL" or "come up with anything more than breach of contract").[7]

*Second*, plaintiff's UCL claim fails under either test for unfairness used by California courts. *Taleshpour v. Apple Inc.*, 549 F. Supp. 3d 1033, 1045 (N.D. Cal. 2021), *aff'd*, 2022 WL 1577802 (9th Cir. May 19, 2022). To state a claim for unfairness under the UCL, a plaintiff must show either (1) that the conduct is "tethered to specific constitutional, statutory, or regulatory pro-visions" (the "tethering test"); or (2) that the harm to the consumer outweighs the utility of the defendant's conduct (the "balancing test"). *See id.* The Amended Complaint does neither.

---

[7] The Amended Complaint suggests that it was "unfair" for Facebook to use an alleged "form contract of adhesion that was drafted by Facebook." Am. Compl. ¶ 129. But even assuming Fa-cebook used a "form contract of adhesion," that argument is baseless: "California law recognizes that 'ordinary' adhesive contracts are 'indispensable facts of modern life' and are generally en-forceable." *Nalbandyan v. CitiBank, N.A.*, 2022 WL 2783839, at *7 (C.D. Cal. June 13, 2022).

As to the tethering test, the Amended Complaint does not even attempt to show that the UCL claim is "tethered" to any specific legislative provision. Instead, citing *Calcagno v. Kipling Apparel Corp.*, 2024 WL 3261205 (S.D. Cal. July 1, 2024), plaintiff posits that Facebook's conduct was somehow "contrary" to a purported California policy favoring "pricing transparency." Am. Compl. ¶ 133. But *Calcagno* underscores the insufficiency of plaintiff's allegations. There, the plaintiff alleged that the defendant violated a "legislatively declared policy in favor of pricing transparency" *tethered to specific statutory provisions.*[8] *Calcagno*, 2024 WL 3261205, at *9. By contrast, a generic purported public policy of the kind invoked here cannot be the predicate to an "unfair" UCL claim. *See Wright v. Charles Schwab & Co*., 2020 WL 6822887, at *5 (N.D. Cal. Nov. 20, 2020) (allegation that defendant's practices were "contrary to legislatively declared and public policies that seek to foster trust and transparency in the securities marketplace" did not plead "unfair" UCL claim absent allegation policies were "tethered to specific constitutional, statutory, or regulatory provisions").

As to the balancing test, because plaintiff's theory for why Facebook's conduct was "unfair" relies on the same allegations that support its breach of contract claim, plaintiff fails to state a claim under this test for the same reason its breach of contract claim fails. *See Millam v. Energizer Brands, LLC*, 2024 WL 2988210, at *2 (9th Cir. June 14, 2024) (affirming dismissal of "unfair" UCL claim under balancing test because the alleged conduct was only supposedly wrongful based on "the same rejected theory" underlying plaintiffs' non-UCL claims).

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court dismiss the Amended Complaint with prejudice.

---

[8] The statutory provisions at issue in *Calcagno* are irrelevant. *See* 2024 WL 3261205, at *8 (discussing Consumer Legal Remedies Act provision barring the "making [of] false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions").

Dated: December 18, 2025

Respectfully submitted,

*/s/ James P. Rouhandeh*

James P. Rouhandeh (*pro hac vice*)
rouhandeh@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800

Andrew Yaphe (SBN 274172)
andrew.yaphe@davispolk.com
DAVIS POLK & WARDWELL LLP
900 Middlefield Road, Suite 200
Redwood City, California 94063
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111

*Counsel for Defendant*
*Meta Platforms, Inc.*