**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Plaintiff Iron Tribe Fitness*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRON TRIBE FITNESS, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant | Case No. 3:25-cv-3281-CRB<br><br>**PLAINTIFF IRON TRIBE FITNESS'S OPPOSITION TO DEFENDANT META PLATFORM INC.'S MOTION TO DISMISS**<br><br><u>CLASS ACTION</u><br><br>Date: March 27, 2026<br>Time: 10:00 a.m.<br>Courtroom: 6, 17th Floor<br><br>Before: The Hon. Charles R. Breyer |

PLAINTIFF'S OPPOSITION TO MOT. TO DISMISS
CASE NO. 3:25-cv-3281-CRB

Plaintiff Iron Tribe Fitness ("Plaintiff") respectfully submits this opposition to Defendant Meta Platform, Inc.'s ("Facebook" or "Defendant") Motion to Dismiss Plaintiff's First Amended Complaint ("Complaint").

**STATEMENT OF ISSUES**

1. Whether Plaintiff has stated a claim for breach of contract.

1. Whether Plaintiff has stated a claim for breach of the implied covenant of good faith and fair dealing.

2. Whether plaintiff has stated a claim for violation of California's Unfair Competition Law ("UCL") under the "unfair" prong.

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES ................................................................................................................ i

SUMMARY OF ARGUMENTS ..................................................................................................... vi

FACTUAL BACKGROUND ............................................................................................................1

ARGUMENT .....................................................................................................................................2

I.    DEFENDANT PROMISED ADVERTISERS IT WOULD USE A SECOND-PRICE AUCTION MODEL, AND WOULD NOT USE A BLENDED-PRICE MODEL ............................................................................................................................2

    A.    Facebook's Express Contract With Class Members Consisted Of The SRR And Help Center Webpages Promising A Second-Price Auction ...........................2

    B.    The Express Terms Of Facebook's Contract States That Facebook Would Use A Second-Price Auction, And Not A Blended-Price Auction ..........................4

    C.    Extrinsic Evidence Confirms That The Contract Required Facebook To Operate A Second-Price Auction .............................................................................7

II.   DEFENDANT BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ..............................................................................................10

    A.    The Implied Covenant Required Facebook To Act Objectively Reasonably in Pricing Advertisements And Facebook Subjectively Lacked Good Faith ........10

    B.    Plaintiff's Claim Does Not Seek To Modify The Contract Or Duplicate Its Claim For Breach Of Contract ...........................................................................12

III.  FACEBOOK'S CONDUCT VIOLATED THE "UNFAIR" PRONG OF THE UCL ...................................................................................................................................13

CONCLUSION ................................................................................................................................15

# TABLE OF AUTHORITIES

**CASES**                                                                                                  **Page(s)**

*A.L. v. Pleasanton Unified Sch. Dist.*,
    2023 WL 5209718 (N.D. Cal. Aug. 14, 2023) (Breyer, J.) .......................................................12

*In re Anthem, Inc. Data Breach Litig.*,
    2016 WL 3029783 (N.D. Cal. May 27, 2016) ...........................................................................4

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................................2

*Brown v. Google LLC*,
    685 F. Supp. 3d 909 (N.D. Cal. 2023) .......................................................................................3

*Calcagno v. Kipling Apparel Corp.*,
    2024 WL 3261205 (S.D. Cal. July 1, 2024) .............................................................13, 14, 15

*Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
    2 Cal. 4th 342 (1992) ...........................................................................................................10, 11

*Daniels v. Alphabet Inc.*,
    2021 WL 1222166 (N.D. Cal. Mar. 31, 2021)..........................................................................12

*Ellsworth v. U.S. Bank, N.A.*,
    2014 WL 2734953 (N.D. Cal. June 13, 2014) ..........................................................................13

*Ellsworth v. U.S. Bank, N.A.*,
    908 F. Supp. 2d 1063 (N.D. Cal. 2012) .............................................................................10, 14

*In re Google RTB Consumer Priv. Litig.*,
    606 F. Supp. 3d 935 (N.D. Cal. 2022) .................................................................................3, 13

*Hammerling v. Google LLC*,
    615 F. Supp. 3d 1069 (N.D. Cal. 2022) ................................................................................6, 7

*Helmer v. Transamerica Life Ins. Co.*,
    2020 WL 13990861 (N.D. Cal. May 28, 2020) ........................................................................10

*HSBC Bank USA, Nat'l Ass'n v. Dara Petroleum, Inc.*,
    2010 WL 2197525 (E.D. Cal. May 28, 2010) ...........................................................................8

*Jeong v. Nexo Fin. LLC*,
    2022 WL 174236 (N.D. Cal. Jan. 19, 2022) .............................................................................15

*Lyons v. Bank of Am., NA*,
    2011 WL 3607608 (N.D. Cal. Aug. 15, 2011) ........................................................................14

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
  863 F. Supp. 2d 928 (N.D. Cal. 2012) ..................................................................................2

*Mendoza v. Countrywide Home Loans, Inc.*,
  2009 WL 4706350 (N.D. Cal. Dec. 3, 2009) ......................................................................13

*Millam v. Energizer Brands, LLC*,
  2022 WL 19001330 (C.D. Cal. Dec. 9, 2022) ....................................................................15

*Millam v. Energizer Brands, LLC*,
  2024 WL 2988210 (9th Cir. June 14, 2024) ......................................................................15

*Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*,
  69 Cal. 2d 33 (1968) .............................................................................................................7

*Pitzer Coll. v. Indian Harbor Ins. Co.*,
  8 Cal. 5th 93 (2019) ...........................................................................................................10

*Robalo LLC v. Ramey*,
  2012 WL 244340 (E.D. Cal. Jan. 25, 2012) ......................................................................12

*Rosell v. Wells Fargo Bank, N.A.*,
  2014 WL 4063050 (N.D. Cal. Aug. 15, 2014) ....................................................................14

*S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*,
  74 Cal. App. 4th 1232 (1999) ...............................................................................................8

*Shared P'ship v. Meta Platforms, Inc.*,
  2024 WL 4280936 (N.D. Cal. Sept. 23, 2024) ..................................................................14

*Shaw v. Regents of Univ. of Cal.*,
  67 Cal. Rptr. 2d 850 (Ct. App. 1997) ..................................................................................4

*Stewart v. Screen Gems-EMI Music, Inc.*,
  81 F. Supp. 3d 938 (N.D. Cal. 2015) ..................................................................................14

*Trident Ctr. v. Conn. Gen. Life Ins. Co.*,
  847 F.2d 564 (9th Cir. 1988) ................................................................................................7

*UPPI LLC v. Cardinal Health, Inc.*,
  2022 WL 3594081 (9th Cir. Aug. 23, 2022).......................................................................10

*Waytena v. Cincinnati Ins. Co.*,
  2025 WL 3268405 (N.D. Cal. Nov. 24, 2025) ................................................................9, 10

*Wi2Wi, Inc. v. Twin City Fire Ins. Co.*,
  2020 WL 4913489 (N.D. Cal. May 5, 2020).........................................................................7

*Wolschlager v. Fidelity Nat'l Title Ins. Co.*,
  4 Cal. Rptr. 3d 179 (Ct. App. 2003) .....................................................................................4

*Wright v. Charles Schwab & Co.*,
    2020 WL 6822887 (N.D. Cal. Nov. 20, 2020) ..........................................................................15

*In re Yahoo! Litig.*,
    251 F.R.D. 459 (C.D. Cal. 2008) ..............................................................................................7

*Yue v. Conseco Life Ins. Co.*,
    282 F.R.D. 469 (C.D. Cal. 2012) ............................................................................................11

*Zenger-Miller, Inc. v. Training Team, GmbH*,
    757 F. Supp. 1062 (N.D. Cal. 1991) ........................................................................................8

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a) ................................................................................................................2

Restatement (Second) of Contracts § 205 (2024) ..........................................................................10

Restatement (Second) of Contracts §211 (2024) ..........................................................................13

**SUMMARY OF ARGUMENTS**

Facebook overcharged its advertising customers for more than four years, reaping "billions" of dollars in additional revenue according to its own executives. Facebook then concealed those overcharges and failed to reimburse advertisers. Such conduct gives rise to claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and for violation of the "unfair" prong of California's Unfair Competition Law.

Facebook's agreement with advertisers consists of a series of Facebook webpages that are incorporated, via express reference and hyperlinks, into Facebook's Statement of Rights and Responsibilities ("SRR"). On its webpages incorporated into the SRR, Facebook promised advertisers that it would operate a Second-Price Auction.

Facebook argues that no such promise exists in the contract, and that the contract is altogether devoid of promises about how Facebook would price hundreds of billions of advertisements that generated tens of billions in revenue for Facebook during the Class Period. This is contrary to the well-pleaded facts alleged in the FAC. In addition to the express promises on webpages incorporated into the SRR, California law is clear that extrinsic evidence must be considered when parsing the meaning and intent of a contract. *See, e.g.*, *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co*., 69 Cal. 2d 33, 38 (1968).

That extrinsic evidence shows that Facebook repeatedly promised to use a Second-Price Auction methodology, specifically a Vickery-Clarke-Groves or "VCG" Auction. A host of documents and statements, including Facebook's handbook for advertisers and presentations and interviews given by its executives, demonstrates that Facebook intended to contract with advertisers to sell advertisements using a Second-Price Auction. Facebook's conduct once it discovered overcharges in its auction process confirms that Facebook neither intended to change its auction process nor believed that doing so was permitted by its contract.

In the alternative, if the contract did not expressly require use of a Second-Price Auction, Facebook breached the implied covenant of good faith and fair dealing by secretly charging advertisers more than they would have paid under a Second-Price Auction and failing to reimburse them for their losses. This conduct reflects Facebook's subjective lack of belief in the validity of

PLAINTIFF'S OPPOSITION TO MOT. TO DISMISS                                    vi
CASE NO. 3:25-cv-3281-CRB

its actions and is objectively unreasonable.  Ignoring this, Facebook argues there cannot be a breach of the implied covenant because that would contradict the contract.  But if the contract is silent as to auction pricing, as Facebook contends, then the terms at issue under the implied covenant cannot be imposing obligations that contradict the express terms of the contract.  Moreover, the law is clear that claims for breach of contract and breach of the implied covenant can be asserted, and sustained, in the alternative.  *See, e.g.*, *Helmer v. Transamerica Life Ins. Co*, 2020 WL 13990861, at *6-7 (N.D. Cal. May 28, 2020).

Finally, Facebook's conduct was unfair to advertisers, in violation of the Unfair Competition Law ("UCL"), Cal. Bus. Prof. Code § 17200 *et seq*.  Facebook not only overcharged advertisers, concealed the overcharges, and refused to pay them back, it also actively encouraged advertisers to place higher bids than they otherwise would have, resulting in greater profits for Facebook and greater losses for advertisers.  Such allegations are more than sufficient to state a claim under either of the judicial tests for unfairness under the UCL and are not precluded by the parallel assertion of contract-based claims.

**FACTUAL BACKGROUND**

Defendant operates the world's largest family of social networking sites, including Facebook, a juggernaut that reaps tens of billions of dollars in advertising revenue per year. ¶¶31, 87.[1] The platform sells online advertising space through an auction system where advertisers bid to show their ads to users in their "feed," a personalized amalgamation of posts curated by Facebook's algorithm. Facebook promised (and intended) to operate a type of auction where the bidder pays the minimum amount needed to displace the next highest bid. ¶¶7, 10, 34-57, 104-8.

This is known as a Second-Price Auction, which was the dominant form of ad auction among major online platforms during the Class Period. ¶13. In describing its auctions, Facebook told advertisers that advertisers should bid their "true maximum bid" because Facebook it "will only charge you as much as the value you displaced from other advertisers who lost to you in the auction." ¶36.  Although there are variations of a Second-Price Auction, the common denominator is that the winning bidder's bid is not used when calculating the final price. *See, e.g.*, ¶¶11, 16, 19, 54. For that reason, Facebook's Help Center "recommend[ed]" that advertisers "enter [their] true maximum bid," as they "will only be charged" for the "minimum amount that you need to pay to have your ad or sponsored story shown." ¶¶104-05.  That language clearly described a Second-Price Auction—and only a Second-Price Auction—regardless of whether Facebook used that highly technical term.  Facebook's Help Center is referenced and linked in Facebook's contract such that it was part of it.  ¶¶2, 8, 100, 103-09.  Reinforcing this contractual promise, Facebook widely publicized its use of a Second-Price Auction.  For example, Facebook, its executives and employees discussed Facebook's use of a Second-Price Auction in media interviews (¶¶42-44), presentations at conferences and seminars (¶¶45-48), comments to academics and others studying auction theory and mechanics (¶49), advertiser forums on Facebook itself (¶¶50, 56), its SEC filings (¶34), and, importantly, a handbook prepared specifically for advertisers entitled "Your Guide to Facebook Bid Strategy." ¶36.

---

[1] Citations to "¶_" are to the First Amended Complaint (ECF No. 47) ("Complaint"); "MTD" are to Defendant's Motion to Dismiss (ECF No. 52), and "Ex. __" are to the accompanying Declaration of Avi Josefson.  All internal citations are omitted and emphasis is added unless otherwise noted.  Capitalized terms have the meanings ascribed in the Complaint.

While Facebook repeatedly told advertisers that Facebook operated a Second-Price Auction, the introduction of new software code in 2013 resulted in the operation of a Blended-Price Auction that Facebook did not correct for years. ¶¶7, 15, 21-27. Unlike a Second-Price Auction, a Blended-Price Auction takes into account the winning bidder's bid when calculating the final price, resulting in a higher price paid by the advertiser. ¶16. As a result, Facebook made even more money from advertisers who, expressly encouraged by Facebook to bid their "true maximum" bid, placed higher bids based on Facebook's promise that the high, winning bid would have no impact on final price. ¶¶8, 39, 72, 106.

Because it took Facebook engineers over four years to identify the software code that caused Facebook to operate a Blended-Price Auction, Facebook reaped roughly $4 billion in additional profits by overcharging advertisers, according to the Company's own documents. ¶27. Facebook's efforts to understand and then correct the software issue that caused the switch from a Second-Price Auction to a Blended-Price Auction demonstrates Facebook's understanding that it was required to use the former, even though the latter yielded greater profits. ¶¶76-86. Rather than fix the problem immediately and notify advertisers that they had been overcharged, Defendant implemented a "slow rollout" to conceal the overcharges from advertisers and prevent a sudden drop in revenue. ¶¶24, 88, 92, 131. At no point did Defendant take any steps to disclose its use of the Blended-Price Auction or compensate advertisers. ¶¶92, 96, 154.

**ARGUMENT**

The notice pleading standard of Fed. R. Civ. P. 8(a) is a "relatively light" burden. *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 948 (N.D. Cal. 2012). A complaint need only include enough facts "plausibly suggesting" a right to relief to avoid dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

**I.    DEFENDANT PROMISED ADVERTISERS IT WOULD USE A SECOND-PRICE AUCTION MODEL, AND WOULD NOT USE A BLENDED-PRICE MODEL**

**A.    Facebook's Express Contract With Class Members Consisted Of The SRR And Help Center Webpages Promising A Second-Price Auction**

Facebook's express contract with advertisers consisted of various documents incorporated by the Statement of Rights and Responsibilities ("SRR"), including Facebook's: (1) Self-Serve Ad

Terms, (2) Community Payment Terms, (3) Advertising Guidelines, and (4) Help Center Webpages hyperlinked therein, including (5) the Glossary of Ad Terms.  ¶¶102-08.

Under California law, a "contract may validly include the provisions of a document not physically a part of the basic contract." *Brown v. Google LLC*, 685 F. Supp. 3d 909, 929 (N.D. Cal. 2023).  "The contract need not recite that it 'incorporates' another document, so long as it guides the reader to the incorporated document." *Id*.  Further, while "the 'mere fact of a hyperlink' [is] not enough for incorporation…a hyperlink embedded within language signifying the linked material—*e.g.*, learn more by visiting the…Help Page,"—does suffice.  *Id*. at 930.  This is especially true where the hyperlinked files "make[s] additional commitments to users[.]" *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 943 (N.D. Cal. 2022).

Here, Facebook's SRR explicitly "included references and hyperlinks directing advertisers" to the Self-Serve Ad Terms, Payment Terms, and Advertising Guidelines.  ¶100-01; Ex. 1 at 3.  Those Advertising Guidelines, in turn, directed users to Help Center pages hyperlinked therein.  ¶103; Ex. 2 at 1. Similarly, Facebook's Payment Terms specifically directed advertisers to its website, and made clear that those webpages were part of the contract, stating that Facebook would electronically communicate "important information regarding your purchases…by posting them on our website" and that such posts "shall be considered received…within 24 hours."  ¶3; Ex. 3 at 3.  Further, advertisers' billing invoices, sent by Facebook, included the "important information" referenced in Facebook's Payment Terms, including the Help Center's explanations of Facebook's Second-Price Auction process.  ¶112. Those explanations, posted on Facebook's website in accordance with its Payment Terms, stated explicitly that Facebook will only charge advertisers "the bid necessary to win the auction," and that advertisers "will only be charged…the minimum amount that you need to pay to have your ad…shown[.]" ¶¶103-106;  Exs. 3, 4. Such language refers to a Second-Price Auction, not a Blended-Price Auction.

Because users are guided to hyperlinked pages that provide additional commitments, they are incorporated into the contract. *See Brown*, 685 F. Supp. 3d at 929; *see also In re Google*, 606 F. Supp. 3d at 943 (finding Google's "How Our Business Works" page part of contract "because

the page is prominently displayed, is hyperlinked, and makes additional commitments").[2]

Facebook does not meaningfully contest this. Apart from a brief parenthetical stating that these parts of Facebook's website "were not" incorporated, Defendant does not explain how the documents referenced in the SRR were not part of Facebook's contract with advertisers, or why the Complaint fails to allege that they are. MTD at 7. Indeed, Facebook previously conceded that "the express contract is composed of the [SRR] and the documents that it incorporates, including the Self-Serve Ad Terms, the Advertising Guidelines, and the Community Payment Terms." Ex. 6. Defendant further conceded that this is because "the SRR explicitly references" and hyperlinks to the documents. *Id.* Accordingly, by Defendant's own standards, Plaintiff has adequately alleged that Facebook's express contract with advertisers consisted of the six documents identified above, which promised that Facebook used a Second-Price Auction.

### B. The Express Terms Of Facebook's Contract State That Facebook Would Use A Second-Price Auction, And Not A Blended-Price Auction

Facebook promised to operate a second price auction in its contracts with advertisers, as set forth above. ¶15; *see also* ¶¶ 9-11, 74, 119. This promise includes: (1) Facebook's commitment in the Help Center, referenced in the Advertising Guidelines, to "automatically calculate the *minimum* amount that you need to pay to have your ad…shown. ***You will only be charged for that amount***"; and (2) Facebook's assurance, in the Glossary of Ad Terms, that it "will ***only*** charge you the bid ***necessary*** to win the auction[.]" ¶¶104, 106; Exs. 4, 5. These statements can only describe a Second-Price Auction, where the winning bidder's cost is calculated as "the minimally higher amount needed to 'displace' the second-highest bid[.]" ¶¶11, 107.

Defendant challenges these straightforward allegations by mischaracterizing the Complaint and its own promises. ***First***, Defendant argues that there was no promise to run a Second-Price Auction because "the webpages on which plaintiff relies do not even *mention* the terms 'second-

---

[2] *See also Shaw v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 2d 850, 856 (Ct. App. 1997) (terms are incorporated where contract "guides the reader to the incorporated document"); *Wolschlager v. Fidelity Nat'l Title Ins. Co.*, 4 Cal. Rptr. 3d 179 (Ct. App. 2003) (incorporating term where contract said other language "should be read" but without "any" specific reference to that term); *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *9-11 (N.D. Cal. May 27, 2016) ("policies" incorporated where contract stated "you may obtain a copy…by accessing our website").

PLAINTIFF'S OPPOSITION TO MOT. TO DISMISS                                    4
CASE NO. 3:25-cv-3281-CRB

price' or 'VCG.'" MTD at 7. This is irrelevant: Plaintiff need not allege that Defendant's promise to advertisers used this specific, highly technical terminology, which may not be understood by the lay advertisers to which it was targeted. Instead, Plaintiff alleges that Facebook's promises to advertisers "*describe[d]*" a Second-Price Auction in a manner that would be understandable to their customers. ¶¶ 104, 107. As alleged, a Second-Price Auction is one in which the winning bidder only pays the amount needed to displace the second-highest bidder, with the winning bid not factored into the final price, while the Blended-Rate Auction that Facebook secretly operated takes into account the winning bid, and therefore charges advertisers more than the "minimum" necessary to win the auction. ¶¶7, 10, 35-37; Ex. 5. Moreover, Defendant explicitly used the phrases "VCG Auction"—calling it a "necessity"—when addressing sophisticated advertisers and academic audiences, making clear its intent when it drafted the contract. ¶¶45-46; Exs. 7-9.

*Second*, Defendant argues that Facebook's language indicating that bidders "may" be charged a lower price than their bid indicates it is not Second-Price Auction because, in a Second-Price Auction, winning bidders would "invariably" and always be charged a lower amount than their actual bids. MTD at 7. This is wrong. A Second-Price Auction typically—and in robust auctions like Facebook's, virtually always—results in a lower final price than the maximum bid, but this is not an inherent feature of a Second-Price Auction. For example, if there is a *de minimis* spread between the first and second bid, the winner could pay the amount of her maximum bid (e.g., a maximum bid of $100 may yield a final price of $100 if the second-highest bid is $99.99). More importantly, the promise that Facebook "will only charge you the bid necessary to win the auction" *cannot* describe a Blended-Price Auction, which charges a price that incorporates the maximum bid. Put another way, the contract promised, at a minimum, that Facebook was *not* using a Blended-Price Auction. And read as a whole, the contract could describe only a Second-Price Auction, as confirmed by how it was repeatedly publicly described by Facebook executives. *See* ¶¶43-47 (describing use of Second-Price VCG Auction).[3]

_____

[3] As described in the Complaint, there are two kinds of Second-Price Auctions: the Generalized Second-Price Auction ("GSP Auction"), and the Vickery-Clarke-Groves or "VCG" Auction. ¶¶13-15. Unlike a GSP Auction, where bids are only the amount offered by bidders, a VCG Auction

Defendant's argument that "there is no basis to infer that the phrases 'minimum amount that you need to pay' or the 'bid necessary to win the auction' signify the *second-place bid*" (MTD at 8), is therefore contrary to the well-pleaded allegations in the FAC, and to a common-sense understanding of a Second-Price Auction. By definition, the minimum price paid to win the auction is the amount needed to displace the second highest bid: a Second-Price Auction. *See* ¶11. In contrast, in a Blended-Price Auction, the price paid will be in a range between the first and second bids, but not the *minimum* needed to displace the second bid. *See* ¶¶16-20, 66-72.

*Finally*, Facebook wrongly claims that Plaintiff "acknowledges that the top two bidders in a blended-price or second-price auction could make identical bids…but the winner in the blended-price auction could be charged *less*…than the winner in the second-price auction." MTD at 8. To support this claim, Facebook relies on examples from the Complaint where "the winning bidder in the second-price auction would be charged $75…but could be charged *less* ($60 or $70) in the blended-price auction." *Id*. at 9. According to Defendant, this undermines Plaintiff's claim that it was overcharged due to the use of a Blended-Price Auction. *See id*.

Facebook's argument improperly conflates two distinct examples provided in the Complaint. The Complaint refers to a VCG Second-Price Auction where the "organic" component raises the final price from $50 to $75. *See* ¶66. The example of a Blended-Price Auction is not describing a VCG auction, which is why the same bids ($50 and $100 from Bob and Alice, respectively) could yield a final price of $60 or $70. Using those same bids in an apples-to-apples comparison of two non-VCG auctions, the final price in the non-VCG Second-Price Auction would be $50. *See* ¶17. It is indeed the case that a Blended-Price Auction will yield a higher price than a *comparable* Second-Price Auction because the latter ignores the highest bid.

The express promises in Facebook's contract distinguish this case from *Hammerling v.*

---

takes into account "how much value is being displaced" from other potential content as a result of the winning bid—what Facebook calls the "organic" component. ¶43 (quoting Facebook's Chief Economist); ¶64. The critical fact is that, in both kinds of Second-Price Auctions, the final price is the minimum needed to displace the second-highest bid, whether that reflects a dollar value or a dollar value plus an "organic" component. This is alleged in the Complaint (¶¶12, 66), supported by numerous statements by Facebook and its executives (¶¶41-50), and must be taken as true.

PLAINTIFF'S OPPOSITION TO MOT. TO DISMISS                                    6
CASE NO. 3:25-cv-3281-CRB

*Google LLC,* 615 F. Supp. 3d 1069, 1095 (N.D. Cal. 2022).  In *Hammerling*, this Court explained that a promise to collect data that "may" include activity on third-party apps does "not plausibly amount to a promise to collect data *only* from" such apps.  *Id*.  In contrast, Facebook's Help Center, which is part of the contract, clearly promises to use a Second-Price Auction (¶¶4, 103-04), there is not similar "permissive" language, and Facebook's recommendation that advertisers bid their "maximum" makes sense *only* in the context of a Second-Price Auction.  *See* ¶¶35, 105.

Contrary to the terms of the contract, Facebook did not charge advertisers "only…the bid necessary to win the auction," but rather a higher price that took into account the winning bid. ¶¶8-9.  On a motion to dismiss, Plaintiff's well-pleaded allegations about the meaning of contractual terms must be accepted as true particularly where, as here, that interpretation is supported by a host of extrinsic evidence supporting Plaintiff's interpretation.  *See, e.g.*, *Wi2Wi, Inc. v. Twin City Fire Ins. Co.*, 2020 WL 4913489, at \*10 (N.D. Cal. May 5, 2020) (courts must assume as "correct plaintiff's allegations as to the meaning of the agreement").

**C.     Extrinsic Evidence Confirms That The Contract Required Facebook To Operate A Second-Price Auction**

Even if Facebook's express contract with advertisers was not comprised of the documents discussed above, those documents, which promise that Facebook would employ a Second-Price Auction rather than a Blended-Price Auction, constitute extrinsic evidence of the parties' intent. Consideration of additional extrinsic evidence further corroborates Facebook's intent, leaving no doubt that Facebook's contract promised the use of a Second-Price Auction.

Under California law, "the exclusion of relevant, extrinsic evidence to explain the meaning of a written instrument could be justified only if it were feasible to determine the meaning the parties gave to the words from the instrument alone."  *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 38 (1968); *see also, e.g.*, *In re Yahoo! Litig.*, 251 F.R.D. 459, 471 (C.D. Cal. 2008) (accepting allegation at motion to dismiss that "extrinsic evidence" will support advertisers promised "targeted advertising" "even if the Agreement appears on its face to state otherwise"); *Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988) ("If one side is willing to claim that the parties intended one thing but the agreement provides for

another, the court must consider extrinsic evidence"). Here, Facebook contends that the express terms of the contract do not promise the use of a Second-Price Auction, or of any specific auction process at all. Under California law, the Court must consider extrinsic evidence to interpret the terms of the contract. *S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*, 74 Cal. App. 4th 1232, 1242 (1999) (it is the job of the court "to at least provisionally entertain all credible extrinsic evidence offered to ferret out the meaning of a written instrument, even one that is unambiguous on its face"); *see also HSBC Bank USA, Nat'l Ass'n v. Dara Petroleum, Inc.*, 2010 WL 2197525, at *4 (E.D. Cal. May 28, 2010) (under California law, courts "always" consider extrinsic evidence to rule on disputed contract language).

Defendant's argument that the Court cannot use extrinsic evidence to "detract from, or vary the terms of the written contract" is misplaced. MTD at 10 (citing *Zenger-Miller, Inc. v. Training Team, GmbH*, 757 F. Supp. 1062, 1067 (N.D. Cal. 1991)). Facebook's contention that the contract does not specify the auction process to be used means that Plaintiff's extrinsic evidence cannot possibly be in conflict with any express contractual terms. *See* MTD at 7-9.[4]

Defendant further argues that the Complaint's allegations based on "news sources and academic papers" is misplaced because California courts only allow extrinsic evidence of the parties' understanding rather than that of third parties. *See* MTD at 9. But the sources cited in the Complaint do reflect Facebook's understanding of its agreement with advertisers. Specifically, the Complaint describes Facebook's statements in the handbook it provided to advertisers to explain the auction process, the presentations delivered by Facebook executives discussing Facebook's use of a Second-Price VCG Auction, and other statements by Facebook advising advertisers that there is "no advantage to underbidding" in Facebook's Second-Price Auction. ¶¶36-57; Exs.7-9, 10. Even Facebook's IPO registration statement explicitly stated that its auction

---

[4] *Zenger-Miller* is thus inapposite. There, defendants argued that all disputes were subject to an arbitration provision, but the court found that provision limited to disputes "arising out of, or related to, amounts due and owing." *See Zenger-Miller*, 757 F. Supp. at 1066. The court in fact **considered** extrinsic evidence but held that it did not alter the unambiguous meaning of these words. In other words, *Zenger-Miller* confirms extrinsic evidence must be considered, particularly given that Facebook claims there are no terms pertaining to the pricing of ads, so any extrinsic evidence cannot conflict with the contract (as interpreted by Facebook).

system "automatically calculates the minimum price an advertiser must pay to 'win' the auction," and that this "encourages advertisers to bid the maximum price they are willing to pay[.]" Ex. 11. Facebook's, handbook, presentations, and SEC filings leave no doubt that Facebook intended to use a Second-Price Auction and publicly shared that intention.

The additional sources the Complaint cites either quote, discuss or reflect Facebook's promises to use a Second-Price Auction. For example, the *Wired* articles quote and summarize discussions with Facebook's Chief Economist and Head of Ad Engineering, while the "consultant posting on LinkedIn," MTD at 9, was a former Facebook Account Manager. ¶¶41, 56; Exs. 12-14. Similarly, the advice, on a Facebook advertising community post, to "[l]ook up VCG auction" was posted by a Facebook Manager, while the academic publication Plaintiff cites were prepared with the cooperation of senior Facebook employees, and further corroborate the widespread understanding of Facebook's statements about its auction process. ¶¶49-50; Ex. 15. Those employees had intimate knowledge of Facebook's internal systems, and their statements provide insight into Facebook's understanding of the contract it drafted and the auction process described therein. Facebook's repeated reiteration of its use of a Second-Price Auction makes clear that Facebook understood itself to be bound to conduct auctions using a Second-Price methodology. Even the Cornell and LinkedIn blog posts discuss the statements of Facebook executives in *Wired*, and therefore reflect that sophisticated readers of those articles understood them to be articulating Facebook's promise to operate a Second-Price Auction. ¶¶52-53; Ex. 16. This understanding is further reinforced by the fact that Facebook (eventually) reverted to a less-lucrative Second-Price Auction after discovering it had been using a Blended-Price Auction. ¶126.[5]

At minimum, Plaintiff's allegations, coupled with Defendant's argument that the contract is silent as to key terms, demonstrate that Facebook's contract is ambiguous. *See, e.g.*, *Waytena v. Cincinnati Ins. Co.*, 2025 WL 3268405, at *4 (N.D. Cal. Nov. 24, 2025) (ambiguity turns on whether contract is "reasonably susceptible" to the interpretation urged). Such ambiguity must be

---

[5] Defendant's argument that *Wired* referred to Facebook's auction process as a "black box" (MTD at 9) ignores the article, which described Facebook's auction as a black box when discussing the "organic" component of Facebook's Second-Price VCG Auction because advertisers could not determine how Facebook calculated the organic component of the bid. ¶¶94-95; Ex. 13.

resolved through consideration of extrinsic evidence. *Id.*  This ambiguity—and the need for evidence to resolve it—renders Plaintiff's claims improper for resolution on this motion. *See UPPI LLC v. Cardinal Health, Inc.*, 2022 WL 3594081, at *2 (9th Cir. Aug. 23, 2022) ("Any dispute over the meaning of contractual terms is a question inappropriate for resolution at the motion to dismiss stage."); *Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1084 (N.D. Cal. 2012) (interpretation of an "ambiguous contract is a factual determination") (citation modified).

## II.    DEFENDANT BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Under California law, "[e]very contract imposes upon each party a duty of [subjective] good faith and [objective] fair dealing in its performance and its enforcement." *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371 (1992) (quoting Rest. 2d Contracts, § 205).  This "implied covenant supplements, rather than overrides, an agreement with a promise to act in good faith." *Pitzer Coll. v. Indian Harbor Ins. Co.*, 8 Cal. 5th 93, 105 (2019).  Accordingly, a party "violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." *Carma*, 2 Cal. 4th at 372.

To the extent that contract and implied covenant claims "are based on the same *alleged* facts, [there is] no error in pleading them in the alternative to account for different facts that may be uncovered by discovery." *Helmer v. Transamerica Life Ins. Co.*, 2020 WL 13990861, at *7 (N.D. Cal. May 28, 2020) (emphasis in original).  Though a plaintiff may not be able to ultimately recover on both claims, an implied covenant claim can survive motion to dismiss alongside a contract claim.  *See id.* Finally, the implied covenant "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Carma*, 2 Cal. 4th at 372.

### A.    The Implied Covenant Required Facebook To Act Objectively Reasonably in Pricing Advertisements And Facebook Subjectively Lacked Good Faith

Advertisers entered into a contract with Facebook through which they agreed to pay the Company in exchange for placing ads on their platform. *See, e.g.*, ¶¶2-3, 6. This contract gave rise to a duty for both parties to deal fairly and in good faith with one another.  *Carma*, 2 Cal. 4th at

371. Accordingly, to the extent that the contract itself did not specify how advertisements were to be sold, the implied covenant of good faith and fair dealing required Facebook to price them in a manner that was objectively reasonable, and to subjectively believe in the validity of that pricing. *See id*. at 373. This duty was elevated by the fact that Facebook had broad discretionary power over the pricing of advertisements. *See* ¶121, *Carma*, 2 Cal. 4th at 372.

Defendant breached both aspects of this implied duty, subjectively lacking belief in the validity of its objectively unreasonable conduct. *See Carma,* 2 Cal. 4th at 373. Such lack of belief is evidenced by the facts that (1) "Facebook repeatedly publicly described its auction process as a second price auction," ¶122; (2) "Facebook expressly acknowledged the importance that advertisers understand Facebook's auction logic," ¶125; (3) "once it identified the responsible code[,] Facebook determined to change that code and revert back to a VCG auction, knowing that such change would negatively impact Facebook's revenues,"  ¶126; and (4) Facebook never "apprised advertisers that it had for years secretly operated a blended price auction[.]" ¶ 127. This conduct frustrated advertisers' rights to the benefits of their contract with Facebook. ¶25.

Facebook's conduct was likewise not objectively reasonable.[6] Indeed, the mere fact that Facebook *secretly* operated a Blended-Price Auction that caused advertisers to pay billions of dollars more than they would in a Second-Price Auction was objectively unreasonable. That unreasonableness is further evidenced by the facts that: (1) "Facebook repeatedly publicly described its auction process as a second price auction," ¶122; (2) these descriptions resulted in "a broad public understanding that Facebook operated a second price auction," ¶123; (3) "Facebook did nothing to rebut or correct the understanding that it used a form of second price auction," *id*.; (4) "Facebook neither apprised advertisers that it had for years secretly operated a blended price auction, or refunded to advertisers the additional amounts they had paid," ¶127;  and (5) Facebook intentionally implemented a "slow rollout" of the fix. ¶92.

In any case, the issue of "[w]hether the implied covenant of good faith has been breached

___

[6] Because the standard is objective, Defendant's prior argument that Plaintiff did not read Facebook's promises to use a Second-Price Auction, MTD Reply at 13, is irrelevant. *See, e.g.*, *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 476 (C.D. Cal. 2012) ("[r]eliance by the customer … is not an element [of an implied covenant claim] because inducement is not the issue.").

is typically a question of fact, unless only one inference can be drawn from the evidence." *A.L. v. Pleasanton Unified Sch. Dist.*, 2023 WL 5209718, at *3 (N.D. Cal. Aug. 14, 2023) (Breyer, J.) (denying dismissal of plaintiff's implied covenant claim).

### B. Plaintiff's Claim Does Not Seek To Modify The Contract Or Duplicate Its Claim For Breach Of Contract

In seeking dismissal of the implied covenant claim, Defendant first argues that "plaintiff impermissibly seeks to impose substantive obligations on Facebook not contemplated by the alleged contract." MTD at 11. This is wrong. As explained above, this is exactly what the contract required. *See supra* Section I. In any event, the argument misapprehends the Complaint, which specifically alleges that "the covenant of good faith and fair dealing did ***not*** prevent Facebook from changing its auction process." ¶124. Facebook simply could not do so secretly, while publicly and repeatedly stating it was using a Second-Price Auction so as to harm advertisers, rather than disclosing the change in auction methodology or paying advertisers back after it uncovered it. *See* ¶24. Facebook's argument that it acted in "good faith" is premised on its incorrect reading of the contract (MTD at 12) and otherwise contradicts the Complaint.[7]

Next, Defendant argues that the implied covenant claim should be dismissed as "duplicative" of the breach of contract claim. MTD at 11. Defendant's position here is inconsistent with its position regarding the contract claim: if, as Defendant contends, the contract makes no promises regarding the pricing of advertisements, then Plaintiff's implied covenant claim is not duplicative of a breach of those purportedly non-existent promises. *Daniels*, on which Defendant relies (MTD at 11), in fact serves to highlight the distinction Plaintiff articulates above. There, the court dismissed the implied covenant claim because it was based "on ***precisely the same*** allegations as [plaintiff's] purported breach of contract claim." *Daniels v. Alphabet Inc.*, 2021 WL 1222166, at *9 (N.D. Cal. Mar. 31, 2021). Here, in contrast, Plaintiff alleges that Facebook breached the contract itself by operating a Second-Price Auction. ¶149. Facebook further breached the implied covenant by secretly operating a Blended-Price Auction while publicly claiming it was

---

[7] Unlike the "slow rollout" and other facts here, in Facebook's case, *Robalo LLC v. Ramey*, 2012 WL 244340, at *6 (E.D. Cal. Jan. 25, 2012), there was nothing demonstrating a lack of good faith.

operating a Second-Price Auction, concealing the change from advertisers, and retaining billions in illicit revenue at the expense of advertisers, all while telling them to bid their "maximum." ¶154; *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d at 945 (implied covenant claim not duplicative where defendant acted bad faith).[8]

Last, revealing the weakness of its argument, Facebook wrongly argues that Plaintiff's individual's "expectations" somehow matter. But the law is clear that, with a form contract like Facebook's, Plaintiff's individual expectations are irrelevant and, instead, the contract is interpreted under an "objective" standard. *See, e.g.*, *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, at *22 (N.D. Cal. June 13, 2014) (implied covenant claims "rooted in form contracts and the application of uniform policies" do not require "examining each plaintiff's individual expectations"); Restatement (2d) Contracts §211(2), cmt. e (interpreting a "standardized contract" requires courts "to effectuate the reasonable expectations of the average member of the public").[9]

**III.     FACEBOOK'S CONDUCT VIOLATED THE "UNFAIR" PRONG OF THE UCL**

The UCL's "unfair" prong proscribes business activity that "violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *Calcagno v. Kipling Apparel Corp.*, 2024 WL 3261205, at *9 (S.D. Cal. July 1, 2024).   California courts have developed two tests to assess claims of unfairness: "balancing" and "tethering."  *See id.*   Under the former, unfairness is found if the injury to consumers is "substantial" and not outweighed by countervailing benefits to consumers; under the latter, a practice is unfair if it "violate[s] a legislatively declared policy[.]" *Id.*

Numerous aspects of Facebook's conduct violated the UCL under either of these tests. *See* ¶131.  These include Defendant's: (1) secret change of the method used to price advertisements; (2) operation of a Blended-Price Auction despite representing publicly that it used a Second-Price

---

[8]  In pressing this argument, Defendant cites the Complaint's allegation that "Facebook was obligated to operate a second price auction for advertisements[.]" MTD at 11-12.  But this quote omits the crucial next line: "Facebook was obligated to operate a second price auction…***until such time*** as it informed advertisers that it had changed its auction process."  ¶154.

[9] *Mendoza v. Countrywide Home Loans, Inc.*, 2009 WL 4706350, at *3-4 (N.D. Cal. Dec. 3, 2009) is inapposite because the plaintiffs there did not identify any contract, let alone an implied duty.

Auction, resulting in overcharging of advertisers; (3) concealment of the Blended-Price Auction; (4) implementation of a "slow rollout" of the fix to both avoid both discovery and a sudden decline in revenue; and (5) wrongful retention of billions in revenues generated by the secret change. ¶ 131. In fact, Facebook not only overcharged advertisers, but ***actively encouraged*** them to place their "maximum," higher bids. ¶¶7-8, 19, 38. Advertisers obviously received no benefit from these practices, which was contrary to California law and policy favoring pricing transparency. ¶¶132, 133; *see also* ¶20. These allegations state a claim. *See, e.g., Ellsworth*, 908 F. Supp. 2d at 1088-90 (sustaining UCL claim under "lenient" Rule 12(b)(6) standard).

Defendant asserts the claim should be dismissed for two reasons, both of which fail. ***First***, Defendant is wrong that Plaintiff's UCL claim merely repeats its contract claim. *See Lyons v. Bank of Am., NA*, 2011 WL 3607608, at *11 (N.D. Cal. Aug. 15, 2011) ("a breach of contract may form the predicate for an unlawful business practices claim if it also constitutes conduct that is unlawful, unfair or fraudulent…an allegation of a systematic breach of certain types of contracts can constitute an unfair business practice."); *see also Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 967 (N.D. Cal. 2015) ("plaintiff may bring a UCL claim even where it overlaps with a concurrently brought breach of contract and breach of the implied covenant of good faith and fair dealing claim"); *Shared P'ship v. Meta Platforms, Inc.*, 2024 WL 4280936, at *6 (N.D. Cal. Sept. 23, 2024) (allowing contract and UCL claims to proceed).

Here, Plaintiff's UCL claim is predicated on aspects of Facebook's conduct beyond the operation of the Blended-Price Auction, including the concealment of that auction process, encouragement of advertisers to place their maximum bid, and failure to refund advertisers. *See* ¶¶7, 30, 72, 92, 95-6, 127, 131, 158. That claim is therefore not based on "the *same alleged conduct* that underpins the breach of contract claim." MTD at 14. These facts also distinguish this case from *Rosell*, where the plaintiffs could "not come up with anything more than breach of contract." *Rosell v. Wells Fargo Bank, N.A.*, 2014 WL 4063050, at *6 (N.D. Cal. Aug. 15, 2014).

***Second***, Defendant argues that Plaintiff's UCL claim does not allege an unfairness claim under either test. MTD at 14. With respect to the tethering test, Facebook argues that *Calcagno* found a policy in favor of pricing transparency that was "*tethered to specific statutory provisions*"

of the Consumer Legal Remedies Act ("CLRA"), which Facebook argues is "irrelevant" here. MTD at 15, n.8. But in reality, the court found a policy favoring transparent pricing in *both* the CLRA *as well as the UCL* itself. *See Calcagno* 2024 WL 3261205, at *9 (referencing "legislatively declared policy in favor of pricing transparency, as exhibited by the CLRA and UCL statutes themselves[.]"). This distinguishes *Wright*, where there was no allegation that the defendant violated a policy recognized by a California court. *See Wright v. Charles Schwab & Co.*, 2020 WL 6822887, at *5 (N.D. Cal. Nov. 20, 2020); *Calcagno* 2024 WL 3261205, at *9.

As to the balancing test, Defendant regurgitates its assertion that Plaintiff's claim "relies on the same allegations that support its breach of contract claim," and cites to *Millam* for the proposition that the balancing test is not met where the alleged conduct is only "wrongful based on 'the same rejected theory' underlying plaintiffs' non-UCL claims." *Id.* (quoting *Millam v. Energizer Brands, LLC,* 2024 WL 2988210, at *2 (9th Cir. June 14, 2024)). Facebook is wrong.

***First***, as explained above, Plaintiff does not hinge its UCL claim solely on the allegations that support its contract claim. *See, e.g.*, ¶¶129-33; *supra* Factual Background; Section II.A.

***Second***, Defendant misapprehends *Millam*, citing it for the broad proposition that a UCL claim cannot be based on conduct that has been rejected under a different theory. *See* MTD at 15. But *Millam* did not even address non-UCL claims or suggest that the dismissal of such claims in any way affects the outcome of a UCL claim. Rather, *Millam* merely held that "the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Millam v. Energizer Brands, LLC*, 2022 WL 19001330, at *7 (C.D. Cal. Dec. 9, 2022). *Millam* therefore has no bearing on Plaintiff's UCL claim.

Moreover, courts recognize that UCL and non-UCL claims can be pleaded in the alternative, and a UCL claim can survive even if parallel non-UCL claims are dismissed. *See Jeong v. Nexo Fin. LLC*, 2022 WL 174236, at *27 (N.D. Cal. Jan. 19, 2022) (allowing plaintiff's UCL claim to proceed alongside his breach of contract claim on motion to dismiss).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss in its entirety.

Dated: February 6, 2026

Respectfully Submitted,

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*/s/ Avi Joefson*

AVI JOSEFSON (*pro hac vice*)
(avi@blbglaw.com)
MICHAEL D. BLATCHLEY (*pro hac vice*)
(michaelb@blbglaw.com)
TAL E. AVRHAMI (*pro hac vice*)
(tal.avrhami@blbglaw.com)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

**BISHOP PARTNOY**
ROBERT E. BISHOP (*pro hac vice*)
(bobby@bishoppartnoy.com)
FRANK PARTNOY
(frank@bishoppartnoy.com)
1717 K Street, NW, Suite 900
Washington, D.C. 20006
(202) 787-5769

*Counsel for Plaintiff Iron Tribe Fitness*