# Exhibit A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COUNTY OF SAN BERNARDINO, | No. 24-6986 |
| *Plaintiff-Appellant*, | |
| v. | D.C. No. 5:21-cv-01978 |
| INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted November 19, 2025
Pasadena, California

Filed April 23, 2026

Before: Richard R. Clifton, Jay S. Bybee, and Ana de Alba,
Circuit Judges.

Opinion by Judge Bybee

## SUMMARY[*]

### California Insurance Law

The panel reversed the district court's judgment dismissing the County of San Bernardino's claim for declaratory relief in an insurance coverage dispute between the County and the Insurance Company of the State of Pennsylvania ("ICSOP") over the costs that the County incurred while remediating environmental damage at the County-owned Chino Airport, and remanded for further proceedings.

The County claimed that the ICSOP was liable for all property damage up to $9 million per occurrence, while ICSOP argued that it was liable only for damages up to $9 million per year in the aggregate. The district court construed the policies in favor of ICSOP.

The panel held that ICSOP's annual aggregate limits provision did not apply to the County's claim for property damage. Applying California law, the panel held that the aggregate limits provisions in the insurance policies were ambiguous. The panel held that the California Court of Appeal's decision in *Garamendi v. Mission Insurance Co.*, 31 Cal. Rptr. 3d 395 (Cal. Ct. App. 2005), did not bind its judgment, and in light of the ambiguity in the policies, it would consider extrinsic evidence of the meaning of the policies. The extrinsic evidence reinforced the panel's conviction that the policies were ambiguous and not susceptible to only one reasonable interpretation. The panel

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

concluded that the policies did not specify an aggregate limit for property damage.

The panel further held that, in light of its conclusion, the district court will need to reconsider the County's request for declaratory relief.

Accordingly, the panel reversed the district court's judgment and remanded for further proceedings.

---

## COUNSEL

James C. Martin (argued), Anthony S. Newman, Keith A. Meyer, and Amber Finch, Reed Smith LLP, Los Angeles, California; Colin E. Wrabley, Reed Smith LLP, Pittsburgh, Pennsylvania; David M. Halbreich, Morgan Lewis & Bockius LLP, Los Angeles, California; Thomas D. Bunton, Senior Deputy County Counsel, San Bernardino Office of the County Counsel, San Bernardino, California; for Plaintiff-Appellant.

Agelo L. Reppas (argued), BatesCarey LLP, Chicago, Illinois; Nicholas B. Salerno, Drew Rosell, and Linda L. Sager, Herold & Sager, Encinitas, California; for Defendant-Appellee.

Andrew B. Breidenbach, Theodora Oringher PC, Costa Mesa, California; Allonn E. Levy, Brent W. Vincent, and Caitlin M. Albaugh, Lathrop GPM LLP, San Jose, California; for Amicus Curiae Roman Catholic Bishop of Orange.

4   CTY. OF SAN BERNARDINO V. INSURANCE CO. OF THE STATE OF PA

**OPINION**

BYBEE, Circuit Judge:

This case arises from an insurance coverage dispute between the County of San Bernardino ("County") and the Insurance Company of the State of Pennsylvania ("ICSOP") over the costs that the County incurred while remediating environmental damage at the County-owned Chino Airport ("Airport"). The County claims that ICSOP is liable for all property damage up to $9 million per occurrence, while ICSOP argues that it is liable only for damages up to $9 million per year in the aggregate. The district court construed the policies in favor of ICSOP and then entered a final judgment as to the County's declaratory action. We hold that ICSOP's annual aggregate limits provision does not apply to the County's claim for property damage. We reverse and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The County and the Airport*

The facts giving rise to this case date back to the Second World War. In 1941, the federal government leased the newly established Chino Airport from the County of San Bernardino. In 1942, the federal government purchased adjoining land, thereby enlarging the Airport property. Operations on the site during these years, including the dismantling and melting of surplus World War II aircraft into ingots, generated significant industrial waste, which was then discharged into the ground.

In 1949, the County took full ownership of the Airport, including the adjoining land that the federal government purchased in 1942. Shortly thereafter, the County began

leasing portions of the property to a variety of businesses. In the 1960s and 70s, at the height of the conflict in Vietnam, the Airport again became a locus of wartime efforts: Its tenants produced napalm, bombs, and other incendiary devices, all sold to the federal government.

In 1990, the California Regional Water Quality Control Board ("Board") found that "industrial waste disposal practices at the Airport" had led to hazardous amounts of trichloroethylene in the drinking water situated downgradient of the site, and these amounts exceeded the highest levels acceptable for potability. The Board issued the first of three cleanup and abatement orders to the County.[1] Highlighting the effects of activities at the Airport since the 1940s, including the wartime efforts in the 60s and 70s, the Board directed the County to investigate and remediate the contamination. The County's response to the orders included arrangements for environmental investigations into more than twenty separate potential sources of contamination; the drilling and sampling of over 280 soil borings; the installation and sampling of seventy-five groundwater monitoring wells; the preparation of feasibility studies; and the removal and disposal of ten inactive underground storage tanks, 310 drums containing hazardous waste, and 51 drums containing napalm. The County continues to incur costs as it takes further steps to comply with the Board's orders.

---

[1] The Board issued a second, superseding order in 2008, and a third order superseding the second in 2017. Each of these orders reflected updated information and directed further action.

B.  *ICSOP's Policies*

Because these environmental damages stemmed from decades-old activities, the County sought coverage for its compliance costs under a series of policies it held with ICSOP from 1966 through 1975.  During that period, ICSOP issued three successive and identically worded policies to the County.  Each of the policies covered a three-year period, together spanning nine years, from July 23, 1966 to July 23, 1975.  Under the policies, ICSOP is obligated to provide coverage in one of two triggering scenarios.  First, in its excess coverage function, ICSOP must indemnify the County when the limits of underlying coverage have been exhausted.  Second, in its umbrella coverage function,[2] ICSOP's policies are triggered when losses are "not covered by said underlying insurances" after the County has paid a self-insured retention of $25,000.  In this case, the County sought coverage under the policies' umbrella function after its primary insurers denied its claims.

The ICSOP policies cover three general categories of liability:

> [D]amages, direct or consequential and expenses . . . on account of:
> (i) Personal injuries, including death at any time resulting therefrom,
> (ii) Property Damage,

---

[2] Excess policies and umbrella policies are distinct:  An "umbrella policy typically insures against certain risks that a concurrent primary policy does not cover," thereby "filling a gap in primary coverage."  1 *New Appleman on Insurance* § 1.06 (2025).  A "true excess policy," however, "does not expand the scope of coverage," it only "expands the dollar amount of coverage available to compensate for a loss."  *Id*.  The ICSOP policies at issue provide both excess and umbrella coverage.

> (iii) Advertising liability,
> caused by or arising out of each occurrence
> happening anywhere in the world.

Umbrella Policy: Insuring Agreements § I ("Coverage"). Each of the categories is defined. Relevant here, "Property damage" is defined as "loss of or direct damage to or destruction of tangible property." *Id.* Def. 3 ("Property Damage"). The policies identify as indemnifiable losses ("ultimate net loss")

> the total sum which the [County] . . . become[s] obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include . . . expenses for . . . investigators and other persons, and for litigation settlement, adjustment and investigation of claims and suits.

*Id.* Def. 6 ("Ultimate Net Loss"). When relevant losses occur, ICSOP's duty to indemnify arises after the County (or its primary insurer) has paid for the losses or its liability has been fixed by a judgment or a settlement.

ICSOP limited its liability under these policies in two ways. First, in Item 2(a) of the Declarations, the policies cap the amount of coverage they will provide for "each occurrence" at $9 million. Umbrella Policy: Declarations Item 2(a). An "occurrence," the policies elaborate, is

> an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and

> unintentionally results in personal injury,
> property damage or advertising liability
> during the policy period. All such exposure
> to substantially the same general conditions
> existing at or emanating from one premises
> location shall be deemed one occurrence.

Second, ICSOP limits its liability by capping the total, or "aggregate" amount of coverage it will provide, regardless of the number of occurrences. Item 2(b) provides for a $9 million "[l]imit in the aggregate for each annual period where applicable."

In a separate section, entitled "Limit of Liability," the policies provide:

> [ICSOP] shall only be liable for the ultimate
> net loss the excess of either
>> (a) the limits of the underlying insurances
>> as set out in the schedule in respect of
>> each occurrence covered by said
>> underlying insurances;
>> (b) the amount as set out in the
>> declarations as the self-insured retention
>> in respect of each occurrence not covered
>> by said underlying insurances.
>> (hereinafter called the "Underlying
>> Limits"):
> and then only up to a further sum as stated in
> Item 2(a) of the Declarations in all in respect
> of each occurrence – subject to a limit as
> stated in Item 2(b) of the Declarations in the
> aggregate for each annual period during the
> currency of this Policy, separately in respect

> of Products Liability and in respect of
> Personal Injury (fatal or non-fatal) by
> Occupational Disease sustained by any
> employees of the Assured.

Umbrella Policy:  Insuring Agreements § II.  The Limit of Liability provision refers both to Item 2(a), the per occurrence provision, and to Item 2(b), the annual aggregate limit.

The confusion stems from the clause that follows the reference to Item 2(b):  "separately in respect of Products Liability and in respect of Personal Injury . . . by Occupational Disease."  "Personal Injury" is a defined term and is one of the three categories of covered losses. "Products Liability" is also defined in the policies, but it is *not* one of the losses described in the coverage section. Recall that Item 2(b) provided an aggregate limit "*where applicable*."  This policy language gives rise to two, different proposed interpretations of the aggregate limit. Are products liability and personal injury by occupational disease the only categories covered by the aggregate limit?  Or is there a general aggregate limit for covered losses and a separate aggregate limit for products liability and occupational injury?

The answers to these questions lead to two possible degrees of exposure for ICSOP, all depending on whether *property damage* is subject to the annual aggregate limit provision.  If property damage is subject to the annual aggregate limit, then the policy limits operate in the following manner.  For any single occurrence, ICSOP's maximum liability is $9 million.  If there are numerous occurrences (of whatever value) within the same year, ICSOP's maximum liability is also $9 million.  If there are

three or more occurrences across three separate years of a single three-year policy, then ICSOP would have a maximum liability of $27 million under a given policy. As the County had three three-year policies (covering nine years in total), ICSOP claims that its maximum exposure would be $81 million.

By contrast, if property damage is not subject to the annual aggregate limit (and only products liability and occupational injury are), ICSOP's exposure increases significantly. For each occurrence, ICSOP's maximum exposure remains $9 million. But if there were two occurrences in one year, for example, each totaling $9 million, then ICSOP's exposure would be $18 million because there is no annual aggregate limit. Supposing there are eighteen occurrences during the policy period—a number the County has proposed in this case—then ICSOP's liability could be as high as $162 million. Indeed, if there is no annual aggregate limit on liability for property damage, then the County would theoretically have unlimited coverage because a theoretically unlimited number of occurrences could take place during the same year.

The County first sought coverage in 2008, and ICSOP began to make payments under the policies in 2012. By 2021, ICSOP paid the County $9 million for what ICSOP said was a single occurrence and advised the County that $0 remained under the policy for that year. The County continued to maintain that the groundwater contamination giving rise to its liability arose from multiple occurrences, emphasizing that each is subject to a separate limit of $9 million. Further, the County told ICSOP that its investigation and remediation efforts in compliance with the Board's order were ongoing and that it expected millions of dollars in additional costs on the horizon.

C. *The Litigation*

Unable to resolve its differences with ICSOP, the County filed a complaint in November 2021. The County brought three causes of action: first, breach of contract for ICSOP's failure to reimburse beyond $9 million per year, second, breach of the implied covenant of good faith and fair dealing, alleging that ICSOP's delays and denials interfered with the County's right to receive benefits under the policies, and third, declaratory relief. Through this declaratory action, the County asked the court to determine whether "ICSOP is obligated under the ICSOP Policies to pay any further amounts that have been or will be incurred" and to thereby "determine the County's additional rights to coverage under the ICSOP Policies with respect to the alleged groundwater contamination emanating from the Airport."

For the first year of litigation, the number of occurrences, not the aggregate limit, was the central issue. Indeed, in an early request for admission, ICSOP acknowledged that it understood its own policies "not [to] contain any aggregate limits of liability that apply to the Chino Airport Claim." In January 2023, however, ICSOP moved to withdraw this admission. The magistrate judge granted the motion under Federal Rule of Civil Procedure 36(b).[3] *See San Bernardino Cnty. v. Ins. Co. of the State of Pennsylvania,* 2023 WL 2629884, at *4 (C.D. Cal. May 16, 2023). The magistrate determined that this annual aggregate limit issue is one "of mammoth importance," radically altering ICSOP's potential exposure, and he further believed that ICSOP had a strong

---

[3] FRCP 36(b) states that "the court may permit withdrawal or amendment [of an admission] if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits."

Case: 24-6986, 04/23/2026, DktEntry: 61.1, Page 12 of 35
ase 3:25-cv-03281-CRB   Document 65-1   Filed 05/13/26   Page 13 of 4

12 CTY. OF SAN BERNARDINO V. INSURANCE CO. OF THE STATE OF PA

case favoring its preferred interpretation of the provision. *Id.* at \*2. The County sought reversal of the magistrate's withdrawal order before the district court, which the court denied, ruling that the magistrate's decision was not clearly erroneous or contrary to law. *Id.* at \*8–\*9.

ICSOP also sought a declaratory judgment from the district court as to the meaning of the aggregate limit provision for property damage. The district court concluded that the "aggregate provision . . . provides for a general aggregate limit that includes property damage." *Id.* at \*10. The court largely based its decision on the California Court of Appeal's interpretation of a similar policy in *Garamendi v. Mission Insurance Co.*, 31 Cal. Rptr. 3d 395 (Cal. Ct. App. 2005). Echoing *Garamendi*, the district court reasoned that "it would make no sense for an insurance company to operate under the threat of unlimited exposure for covered injuries other than products liability and occupational injury." *San Bernardino Cnty.,* 2023 WL 4291835, at \*9.

In response to a subsequent motion from ICSOP, the district court dismissed altogether the County's declaratory relief claim. *San Bernardino Cnty. v. Ins. Co. of State of Pennsylvania*, 2024 WL 4003162, at \*3–\*4 (C.D. Cal. June 6, 2024). In the court's view, there was no longer any reason "to entertain the County's claim for declaratory relief." *Id.* at \*4. It considered that the County could no longer offer "evidence or argument regarding its damages claim for future policy benefits." *Id.* at \*3. Thus, in its view, the County's claim was nonjusticiable, lacking an "actual controversy," and granting relief would be "speculative and more akin to an advisory opinion." *Id.* at \*3–\*4. Alternatively, the court ruled that even if there were an actual controversy, the court would nevertheless dismiss on discretionary grounds because declaratory relief "serves no

Case: 24-6986, 04/23/2026, DktEntry: 61.1, Page 13 of 35
ase 3:25-cv-03281-CRB    Document 65-1    Filed 05/13/26    Page 14 of 4

CTY. OF SAN BERNARDINO V. INSURANCE CO. OF THE STATE OF PA 13

useful purpose," given that the court had "precluded all evidence of future damages" and therefore had "no record on which to base the requested declaratory relief." *Id.* at \*4.

The parties jointly moved for entry of final judgment on the court's dismissal order under Rule 54(b) of the Federal Rules of Civil Procedure.[4]  The district court granted the motion and stayed the remaining proceedings on the breach of contract and bad faith counts pending the County's appeal. *San Bernardino Cnty. v. Ins. Co. of the State of Pennsylvania,* No. 21-019789 (C.D. Cal. Oct. 25, 2024).

## II.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the County's appeal because the district court entered final judgment on the declaratory relief claim pursuant to Federal Rule of Civil Procedure 54(b), rendering it a "final decision[] of the district court[]."  28 U.S.C. § 1291; *see Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956).

We review questions of law—including those of state law, such as the interpretation of insurance policies—de novo.  *Matter of McLinn*, 739 F.2d 1395, 1398 (9th Cir. 1984).  And we review a district court's decision to decline jurisdiction over a declaratory action for abuse of discretion. *Argonaut Ins. Co. v. St. Francis Med. Ctr.*, 17 F.4th 1276, 1280 (9th Cir. 2021).  Under the abuse of discretion standard, "We first look to whether the trial court identified and applied the correct legal rule to the relief requested.  Second, we look to whether the trial court's resolution of the motion

---

[4] Under Rule 54(b), "[w]hen an action presents more than one claim for relief . . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties" but "only if the court expressly determines that there is no just reason for delay."

resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *See United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

## III. ANALYSIS

The County argues that the district court made two errors: First, the court erred in its reading of the policies' annual aggregate limits provision, and second, it erred in ruling that the County had no basis for declaratory relief after it excluded recovery for future damages. We address each issue.

A. *Whether the ICSOP Policies' Annual Aggregate Limit Provision Applies to the County's Claims for Property Damage*

Because we are sitting in diversity, we begin with the presumption that we will apply the law of California, including its choice of law principles. *See Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1044–45 (9th Cir. 2021). Each of the policies at issue in this case was purchased by the County in San Bernadino and is effective there, and the parties do not dispute that the policies are governed by California law. The Supreme Court of California has summarized California law relative to the interpretation of insurance policies as follows:

> In general, interpretation of an insurance policy is a question of law that is decided under settled rules of contract interpretation. While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. The fundamental goal of contractual

interpretation is to give effect to the mutual intention of the parties. Such intent is to be inferred, if possible, solely from the written provisions of the contract. If contractual language is clear and explicit, it governs. The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation.

A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. A term is not ambiguous merely because the policies do not define it. Nor is it ambiguous because of disagreement concerning the meaning of a phrase, or the fact that a word or phrase isolated from its context is susceptible of more than one meaning. Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract. If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.

*State of Calif. v. Cont'l Ins. Co.*, 281 P.3d 1000, 1004–05 (Cal. 2012) (quotation marks, brackets, and citations

omitted); *see also Yahoo Inc. v. Nat'l Union Fire Ins. Co.*, 519 P.3d 992, 997 (Cal. 2022); *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 84 P.3d 385, 389–90 (Cal. 2004).

California has a generous rule with respect to considering extrinsic evidence in contract disputes. Since its seminal decision in *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." 442 P.2d 641, 644 (Cal. 1968). "Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face. Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." *Morey v. Vannucci*, 75 Cal. Rptr. 2d 573, 578 (Cal. Ct. App. 1998) (citations omitted). In sum, "[e]xtrinsic evidence is thus admissible to interpret the language of a written instrument, as long as such evidence is not used to give the instrument a meaning to which it is not reasonably susceptible." *Id.*

In this case, the parties vigorously contest the meaning of the aggregate limits provisions in the three ICSOP policies. Consistent with California contract law, we will begin with the policies themselves. Although we are persuaded that ICSOP has offered a reasonable reading of the policies, we conclude that the County has also set forth a reasonable reading and, for that reason, the policies are

Case: 24-6986, 04/23/2026, DktEntry: 61.1, Page 17 of 35
ase 3:25-cv-03281-CRB   Document 65-1   Filed 05/13/26   Page 18 of 4

CTY. OF SAN BERNARDINO V. INSURANCE CO. OF THE STATE OF PA 17

ambiguous. We then turn to ICSOP's argument that, irrespective of our view of the policies, the California Court of Appeal's decision in *Garamendi* is both persuasive and binding on this court. Concluding that *Garamendi* does not bind our judgment, and in light of the ambiguity in the policies, we will consider extrinsic evidence of the meaning of the policies.

 1.   Reading the policies

We previously set forth briefly (in Part I.B) the relevant provisions in the policies, the parties' differing interpretations, and the resulting confusion. Let us begin with what is clear. First, ICSOP's policies set forth three categories of claims that are covered: personal injury, property damage, and advertising liability. Second, for any single "occurrence" in any of those three categories, Item 2(a) in the Declaration limits ICSOP's coverage to $9 million. Third, Item 2(b) sets an annual aggregate limit on ICSOP's coverage of $9 million "where applicable." Fourth, the "Limit of Liability" section refers back to both Item 2(a) and Item 2(b) and states that ICSOP will pay "only up to a further sum as stated in Item 2(a) in the Declarations in all in respect of each occurrence – subject to a limit as stated in Item 2(b) of the Declarations in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and in respect of Personal Injury . . . by Occupational Disease." Let us now consider how the parties attempt to harmonize these provisions.

*ICSOP's reading*. ICSOP argued, and the district court agreed, that the policies created three separate annual aggregate limits: (1) an annual aggregate limit of $9 million for personal injuries (a covered category), but only if the injury results from occupational disease; (2) an annual

aggregate limit of $9 million for products liability (which is a fourth category of liability not listed in the coverage section); and (3) an annual aggregate limit of $9 million for all other covered claims, including personal injuries not the result of occupational disease, property damage, and advertising liability.

ICSOP thus reads Item 2(b) as establishing a general aggregate limit of $9 million and the "separately" clause in the Limit on Liability section as imposing an aggregate limit on a subset of personal injury (occupational injury) and on an entirely new category of covered injury (products liability).    Under ICSOP's theory, the term "where applicable" in Item 2(b) means the annual aggregate limit is generally applicable, except where the policies expressly state otherwise.  ICSOP's reading of the policies is plausible.

*The County's reading*.   On the other hand, the County offers a somewhat simpler reading.  It reads the aggregate limit as applying to products liability and occupational personal injury only.  For the County, Item 2(b) indicates from the outset that the annual aggregate limit applies only "where applicable," meaning it applies only for specified coverages. And when the Limit of Liability provision refers back to Item 2(b) and names occupational injury and products liability, it triggers the "where applicable" language.  It observes that that the policies could very easily have made the annual aggregate limit applicable to property damage by simply naming it.  The County's reading is also plausible.

Neither ICSOP's reading nor the County's reading is implausible, but neither is obvious nor compelling.[5] The two critical terms here are "where applicable" and "separately." We think that the better reading of "separately" is ICSOP's: The phrase it introduces means "separate from the annual aggregate limit on covered injuries, the policy will also cover up to an additional $9 million per year for products liability and occupational personal injuries." But at the same time, we also conclude that the County has the stronger reading of "where applicable." That phrase strongly suggests that the annual aggregate limit may or may not be applicable, and that the policies will identify elsewhere what is subject to that cap—here, by expressly naming products liability and personal injuries caused by occupational disease. We think it obvious that these readings are inconsistent, and that leaves us in equipoise with three poorly drafted, ambiguous policies. *See Unigard Mut. Ins. Co. v. Abbott*, 732 F.2d 1414, 1418 (9th Cir. 1984) (suggesting that a "separately" clause in a form insurance policy was "[a]t the very least . . . an ambiguity"); *see also Cnty. of San Diego v. Ace Prop. & Cas. Ins. Co.*, 118 P.3d 607, 618 (Cal. 2005) ("Our standard for declaring ambiguity in insurance policy language is . . . language capable of two or more constructions, both of

---

[5] And neither theory can account for certain anomalies in the policies. Why, for example, does products liability not appear in the "Coverage" section as a covered injury, but it shows up in the "Limit of Liability" section as a new category of injury subject to an annual aggregate limit? In other words, the "Limit of Liability" section apparently expands the scope of ICSOP's liability under the policies beyond what the policies said was covered. As products liability is not at issue here, we will leave the point unanswered, noting it only because it adds to the general confusion as to what the policies mean.

20 CTY. OF SAN BERNARDINO V. INSURANCE CO. OF THE STATE OF PA

which are reasonable . . . ." (quotation marks and citation omitted)).

### 2. *Garamendi*

ICSOP, like the district court, rests much of its argument on the California Court of Appeal's decision in *Garamendi*. There, the court interpreted an aggregate limit provision very similar to the one at issue here and concluded that the best reading of the policy was that there was a general aggregate limit. *Garamendi* is the principal case in California, but there is a prior decision we should consider as well—one that *Garamendi* also addressed—the Washington Supreme Court's decision in *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115 (Wash. 2000).

*Weyerhaeuser*. The Weyerhaeuser Company was responsible for cleaning up hazardous waste at 130 sites nationwide. Its potential liability was in the hundreds of millions of dollars. In 1970, Weyerhaeuser purchased an excess policy issued by a predecessor to Commercial Union Insurance.[6] Commercial Union claimed that its liability was limited to an aggregate of $1.5 million; Weyerhaeuser claimed that the aggregate applied only to products liability and personal injury and did not apply to property damage. *Weyerhaeuser*, 15 P.3d at 120–21. The provision in question

---

[6] Ironically, one of the policies Weyerhaeuser stacked above the Commercial Union policy was issued by ICSOP. That policy corrected the ambiguity we have identified here. The relevant provision specified an aggregate limit for property damage: "In any one Policy year in respect of *Property Damage* (other than Automobile Property Damage Liability), Products Liability, and Occupational Disease." *Weyerhaeuser*, 15 P.3d at 144 (emphasis added).

Case: 24-6986, 04/23/2026, DktEntry: 61.1, Page 21 of 35
ase 3:25-cv-03281-CRB   Document 65-1   Filed 05/13/26   Page 22 of 4

CTY. OF SAN BERNARDINO V. INSURANCE CO. OF THE STATE OF PA 21

was very similar to the Limit of Liability provision at issue here:

> $[500,000] ultimate net loss in respect of each occurrence, but
> $[500,000] in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability and separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.

*Id.* at 122–23.[7]  The court rejected Commercial Union's reading of the provision and held that "there is no ambiguity in this policy and that if [Commercial Union] had intended to place an aggregate limit on property damage it would have said so." *Id.* at 123.[8]  Four justices dissented.  They disputed the majority's conclusion that the policy was unambiguous. *Id.* at 142 (Talmadge, J., dissenting) ("the language in the Commercial Union policy is not a picture of clarity").  The dissenters thus suggested that because "the policy language is ambiguous," the court should have resorted to other interpretive tools. *Id.* at 142–43.  The dissent then looked to the fact that Weyerhaeuser had stacked additional excess policies "*above* the Commercial Union coverage." *Id*. at 143 (emphasis in original).  In such a context, "[i]t would be

---

[7] We note that one difference between the ICSOP policies and the Commercial Union policy is that there is no comma following "Policy," setting off the "separately" clause in the Commercial Union policy.

[8] *Weyerhaeuser* was followed in *Cadet Mfg Co. v. Am. Ins. Co.*, 391 F. Supp. 2d 884 (W.D. Wash. 2005).

absurd . . . to construe the Commercial Union policy to provide unlimited property damage coverage." *Id.*

*Garamendi.* The California Court of Appeal reached the opposite conclusion in *Garamendi.* That case involved a dispute over an aggregate limit provision in a policy that dated to the mid-1980s. The facts are complex. Industrial Trucking Service Corp. (ITSC) was the successor in interest of an entity insured by Mission Insurance. The Mission policy was a secondary excess policy, triggered only after the limits of the primary policy and excess policies had been exhausted. ITSC became liable to clean up waste dumped on a site in New Jersey between 1951 and 1985. It settled the claims and then sought indemnity from the various insurance companies. In the meantime, Mission had become insolvent, and Garamendi, the Insurance Commissioner for California, stepped into Mission's shoes. ITSC sought indemnity from Garamendi for the damages ITSC had paid for dumping that occurred in 1985. Garamendi denied full payment on the grounds that the Mission policy did not kick in because Mission was not obligated to pay anything until the underlying excess policy was exhausted, and that policy also had an aggregated annual limit for products liability and personal injury, but not for property damage. Garamendi reasoned that because the underlying excess policy did not have a limit, excess coverage under the Mission policy never triggered. 31 Cal. Rptr. 3d at 405–06.

Like the ICSOP provisions at issue in this case, the Mission policy covered three categories of injury: personal injury, property damage, and advertising liability. And like the ICSOP policies, a limitation on liability provision recited that Mission was only obligated to pay "[$1 million] . . . in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability and in

respect of [Occupational Injury]." *Id.* at 405 (emphasis omitted).[9] The parties disputed whether this provision meant there was "a single $1 million excess primary aggregate limit for each annual period during the currency of the policy for all the different types of covered claims, even though the provision only specifically mentioned products liability and occupational injury." *Id.* at 401.

Garamendi argued that the annual aggregate limit did not apply "because it refers specifically only to products liability and occupational injury claims, and the claim at issue [wa]s a real property damage claim." *Id*. at 405–06. ITCS contended that the aggregate limit did not "exist[] only for products liability and occupational injury," but that there was a general aggregate limit and a "separate" limit for those two categories of claims. *Id*. at 406 (emphasis omitted).

The California Court of Appeal addressed the Washington Supreme Court's decision in *Weyerhaeuser* and thought "the views expressed by the dissent are more in line with California law." *Id.* at 408. Like the dissent, it thought the provision was "not just ambiguous, but nearly incoherent." *Id*. And it stated that when a provision is ambiguous, courts should first attempt to opt for the "more reasonable interpretation[]" and then, if it can yield no reasonable reading, proceed to "interpret the ambiguous provision against the insurer." *Id*. at 404. Applying both of these principles, the court disagreed with Garamendi, viewing ITCS's position as "more reasonable—or at least less wholly irrational." *Id*. at 408. That conclusion also had

---

[9] We note that the Mission policy, like the policy at issue in *Weyerhaeuser*, also omits a comma after the word "Policy." The ICSOP polices in our case have a comma following "Policy."

Case: 24-6986, 04/23/2026, DktEntry: 61.1, Page 24 of 35
ase 3:25-cv-03281-CRB   Document 65-1   Filed 05/13/26   Page 25 of 4

24 CTY. OF SAN BERNARDINO V. INSURANCE CO. OF THE STATE OF PA

the effect of construing the policy against the nominal insurer, Garamendi. *Id.* at 409.[10]

ICSOP argues that *Garamendi* resolves this case in its favor because "[t]he same policy language has been judicially construed to impose a general aggregate limit, and this judicial construction must be read into the ICSOP policies to render them unambiguous as a matter of law." ICSOP argues that once a policy's terms have been construed by a court, they are no longer ambiguous. Although this principle of judicial construction is sometimes expressed in broad terms, *see, e.g. Ace Prop. & Cas. Ins. Co.*, 118 P.3d at 618; *see also Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1161 (S.D. Cal. 2022), California courts have also recognized that prior courts' constructions of policy language must be treated "with caution." *Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London*, 73 Cal. Rptr. 3d 770, 782–83 (Cal. Ct. App. 2008) (citation omitted). There are two limitations on this interpretive principle relevant to our case.

First, a provision that is ambiguous does not become unambiguous once a court construes it, except as to those policies entered into after the decision. Because the most important question of intent is "at the time the contract is formed," a post-contract judicial decision "could not have informed the parties' understanding" of the policy. *London Mkt. Insurers v. Superior Ct.*, 53 Cal. Rptr. 3d 154, 168 (Cal. Ct. App. 2007) (emphasis omitted); *see also Qualcomm*, 73 Cal. Rptr. 3d at 782–83. As one of the leading commentaries explains: "The judicial construction placed on particular words or phrases made *prior to the issuance of a policy*

---

[10] *Garamendi* was followed in *Evanston Ins. Co. v. Roman Catholic Bishop of Orange*, 759 F. Supp. 3d 1019 (C.D. Cal. 2024).

Case: 24-6986, 04/23/2026, DktEntry: 61.1, Page 25 of 35
ase 3:25-cv-03281-CRB   Document 65-1   Filed 05/13/26   Page 26 of 4

CTY. OF SAN BERNARDINO V. INSURANCE CO. OF THE STATE OF PA 25

employing them will be presumed to have been the construction intended to be adopted by the parties." 2 *Couch on Ins.* § 22:40 (3d ed. 2025) (emphasis added); *accord Bartlome v. State Farm Fire & Cas. Co.*, 256 Cal. Rptr. 719, 721 (Cal. Ct. App. 1989) (citing Couch's explanation of the judicial construction canon). A court's decision as to what an ambiguous term means may bind subsequent courts construing the same term in post-decision policies, but for policies entered into prior to or contemporaneously with the policy construed by the court, whether or not to apply the court's decision is an application of the ordinary rules of *stare decisis*. In our case, ICSOP's policies date to the 1960s and 70s, while *Garamendi* was decided decades later in 2005. We cannot retroactively apply *Garamendi*'s construction to ICSOP's policies under this canon.

Second, before a court concludes that a prior judicial construction renders an ambiguous provision unambiguous as a matter of law, it must "determine whether the context in which the construed term appears is analogous to the context of the term before it." *Qualcomm*, 73 Cal. Rptr. 3d at 783 (citation modified). There are important factual differences between our case and *Garamendi*. The policy in *Garamendi* provided excess coverage, and the insured had stacked policies, meaning that it had more than one excess policy. The policy at issue in *Garamendi* was triggered by the exhaustion of the limits in the underlying excess policy. In *Garamendi*, the insurance commissioner, having succeeded to the Mission policy, claimed that the underlying policy had no policy limits—which meant that the Mission policy, as an excess policy, would never be triggered; it covered nothing. In the commissioner's telling, the Mission policy was an empty act. The *Garamendi* court disagreed and construed the Mission policy against Mission and the commissioner.

By contrast, the ICSOP policies are both excess and umbrella, and the County sought coverage under the umbrella portion of the policies. When functioning as umbrella coverage, the ICSOP policies are operating on a "stand-alone" basis. 1 *New Appleman on Insurance* § 1.06. Distinct from the claims brought under the Mission policy in *Garamendi*, there is no underlying insurer that covered any of the County's claims that it brought under ICSOP's policies. Thus, the dynamics between the County and ICSOP are quite different from the dynamics at play in *Garamendi*. As an important result of these differences, by ruling that the underlying coverage had an aggregate limit, thereby requiring coverage under the Mission policy, the *Garamendi* court's construction favored the *insured*. But in our case, by limiting coverage in the aggregate, that same construction would favor the *insurer*—which would put our interpretation in tension with general principles of California law favoring resolution of ambiguous provisions for the insured. *See Cont'l Ins. Co.*, 281 P.3d at 1004–05.

We also observe, as another important difference between the *Garamendi* Court's decision and the case before us, that *Garamendi* did not consider the impact of the "where applicable" phrase. In California, insurance contracts must be read as a whole. *See Powerine Oil Co. v. Superior Ct.*, 118 P.3d 589, 598 (Cal. 2005). Although the policies in both our case and *Garamendi* are standard form contracts, *see* 31 Cal. Rptr. 3d at 409, such contracts can have different provisions. Thus, we are not willing to assume that the *Garamendi* court would come to the same conclusion in this case, where we must consider provisions in the policies that were not—either because they were not in the contract or the parties failed to raise the issue—actually litigated in *Garamendi*.

Case: 24-6986, 04/23/2026, DktEntry: 61.1, Page 27 of 35
Case 3:25-cv-03281-CRB   Document 65-1   Filed 05/13/26   Page 28 of 4

CTY. OF SAN BERNARDINO V. INSURANCE CO. OF THE STATE OF PA 27

For these reasons, we do not accept *Garamendi* as a binding judicial construction. We do, however, agree in full with the court's observation that the language at issue is "not just ambiguous, but nearly incoherent." 31 Cal. Rptr. 3d at 408. In turn, we also fundamentally disagree with *Weyerhaeuser*—whose construction would favor the County—that the policies in these cases are unambiguous. Because we decline to accept *Garamendi* as binding in this case, and because we find that ICSOP's policies are ambiguous, we turn now to extrinsic evidence to aid our interpretation.

### 3. The extrinsic evidence

As we set out above, in California, when "the meaning of the words used in a contract is disputed," the court must "provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning." *Wolf v. Superior Ct.*, 8 Cal. Rptr. 3d 649, 655 (Cal. Ct. App. 2004); *see also Garcia v. Truck Ins. Exch.*, 682 P.2d 1100, 1104 (Cal. 1984).

The parties have not offered us any direct evidence of negotiations or communications between the parties contemporaneous with the issuing of these policies in 1966, 1969, or 1972. Rather, the County asks us to consider two categories of extrinsic evidence. First, it points out that these policies followed the standard form Commercial General Liability (CGL) policies issued by the insurance industry in the 1960s and asks us to consider the history of such form contracts; specifically, the well-documented fact that many of those contracts contained no aggregate limits, which had disastrous results for the industry. Second, the County proffers more recent ICSOP documents—in which ICSOP's personnel, including legal counsel, took the position that

there was no aggregate limit in these policies—as evidence of the meaning of the aggregate limits provision.

*Standard form CGL policies.*   The district court concluded that the policies "unambiguously include a general aggregate limit, which includes a limit on property damage." *San Bernardino Cnty.*, 2023 WL 4291835, at *10. The court reasoned that "it would make no sense for an insurance company to operate under the threat of unlimited exposure for covered injuries other than products liability and occupational injury." *Id*. at *9.   *Garamendi* had similarly reasoned.  31 Cal. Rptr. at 410 ("[I]t is even harder to imagine that Mission would design a policy under which it could be liable for up to $5 million per claim or occurrence for an unlimited number of occurrences.").   There is much common sense in the district court's observation about insurance companies' incentives to limit their liability. Nevertheless, the court's *reductio ad absurdum* reasoning is a standard for business judgment, not a canon of interpretation.  We know of no rule of contract construction that imputes post-hoc rationality to the parties.  Things get overlooked all the time.  We have to deal with the policies as written, not as we would have written them.

More importantly, we think the district court's presupposition about rational insurance policy drafting is inconsistent with the historical record the County asks us to consider.  The policies in question here are CGL policies, which date to the 1940s, with revised standard form policies issued in 1943, 1947, 1955, 1966, 1973, and 1986. *See* Jeffrey W. Stempel, *Assessing the Coverage Carnage: Asbestos Liability and Insurance After Three Decades of Dispute*, 12 Conn. Ins. L.J. 349, 355 (2006).  In 1966—the same year the first of ICSOP's three polices issued in this case—the standard forms underwent a significant change in

terminology, from insuring against "accidents" to insuring "occurrences." *See* 3 *New Appleman on Insurance* § 16.02[3][a][iv] (2025); Jeffrey W. Stempel, 2 *Stempel on Insurance Contracts* § 14.01[A][2] (3rd ed. 2006 & Supp. 2019). At the time, the per occurrences provision was the industry's focus and was thought to be the principal means of limiting its liability; the aggregate limit was an overlooked backstop. As one commentator recounts, such CGL policies had

> an "aggregate limit" establishing the insurer's maximum liability no matter how many occurrences, claims or injuries may arise from a policyholder's activity during the policy period. However, aggregate limits were not the norm for general liability claims until the 1986 [Insurance Service Organization] revision of the standard CGL policy form. Prior to this point, many if not most insurers included an aggregate limit for claims arising from a "products" or "completed operations" hazard . . . *but had no aggregate limit for general liability claims* that arose out of a policyholder's ongoing operations rather than from sale or distribution of a product or the failings of a completed project causing injury at a later date.

Stempel, 12 Conn. Ins. L.J. at 376 (emphasis added).

The CGL policies did not anticipate the advent of environmental and, especially, asbestos-related tort litigation. The "resulting cascade of liability" exposed

insurers to unlimited aggregate liability and triggered a crisis in the insurance industry. Jeffrey W. Stempel, *The Insurance Policy as Social Instrument and Social Institution*, 51 Wm. & Mary L. Rev. 1489, 1565 (2010); *See MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1216 (Cal. 2003) (noting that a pollution exclusion in the policy "was adopted to address the enormous potential liability resulting from anti-pollution laws enacted between 1966 and 1980"). A 1986 report to Congress from the General Accounting Office found that many insurers were subject to "'open-ended' risks" as a result of "the earlier occurrences-based form's lack of an aggregated policy limit." Gen. Accounting Off., *Liability Insurance: Changes in Policies Set Limits on Risks to Insurers* 7–8 (1986). As the report found, "[w]hile the previous CGL occurrence-based form included limits per individual occurrence for CGL risks, it applied aggregate policy limits of liability only to risks involving bodily injury and property damage arising from products and completed operations. It did not place aggregate limits on the other types of risks . . ." *Id.* at 17; *see, e.g.*, *Bondex Int'l, Inc. v. Hartford Acc. & Indem. Co.*, 667 F.3d 669, 681–82 (6th Cir. 2011) (noting, in an asbestos case, an instance where the policy set no aggregate limits on certain classes of liability); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1186 & n.3 (2d Cir. 1995) (noting that standard form CGL policies did not anticipate the kinds of injuries that would result from asbestos claims); *Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440, 468 (N.J. Super. Ct. App. 1992) ("[T]he excess policies do not contain an aggregate limit. Diamond has coverage under the excess policies up to the per occurrence limits for an unlimited number of occurrences during the three year policy period."); *Employers Reinsurance Co. v. Superior Court*, 74

Cal. Rptr. 3d at 733, 737–38 (Cal. Ct. App. 2008) (noting, in an asbestos case, that the "policies' aggregate limits of liability apply to products claims but not non-products claims. In other words, non-products claims would not exhaust a policy."); *In re ACandS, Inc.*, 297 B.R. 395, 398 (Bankr. D. Del. 2003) (noting, in an asbestos case, that "[t]he stakes in those coverage disputes are high. Although Travelers' policies . . . contain a \$1 million per occurrence limit, there is no aggregate limit for non-product liability claims. Travelers' potential liability under the policies may exceed \$1 billion.")

These observations have been made by other commentors as well, including in the American Law Institute's *Restatement of the Law of Liability Insurance*. *See* ALI, *Rest. of the Law of Liab. Ins.* § 37(3) (2019) ("[A]n insurance policy may have an aggregate limit that applies to all claims covered by the policy or it may have one or more aggregate limits that apply only to a defined set of claims. Not all liability insurance policies contain an aggregate limit."); *id.* cmt. B ("[F]or much of the 20th century it was common for commercial general-liability policies to have an aggregate limit for products-liability claims but not for other kinds of claims."); 3 *New Appleman on Insurance*, § 16.09[3][a][iii] ("Some policies may only contain aggregate limits of liability for specific claims, but do not cap the aggregate limits for all other claims." (footnote omitted)); John H. Mathias, et al., *Insurance Coverage Disputes* § 1.01 (2026) ("[G]eneral liability policies issued in the 1960s and 1970s frequently provided aggregate limits of liability with respect to products/completed operations claims, but provided per occurrence limits without aggregate limits with respect to other types of property damage and bodily injury claims."); Jeffrey W. Stempel, *Stempel on*

Case: 24-6986, 04/23/2026, DktEntry: 61.1, Page 32 of 35
ase 3:25-cv-03281-CRB Document 65-1 Filed 05/13/26 Page 33 of 4

32 CTY. OF SAN BERNARDINO V. INSURANCE CO. OF THE STATE OF PA

*Insurance Contracts* § 14.01[A][2] ("Today, most occurrence basis CGL policies also provide an 'aggregate limit' for all claims, which sets forth the maximum amount of the CGL insurer's liability irrespective of the number of occurrences. However, aggregate limits for general liability claims did not become part of the standard ISO form until 1986."); Lester Brickman, *On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality*, 31 Pepp. L. Rev. 33, 55 (2004) ("It would later become known that a number of insurance companies had issued comprehensive general liability insurance to asbestos product manufacturers . . . that included per person or per occurrence limits but did not set aggregate policy limits, thus exposing these insurers to virtually unlimited liability, in the billions of dollars." (footnote omitted)).

This history helps explain why the district court's reasoning is built on a flawed premise. Policies from the 1960s sometimes did not contain a general aggregate limit, only separate limits for enumerated claims. We caution, however, that although this history tells us that there were holes in aggregate limits in some standard form policies, it does not tell us anything conclusive about these particular policies.

*ICSOP's understanding of the policies.* The County has also directed us to several documents obtained from ICSOP that show that ICSOP employees evaluating these policies reported that they contained no annual aggregate limit. There are four such documents. The first, prepared in October 2012, is a memorandum entitled "Request for Payment Authority." It requests authority to pay sums

exceeding \$5 million for costs associated with the Chino Airport. The memorandum states:

> The insured, County of San Bernardino . . . tendered notice under three consecutive umbrella policies spanning nine years of coverage from 1966 through 1975. The policies have non-annualized per occurrence limits of \$9M per policy term and Prior Insurance Non-Cumulation provisions. There are no applicable aggregate limits.

The second document is dated April 2014 and is a memorandum to the file in connection with the three policies and the claims arising out of the activities at Chino Airport. The memorandum notes:

> With regard to the aggregate limit, the Limit on the Declarations page indicated as "aggregate for each annual period" is qualified by the phrase "where applicable." The Limits provision in the Insuring Agreement states that the annual aggregate is provided "separately in respect to" Products Liability and Personal Injury for Occupational Disease. No aggregate limit applies to premises liability losses, such as

> these, for which is only an occurrence limit,
> which is not annualized.

The third is a Report to Reinsurer, dated September 2014. It states:

> Based on the language of the policy and the advice of counsel, it is ICSOP's position that its coverage is subject to a single limit per occurrence. The foregoing position is predicated on the following: (1) aggregate limits are annualized, but no aggregate limit applies to premises liability losses such as this, which there is only an occurrence limit which is not annualized; . . . .

Finally, in a loss-run document summarizing the claims made under the policies, the document recites "NO GA LIMIT," meaning "no general aggregate limit."

These documents provide an interesting window into the internal workings at ICSOP. We need not explore the weight of this evidence. At the very least, what they demonstrate is that reasonable people—including employees at ICSOP—could read these policies as the County has. *See Glenfed Dev. Corp. v. Superior Ct.*, 62 Cal. Rptr. 2d 195, 197–98 (Cal. Ct. App. 1997) (finding that a claims manual was admissible as extrinsic evidence to "show how [the insurer] understood and intended to apply the standard language used in its CGL policies"); *see also N. Counties Eng'g, Inc. v. State Farm Gen. Ins. Co.*, 169 Cal. Rptr. 3d. 726, 742 (Cal. Ct. App. 2014) (accepting testimony of claims personnel as extrinsic evidence of the insurer's duty to defend). The extrinsic evidence thus reinforces our conviction that the

policies are ambiguous and not susceptible to only one reasonable interpretation.

* * *

In the end analysis, we remain persuaded that the polices are genuinely ambiguous. At this junction, having exhausted other interpretive tools, we have to look to the well-established canon that when there are "doubts, uncertainties and ambiguities arising out of policy language," insurance policies "ordinarily should be resolved in favor of the insured." *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 718 P.2d 920, 924 (Cal. 1986). This was a standard form policy, drafted in an era when the industry did not anticipate the consequences of not specifying the aggregate limits for umbrella and excess policies. We conclude that these policies do not specify an aggregate limit for property damage.

B. *The County's Declaratory Relief Claim*

In light of our conclusion, the district court will need to reconsider the County's request for declaratory relief.

## IV.   CONCLUSION

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

### Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate electronic filing system or, if you are a pro se litigant or an attorney with an exemption from the electronic filing requirement, file one original motion on paper.

**Petition for Panel Rehearing and Petition for Rehearing En Banc (Fed. R. App. P. 40; 9th Cir. R. 40-1 to 40-4)**

**(1) Purpose**

**A. Panel Rehearing:**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ➤ A material point of fact or law was overlooked in the decision;
  - ➤ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ➤ An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B. Rehearing En Banc**
- A party should seek en banc rehearing only if one or more of the following grounds exist:
  - ➤ Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
  - ➤ The proceeding involves a question of exceptional importance; or

> ➢ The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

## (2) Deadlines for Filing:

- A petition for rehearing or rehearing en banc must be filed within 14 days after entry of judgment. Fed. R. App. P. 40(d).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(d). The deadlines for seeking reconsideration of a non-dispositive order are set forth in 9th Cir. R. 27-10(a)(2).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- See Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-4.

## (3) Statement of Counsel

- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.

## (4) Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))

- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

2

Post Judgment Form - Rev. 8/2025

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms*.
- Attorneys must file the petition electronically via the appellate electronic filing system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms*.

**Attorneys Fees**
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-8000.

**Petition for a Writ of Certiorari**
- The petition must be filed with the Supreme Court, not this Court. Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov.

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send a letter **in writing within 10 days** to:
  - ➤ Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Maria Evangelista, maria.b.evangelista@tr.com);
  - ➤ **and** electronically file a copy of the letter via the appellate electronic filing system by using the Correspondence filing category, or if you are an attorney exempted from electronic filing, mail the Court one copy of the letter.

3

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 10. Bill of Costs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form10instructions.pdf*

**9th Cir. Case Number(s)**

**Case Name**

Name of party/parties requesting costs to be taxed:

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                    **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee / Appeal from Bankruptcy Appellate Panel Docket Fee/Appeal from District Court filing portion of fee ($5) | | | | $ |
| | | | **TOTAL:** | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

**Form 10**        *Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*        *Rev. 12/01/2025*